THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SANDRA L. VALENTINO and WILLIAM P. BRAMANTI, <br><br> Plaintiffs, <br><br> v. <br><br> VILLAGE OF SOUTH CHICAGO HEIGHTS, PAUL PETERSON, and MAYOR DAVID OWEN, in their official and individual capacity, <br><br> Defendants. | No. 04 C 2373 <br><br> Honorable Judge William J. Hibbler |

**PLAINTIFFS' ADDITIONAL STATEMENT OF FACTS IN SUPPORT OF PLAINTIFFS' RESPONSES TO ALL DEFENDANTS' <u>MOTIONS FOR SUMMARY JUDGMENT</u>**

Pursuant to Local Rule 56.1(b), Plaintiffs SANDRA L. VALENTINO and WILLIAM P. BRAMANTI, states the following additional facts in opposition to all Defendants' Motions for Summary Judgment:

### I. Introduction

1. Plaintiffs Sandra Valentino and William ("Bill") Bramanti bring this action to redress the retaliatory acts of Defendants in response to Defendants' belief that Plaintiffs did and would expose Defendants' ghost pay rolling practices, fraud, and other illegal and unlawful conduct, including violations of Plaintiffs' First Amendment rights as protected under the United States Constitution for speaking out about matters of public concern (Count III); retaliatory discharge against Plaintiff Valentino in violation of public policy under Illinois law (Count I); defamation and slander against Plaintiff Bramanti for speaking out about Defendants' ghost pay rolling practices (Count II).

### II. The Parties

2. Plaintiff Sandra Valentino was employed by the Village of South Chicago Heights ("Village") from in or about 1989 to March 3, 2003. Plaintiff Valentino was terminated on March 3, 2003. (Valentino Dep. at 60, 233-235, Defs.' Ex. C.)[1]

---

[1] References herein to "Defs.' Ex." (A, B, C, etc.) refer to exhibits filed by Defendants Owen and Peterson in support of Defendants Owen and Peterson's Statement of Facts. Plaintiffs have incorporated those exhibits herein rather than filing duplicate deposition transcripts.

3. Plaintiff William Bramanti was employed by the Village of South Chicago Heights from June 1993 to September 2001. (Bramanti Dep. at 22, 34, Defs.' Ex. B.)

4. In September 2001, Plaintiff Bramanti resigned from his position with the Village of South Chicago Heights because he had concerns about Mayor David Owen hiring his own family members for positions that were unnecessary or at a higher salary rate than budgeted for and as a result of the Mayor's family members "not working for the money they were getting paid." (Bramanti Dep. at 77-78, Defs.' Ex. B.)

5. Defendant Mayor Owen became the Mayor of the Village of South Chicago Heights in 1989 and has held that position through the present. The position of Mayor for the Village is part-time. (Owen Dep. at 16-17, Defs.' Ex. F.)

6. Defendant Paul Peterson, who is the brother-in-law to Defendant Owen, holds the position of Village Administrator, and he held the position of Office Manager from 1989-1990 until he was appointed Village Administrator. (Peterson 30(b)(6) Dep. at 19-20, Defs.' Ex. D.)

7. Eric Faoro is the son-in-law of Defendant Mayor David Owen, and the husband to April Faoro (Owen). During all relevant times, Eric Faoro worked for the Village of South Chicago Heights. (Peterson 30(b)(6) Dep. at 21, 186-187, Defs.' Ex. D.)

8. April Faoro (Owen) is the daughter of Defendant David Owen and the niece of Defendant Peterson. During all relevant times, April Faoro worked for the Village of South Chicago Heights. (Peterson 30(b)(6) Dep. at 21-23, Defs.' Ex. D.)

9. Scott Owen is the son of Defendant Owen and the nephew of Defendant Peterson. During all relevant times, Scott Owen worked for the Village of South Chicago Heights. (Peterson 30(b)(6) Dep. at 21, 70, Defs.' Ex. D.)

10. Erika Owen is the daughter of Defendant Owen and the niece of Defendant Peterson. During all relevant times, Erica Owen works for the Village of South Chicago Heights. (Peterson 30(b)(6) Dep. at 21, 37, Defs.' Ex. D.)

11. Yvette Owen is the daughter to Defendant Owen and the niece of Defendant Peterson. During all relevant times, Yvette Owen works for the Village of South Chicago Heights. (Peterson 30(b)(6) Dep. at 21, 37, Defs.' Ex. D.)

12. Defendant Mayor Owen had final policy making authority as to the termination of employees from the Village Hall. (Owen Dep. at 18-20, Defs.' Ex. F; Peterson Dep. at 84, Defs.' Ex. E; Fiorenzo Dep. at 148, Ex. 1.)

13. Defendant Mayor Owen delegated Defendant Peterson with final policy making authority with respect to the termination of employees. (Owen Dep. at 18-20, Defs.' Ex. F; Peterson Dep. at 84, Defs.' Ex. E; Fiorenzo Dep. at 148, Ex. 1.)

14. The Village Board of Trustees is not the final policy making authority with respect to the termination of employees for the Village. Former Trustee Terry Fiorenzo testified that the Board of Trustees cannot hire or fire. This can only be done by Mayor Owen or Paul Peterson, to whom he has delegated final policy making authority. (Owen Dep. at 18-20, Defs.' Ex. F; Peterson Dep. at 84, Defs.' Ex. E; Fiorenzo Dep. at 148, Ex. 1.)

### III. Defendants' History of Being Accused of Fraud

15. When Terry Fiorenzo was a Village Trustee (from April 1989 to 1997), he was aware of facts and circumstances that led him to believe that Defendants Owen and Peterson were engaging in fraud and mismanagement of public funds. (Fiorenzo Dep. at 19, 69, Ex. 1.)

16. Terry Fiorenzo and others found that Defendants Mayor Owen and Paul Peterson were using "secret" checks, not disclosed to the Village Board of Trustees, to pay for personal expenses and expenses that had not been authorized by the Village Board. (Fiorenzo Dep. at 35-36., Ex. 1.)

17. For example, Paul Peterson admitted that he and Defendant Mayor Owen had used the Village credit card for personal expenses, for such things nylon stockings for his daughter, among other things. (Peterson 30(b)(6) Dep. at 82, Defs.' Ex. D; Fiorenzo Dep. at 35-36, 69-70, 143-145, Ex. 1.)

18. Terry Fiorenzo also testified that he was aware that certain people that were supposed to be on salary were getting two checks when they were only supposed to received one, including Paul Peterson. (Fiorenzo Page 73-74, Ex. 1.)

19. Terry Fiorenzo went to the FBI regarding the "secret checks" and the FBI was investigating the matter. (Fiorenzo Dep. at 35-36, Ex. 1.)

20. Terry Fiorenzo also spoke with the State's Attorney about the "secret checks" and fraud he believed was occurring in the Village. It was relayed to Terry Fiorenzo that the secret checks and things he reported constitute "fraud by deception." (Fiorenzo Dep. at 69-70, Ex. 1.)

21. After Terry Fiorenzo went to the FBI and the FBI was investigating the matter of the "secret checks" and misuse of public funds, Defendant David Owen held private meetings in his gazebo where he pleaded with the Trustees to approve of the "secret checks" at the advice of Robert Bush (Village attorney) even after the "secret checks" were over two-and-a-half years old. (Fiorenzo Dep. at 143-145, Ex. 1.)

22. Defendant Owen had requested them to approve the "secret checks" in order to save himself. (Fiorenzo Dep. at 143-145, Ex. 1.)

23. In or about January 2002, Bill Bramanti had a meeting with Defendant Paul Peterson and Joe Christophenelli. Prior to this meeting, several trustees had approached Bramanti about coming back to work for the Village. In this meeting with Peterson, Bramanti told him that he was

not going to come back to work for Owen because of he could not work with such dishonesty; that he was not going to go to jail for them. (Bramanti Aff. Ex. 32.)

### IV.     Joe Minotti

24.     In or about November 2001, Defendant South Chicago Heights hired Joe Minotti and told Plaintiff Valentino that he was hired because he was the "vote getter." (Valentino Dep. at 180, Defs.' Ex. C; Owen Dep. at 48-50, Defs.' Ex. F.)

25.     Minotti engaged in what plaintiff believed were fraudulent practices and failed to perform his duties in shutting off people's water for political gain for Defendant Mayor Owen, which Defendants condoned and consented despite Plaintiff Valentino's reports of the improprieties. (Valentino Dep. at 39, 178-180, 184-185, 192-193, 198-202, 206, 267, Defs.' Ex. C; Peterson Dep. at 136-137, Defs.' Ex. E; Valentino Aff. ¶¶ 4-7, Ex. 31; 9/13/02 Valentino Memo, Ex. 5.)

### V.     Plaintiffs' Complaints On Matters of Public Concern

A.     Plaintiff Valentino's Complaints About Unlawful Water Billing Practices

26.     In or about September 2002, Plaintiff Valentino gave Joe Minotti a list of approximately 31 names of individuals who had not paid their water bills and whose water should have been shut off for non-payment. The employee failed to perform his duties in conducting the shut-offs for non-payment. (Valentino Dep. at 184-185, 198-199, Defs.' Ex. C.)

27.     In or about December 2002 Valentino complained to Peterson about Mr. Bednarek's failure to pay the water hookup fees. (Valentino Dep. at 44, Defs.' Ex. C; Pl. Valentino's Ans. to Defendant SCH Interrog. Request No. 5, Ex. 6.)

28.     Plaintiff Valentino complained to Defendant Paul Peterson, and Trustees Terry Matthews and Tony Renzetti that Joe Minotti was not fulfilling his assigned duties and was refusing to enforce compliance with shut off procedures and bill payment. (Valentino Dep. at 179-180, 267, Defs.' Ex. C; Peterson Dep. at 136-137, Defs.' Ex. E.)

29.     Plaintiff Valentino again questioned Joe Minotti about enforcement of the unpaid water bills and the status of the shut-offs, to which he responded that he had not shut off anyone's water. (Valentino Aff. ¶5, Ex. 31.)

30.     Plaintiff Valentino believed that Minotti was not shutting off certain individual's water in order to sway them to vote for Mayor Owen or the trustee candidates that he slated during the elections. (Valentino Aff. ¶6, Ex. 31.)

31.     Minotti's failure to conduct the shut offs and failure to perform his duties, resulted in lost revenue for the Village of South Chicago Heights. (Valentino Aff. ¶ 7, Ex. 31.)

32. Defendants Peterson and Owen condoned and consented to this employee's failure to ensure that certain individuals paid their water bills by failing to conduct any investigation and by failing to discipline Minotti. (Valentino Dep. at 39, 178-180, 184-185, 192-193, 198-202, 206, 267, Defs.' Ex. C; Peterson Dep. at 136-137, Defs.' Ex. E; Valentino Aff. ¶ 4-7, Ex. 31; 9/13/02 Valentino Memo, Ex. 5.)

      B.     Plaintiff Valentino's Complaints About Other Unlawful Conduct by Minotti

33. On or about September 13, 2002, Plaintiff Valentino became aware that Joe Minotti had unlawfully closed on a home he had purchased, without receiving a final water bill, a final inspection, other certificates, and payment of escrow. When Plaintiff questioned the employee about the unlawfulness of this, he flew into a rage and responded: "deal with my attorney." (Valentino Dep. at 39, 178, 192, 201-202, 206, Defs.' Ex. C.)

34. On or about September 13, 2002, Plaintiff Valentino again complained to Defendant Peterson about what she believed to be fraudulent and unlawful practices, about Mr. Minotti failing to pay the necessary fees and fill out the necessary paperwork for his house closing, which resulted in money lost to the Village of South Chicago Heights. (Valentino Dep. 193, Defs.' Ex. C; 9/13/02 Valentino Memo, Ex. 5; Peterson Dep. at 136, Defs.' Ex. E.)

35. In her memorandum of September 13, 2002, Valentino complained to Paul Peterson about Joe Minotti not doing his job and how he closed on a house without a final water bill, a final inspection, $1000 escrow, occupancy permit and other things that are required by the Village. (Valentino Dep. at 204, 206, Defs.' Ex. C; Valentino 9/13/02 Memo, Ex. 5.)

      C.     Defendant Peterson Disciplines Plaintiff Valentino In Retaliation

36. Within days, on or about September 18, 2002, Defendant Peterson subjected Plaintiff Valentino to false and unwarranted disciplinary action without justification in retaliation for her complaints. (Valentino Dep. at 207-210, 214, Defs.' Ex. C; 9/18/02 Valentino Verbal Warning, Ex. 7.)

37. Defendant Peterson testified that he never disciplined Plaintiff Valentino for yelling and screaming. Then later testified that he did. (Peterson Dep. at 220, 229, Defs.' Ex. E.)

38. While Defendants may claim that Minotti was also disciplined, circumstantial evidence suggests that Defendants created the "written warning" for Minotti after the fact in an effort to cover up their retaliatory motive. (*See* ¶¶ 39-40, *infra*.)

39. On the "written warning" for Minotti, it appears that the date was written in retroactively as reflected by the handwriting over the date. (Minotti Written Warning, Ex. 8.)

40. The language in the "written warning" for Minotti is exactly the same as the language in the "verbal warning" issued to Plaintiff Valentino on September 18, 2002. (*Compare* Valentino Verbal Warning, Ex. 7; *with* Minotti Written Warning, Ex. 8.)

41. The "written warning" Peterson claims he issued to Minotti is contrary to Peterson's own testimony. The written warning provides that "you (referring to Minotti) continued to shout at and abuse another employee in my presence, making wholly unjustified accusations of incompetence and misconduct …", (Minotti Written Warning, Ex. 8.), whereas Peterson testified that while Minotti said "some things" to Ms. Valentino, he said them "in a quiet tone," (Peterson Dep. at 217-220, Defs.' Ex. E).

### D. Plaintiff Valentino's Speech About Alleged Ghost Pay Rolling

42. Plaintiff Valentino also became aware that certain employees, family members of Defendants Owen and Peterson, were getting paid for time that they had not worked. (Valentino Dep. at 92-94, 112, 156, Defs.' Ex. C.)

43. Plaintiff Valentino believed that Eric Faoro was being ghost pay rolled. (Valentino Dep. at 112, Defs.' Ex. C.)

44. For example, in 2003 Eric Faoro's scheduled shift was from 3:00 p.m. to 11:00 p.m. (Valentino Dep. at 112, Defs.' Ex. C; Peterson 30(b)(6) Dep. at 114-115, Defs.' Ex. D.)

45. While Defendant David Owen represented that his son-in-law was only hired for one year only (on a full-time temporary basis), Eric Faoro worked longer than a year. (Owen March 2003 Letter, Ex. 9; Peterson 30(b)(6) Dep. at 21, 186-187, Defs.' Ex. D.)

46. Defendant Peterson attempted to claim in his deposition that Eric Faoro only worked for the Village on a full-time basis when he was not working as a teacher. (Peterson Dep. at 107, 111, Defs.' Ex. E.)

47. In fact, Eric Faoro was working full time for the Village of South Chicago Heights while at the same time working as a school teacher full time. (Valentino Aff. ¶ 8, Ex. 31.)

48. Eric Faoro did not sign in or out on the sign-in sheet and his car was not at Village hall when he was to be at work. (Valentino Dep. at 112, Defs.' Ex. C.)

49. According to Plaintiff Valentino's "post-it" notes (those that she had not left in her desk) reflecting times when certain employees were not at work, the following are a few examples of times when Eric Faoro was not at work, but was paid by Defendants:

    a. On September 6, 2002, Eric Faoro's car was not parked in back yet he was paid for 8 hours. (Valentino hand written note, 10; Faoro timesheets, Ex. 11.)

      b.      On September 11, 2002, Eric Faoro's car was not parked in back yet there is a time sheet indicating he was paid for 8 hours. (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12; Faoro timesheets, Ex. 11.)

      c.      On September 13 2002, Eric Faoro's car was not parked in back yet he was paid for 8 hours. (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12; Faoro timesheets, Ex. 11.)

      d.      On September 25, 2002, Eric Faoro was not there at 7:05 pm but his sign-in sheet states he left at 8:00pm and was paid for 5 hours. (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12; Faoro timesheets, Ex. 11.)

      e.      On October 3, 2002, Eric Faoro was not at work yet he was paid for 8 hours. (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12; Faoro timesheets, Ex. 11.)

      f.      On October 17, 2002, Eric Faoro did not arrive to work until 4:10 pm yet signed in at 3:00pm. (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12; Faoro timesheets, Ex. 11.)

      g.      On October 31, 2002, Eric Faoro came into work early with his daughter and on his sign-in sheet marked that he worked from 12 pm – 7 pm and did not take a lunch and his timesheet shows he was paid for 8 hours when he should have only been paid for 7 hours. (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12; Faoro timesheets, Ex. 11.)

      h.      On November 15, 2002, Eric Faoro came in at 11 am with his daughter and worked for only part of the day. His sign-in sheet for this day suggests that he came in and worked 8 am – 5 pm, when in fact he only worked part of the day. No timesheet for this period was produced to determine what he was paid. (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12.)

      50.      Many of the time sheets approving Eric Faoro's time when he was not actually at work were signed by him without a supervisor's approving authority. (*See* Faoro sign-in sheets, Ex. 12.)

      51.      Sandra Valentino also believed that Erika Owen was improperly being paid by Defendants for time that she did not work. (Valentino Dep. at 31, 52, Defs.' Ex. C.)

      52.      Erika Owen's sign-in sheets are suspect as well. In many instances, she wrote in at the end of the time sheet, "1 hr" or "1 hr + 30 min cleaning." This was an apparent effort, after the filing of this lawsuit, to correct for the time she had already been paid. Valentino never saw Erika cleaning, and certainly never saw her staying after hours to clean. (Erika Owen Sign-In Sheets, Ex. 12; Valentino Aff. ¶¶ 9, Ex. 31.)

53. By way of another example, on July 19, 2002, while their was room for Erika to sign in on the daily time schedule as required by Peterson, Defendants produced a separate document in discovery in this case that which Erika purportedly signed off on. Her signature does not appear on the sign in sheet that was posted in the office. (*Compare* Sign-In Sheet, S000204 *with* S000203, Ex. 12.)

54. By way of another example, on August 13, 2002, at the bottom of the sign-in sheet, Erika wrote down her name three times for 6:00, 7:00, and 8:00, in an apparent attempt to justify the fact that she had been paid for several hours that she had not worked. (Sign-In Sheets, S000240, Ex. 12.)

55. Plaintiff Valentino believed that Scott Owen was being ghost pay rolled. (Valentino Dep. at 154-157, Defs.' Ex. C; Peterson 30(b)(6) Dep. at 33, 35, Defs.' Ex. D.)

56. Bill Brink, the Director of Public Works, was told that Defendant Peterson would be handling Scott Owen's time sheet contrary to Brink's duty as director to fill out his employee's time sheets. (Valentino Dep. at 154-157, Defs.' Ex. C; Peterson 30(b)(6) Dep. at 33, 35, Defs.' Ex. D.)

57. Terry Fiorenzo testified that when he was Trustee he was aware that either Scott Owen or April Owen's time sheets and sign-in sheets for the Public Works Department had been changed. He started tracking some of the payroll, and saw the payroll sheets for public works. When he checked the payroll sheet again at the Village Hall, the amount of hours in the payroll sheets had been changed. (Fiorenzo Dep. at 74-75, Ex. 1.)

58. Plaintiff Valentino believed Sally Marrufo was being ghost pay rolled. (Valentino Dep. at 36, 126, Defs.' Ex. C.)

59. Sally Marrufo had been receiving 3 checks in a month. (Valentino Dep. at 36, 126, Defs.' Ex. C.)

60. As another example, according to one of Plaintiff Valentino's "post-it" notes reflecting times when certain employees were not at work, she noted that Sally Marrufo was out sick on September 17, 2002." Despite the fact that Sally Marrufo was not at work she was paid for 6.5 hours on that day. (Valentino hand written note, Ex. 10; Marrufo timesheet, Ex. 11.)

61. Plaintiff Bramanti was aware and discussed with a number of trustees about complaints they had regarding Ron Diedrich (Police Chief) being ghost pay rolled. (Bramanti Dep. at 44-46, Defs.' Ex. B.)

62. Trustee Joe Kudra recalls issues being raised by other Trustees about Chief of Police (Ron Diedrich) and whether or not he was putting in his time. (Joe Kudra Dep. at 29, Ex.2.)

63. Plaintiff Valentino complained to Terry Fiorenzo and Joe Kudra (Village Trustees) about Defendant Peterson's work attendance and being paid. (Valentino Dep. at 163-167, Defs.' Ex. C.)

64. As for the "daily time schedules" ("sign-in" sheets), only those that appear to be suspect are those for Mayor Owen's children (Erika, Eric, and Scott, mainly) and Sally Marrufo. The handwriting with respect to those "completed" by Mayor Owen's children are all in the same handwriting as if they were all completed at the same time and filled in at the bottom and not in sequential order. (*See* Sign-In Sheets, Ex. 12.)

65. Plaintiff Sandra Valentino began reporting the issues of what she believed was ghost pay rolling and the fraudulent water billing practices to Bill Bramanti. (*See* ¶¶ 42-63, *supra*; *see also* Valentino Dep. at 92-94, 156, Defs.' Ex. C; Bramanti Dep. at 77, Defs.' Ex. B.)

### Plaintiff Valentino Docked When Owen's Children Were Not

66. In February 2002, Plaintiff Valentino began noticing that her paycheck was incorrect and did not reflect the correct number of hours worked. (Valentino Dep. at 70-71, Defs.' Ex. C.)

67. Plaintiff complained in April 2002 and requested to see her timesheets. Initially, Plaintiff's request was refused. Plaintiff was finally given her time sheets in December 2002. (Valentino Dep. at 70-71, Defs.' Ex. C.)

68. In several instances, while Plaintiff Valentino's time was docked 15 minutes when she was only 5 – 10 minutes late, Defendant Owen's children were not docked for similar infractions. (*Compare* Sign-In Sheets, Ex. 12, *with* Time Sheets, Ex. 11.)

E. **Plaintiff Bramanti's Freedom of Information Act (FOIA) Requests**

69. In response to Plaintiff Sandra Valentino reporting to him issues of ghost pay rolling and the fraudulent water billing practices, on or about January 21, 2003, Plaintiff Bill Bramanti submitted to Defendants several Freedom of Information Act ("FOIA") Requests, which sought the following:

> (1) time cards and/or sign in sheets for Scott Owen, Erika Owen and Yvette Owen for the months of June 2002, July 2002 and August 2002 also their hourly salary,
>
> (2) Copy of the Contract and/or Ordinance on the purchasing of water from the city of Chicago Heights,
>
> (3) A list of all accounts held by the Village including but not limited to – checking, savings, money market and C.D.'s
>
> (4) Account activity, checking account register and balance sheets for the Lake Michigan bond issue since its inception, and
>
> (5) All bond, financial, contracts and bills documents relating to the Lake Michigan water project.

(Valentino Dep. at 38, 92-94, 112-114, 122-123, 156, 168-170, 172-173, 220-221, 240-241, Defs.' Ex. C; Bramanti Dep. at 77, 142, Defs.' Ex. B; Bramanti 1/21/03 FOIA Requests, Ex. 13-; *see* ¶¶ 42-63, *supra*.)

70. On or about January 23, 2003, Plaintiff Bramanti sent another set of FOIA requests seeking the following:

> (1) List of all commercial and industrial water users including addresses, (Bramanti 1/23/03 FOIA Requests, Ex. 14.), and

> (2) The check register for payroll and all bills and services paid by the Village for fiscal years 2001 to 2002 and 2002 to present, (Bramanti 1/23/03 FOIA Requests, Ex. 14.).

71. On or about January 30, 2003, Plaintiff Bramanti received a letter from Defendant Peterson denying his FOIA request for time-cards and sign-in sheets for various employees and members of Defendant Owen's and Peterson's family who Plaintiffs believed were getting paid for hours that they had not worked. (1/30/03 Peterson FOIA denial letter, Ex. 17; Valentino Dep. at 92-94, 156, Defs.' Ex. C.)

72. On or about February 3, 2003, Plaintiff Bramanti received another letter from Defendant Peterson denying his FOIA request for payroll information. (2/3/03 Peterson FOIA denial letter, Ex. 18.)

73. On February 3, 2003, Mayor Owen threatened to fire Plaintiff Valentino, telling another employee: "[Valentino's] going to get her but canned." (Valentino Dep. at 220-221, 240-241, Defs.' Ex. C; Bramanti Dep. at 142, Defs.' Ex. B.)

74. Defendant Owen made this comment after Plaintiff Bramanti filed his FOIA request and Defendants' knew that Plaintiff Valentino had spoken to Plaintiff Bramanti. (Valentino Dep. at 220-221, 240-241, Defs.' Ex. C; Bramanti Dep. at 142, Defs.' Ex. B.)

75. Defendant Peterson admitted that he told Sally Maruffo not to talk to Sandra Valentino because Sandra Valentino would tell William Bramanti. (Peterson Dep. at 84, Defs.' Ex. E.)

76. On February 27, 2003, Plaintiff Bramanti sent another set of FOIA requests seeking:

> (1) The actual bills and not statement for a list of items, which was attached to the FOIA (the "bill list" was attached); and

> (2) The names of the person or if more than one person their names and the breakdown of the salary on the appropriation ordinance #02-ORD-08.

(Bramanti 2/27/03 FOIA Requests, Ex. 16.)

77.     Plaintiff William Bramanti submitted the FOIA requests to the Village of South Chicago Heights seeking the production of documents requested (*see* ¶¶ 69, 70, 76, *supra*) because he wanted to inform the taxpayers where their money was going and to expose this information. (Valentino Dep. at 172, Defs.' Ex. C.)

78.     On Friday, February 28, 2003, Plaintiff Bramanti sent a letter to the citizens of the Village of South Chicago Heights addressing the possible misappropriations of funds. (2/28/03 Citizens Against Corruption Letter, Ex. 22.)

### VI.     Defendants Owen and Peterson Knew About Plaintiff Valentino's Speech Regarding Defendants' Unlawful Conduct

79.     Defendants Owen and Peterson were aware of the FOIA requests that had been filed by Plaintiff Bramanti as they came in. (Owen Dep. at 58-60, Defs.' Ex. F; 2/3/03 Peterson FOIA denial letter, Ex. 18; 1/30/03 Peterson FOIA denial letter, Ex. 17.)

80.     On February 3, 2003, Mayor Owen threatened to fire Plaintiff Valentino to other employees stating "she's going to get her butt canned." This occurred immediately following Plaintiff Bramanti submitting several FOIA requests in an attempt to investigate and expose the fraud and misuse of public funds. (Valentino Dep. at 220-221, 240-241, Defs.' Ex. C; Bramanti Dep. at 142, Defs.' Ex. B; *see also* Bramanti FOIA Requests, Ex. 13-16.)

81.     Defendant Owen also made the statement – that "Valentino's going to get her butt canned" – on the same day that Defendant Peterson sent Plaintiff Bramanti the letter denying his FOIA request for the payroll information, among other things. (Valentino Dep. at 220-221, 240-241, Defs.' Ex. C; Bramanti Dep. at 142, Defs.' Ex. B; 2/3/03 Peterson FOIA denial letter, Ex. 18.)

82.     Defendants' knew that Plaintiff Valentino had spoken to Plaintiff Bramanti. (Valentino Dep. at 220-221, 240-241, Defs.' Ex. C; Bramanti Dep. at 142, Defs.' Ex. B.)

83.     Defendant Peterson admitted that he told Sally Maruffo not to talk to Sandra Valentino because Sandra Valentino would tell William Bramanti. (Peterson Dep. at 84, Defs.' Ex. E.)

84.     Defendant Peterson knew of Plaintiff Valentino's written complaints about the water billing issues and Minotti failing to comply with closing requirements and not having to pay the required fees. (Valentino Dep. at 204, 206, Defs.' Ex. C; Valentino 9/13/02 Memo, Ex. 5.)

85.     Defendant Peterson admits that Plaintiff Valentino had complained to him in regards to the issues she had with Joe Minotti. (Peterson Dep. at 136, 173, 186, 220-221, 294-295, Defs.' Ex. E.)

86.     After Bramanti submitted the January 23, 2003 FOIA request, he was allowed to review a "bill list." While Plaintiff Bramanti was reviewing these documents at the Village Hall in the

treasure's office, Defendant Peterson walked in and saw Plaintiffs Bramanti and Valentino asking the treasurer questions about the "bill list." (Peterson Dep. at 255-260, Defs.' Ex. E.)

87. Plaintiff Valentino had complained to Plaintiff Bramanti on several occasions about the issues with the water billing and what she believed was ghost pay rolling. (Valentino Dep. at 38, 44, 112-114, 122-123, 168-170, 172-173, 179-180, 184-185, 198-199, 276, Defs.' Ex. C.)

88. Following receipt of the FOIA requests from Bramanti and immediately following notification to Defendants of Bramanti's letter to the residents of February 28, 2003, Defendant Peterson went to Plaintiff Valentino's desk (that evening), rifled through her desk drawer, and found copies of some of her sign-in sheets, and Valentino's notes about those employees she believed were not being docked when they did not show up to work and were getting paid for time that they were not working. (Valentino Dep. at 122-123, 127-145, 238-241, Defs.' Ex. C.) Valentino was also keeping notes in her desk about Joe Minotti, Lou Bednarek, and the fraudulent water billing practices. (Valentino Dep. at 238-241, Defs.' Ex. C.)

### VII. Retaliatory Termination of Sandra Valentino

89. On February 28, 2003, immediately following Defendants' receipt of Plaintiff Bramanti's February 28, 2003 letter to the citizens of the Village of South Chicago, and immediately following the submission of the FOIA requests by Plaintiff Bramanti, Defendant Peterson rummaged through Sandra Valentino's desk drawer and found her notes on the fraudulent water billing practice, the ghost payrolling, and copies of some of her sign-in sheets. (Valentino Dep. at 122-123, 127-145, 238-241, Defs.' Ex. C; Peterson Dep. at 316-317, Defs.' Ex. E; Defendant's 3rd Request to Admit Facts, No. 1, Ex. 23; Kurtz 37.2 Letters, Ex. 27.)

90. The very next business day (the next day that Valentino worked), on March 3, 2003, Defendant Peterson called Plaintiff Valentino into the office and told her: she was being terminated for these (holding the sign-in sheets and other documents – Valentino's notes – in his hand) and that he believed that she was making copies for Plaintiff Bramanti and taking them out of the office, which Plaintiff Valentino denies. (Valentino Dep. at 234-235, Defs.' Ex. C.)

91. Defendants claim that Plaintiff Valentino was terminated for "theft of Village property," i.e., the sign-in sheets. (Peterson 30(b)(6) Dep. at 322-323, Defs.' Ex. D.)

92. Peterson admitted that the documents he was accusing her of "taking," he found in her desk and that they had no knowledge and did not see her actually taking anything out of the office. (Peterson 30(b)(6) Dep. at 322-323, Defs.' Ex. D.)

93. Defendant Peterson also admitted that the sign-in sheets were not private and that anyone could see them and that there is no policy that restricts an employee from keeping copies of the daily sign-in sheets. (Peterson 30(b)(6) Dep. at 122, Defs.' Ex. D.)

94. Defendant Peterson informed Defendant Owen that he found documents in Ms. Valentino's desk (her notes about the fraudulent water billing practices and some of the sign-in

sheets) and that he was not happy about it. Owen testified that he told Peterson that it was okay with him (Owen) to terminate Valentino. (Peterson Dep. at 84, Defs.' Ex. E; Owen Dep. 18-20, Defs.' Ex. F.)

95. Defendant Peterson made the decision to terminate Plaintiff Valentino at the direction of and with the consent of Defendant Owen. (Owen Dep. at 18-20, Defs.' Ex. F; Peterson Dep. at 84, Defs.' Ex. E; Fiorenzo Dep. at 148, Ex. 1.)

96. Defendants terminated Plaintiff Valentino's employment because they believed that Plaintiff Valentino had and did expose Defendants' ghost pay rolling, fraudulent payments and overpayments to employees and purported employees of the Village of South Chicago Heights, fraudulent billing practices with respect to the Village's water bills and collection of payments, and other fraudulent and other unlawful conduct. (Valentino Dep. at 240-241, Defs.' Ex. C.)

97. Plaintiff Valentino provided this information to Bill Bramanti who then engaged in an investigation and submitted FOIAs to the Village in an effort to further investigate the information, and then disclosed the information and apparent cover-up by Defendants, in that Defendants refused to provide the information requested, to the residents of the Village of South Chicago Heights. (Valentino Dep. at 92-94, 156, 240-241, Defs.' Ex. C; 1/30/03 Peterson FOIA denial letter, Ex. 17.)

98. The evidence in the record suggests that in fact Defendants were engaging in ghost pay rolling and other fraudulent and illegal acts, and thereby unlawfully depleting public funds. (Valentino hand written notes, Ex. 10; Faoro timesheets, Ex. 11; Valentino Dep. at 112, 36, 126, Ex. Defs.' Ex. C; Marrufo timesheet, Ex. 11; *see also* ¶¶ 42-64, *supra*.)

## VIII. Defendants' Retaliation Against Plaintiff William Bramanti

### A. Defamatory Letters from Defendant Owen

99. On or about March 11, 2003, Defendant Owen sent a letter to citizens of the Village of South Chicago Heights defaming and slandering Plaintiff Bramanti, stating in part: "It strikes me as odd that these charges are likely coming from someone I had to fire because he wanted me to ghost payroll him." Defendant Owen made these false statements to the public in retaliation for Plaintiff Bramanti's attempts to discover and disclose the fraudulent and unlawful conduct by Defendants. (Bramanti Dep. at 192-195, Defs.' Ex. B; Owen Dep. at 250-251, Defs.' Ex. F; 3/11/03 Owen letter, Ex. 9.)

100. A second time in March 2003, Defendant Owen again slandered and defamed Plaintiff Bramanti by sending out another letter to the citizens of the Village of South Chicago Heights that stated in part: "It is Mr. Bill Bramanti, the person who wanted me to ghost payroll him." (3/03 Owen Letter, Ex. 9.)

101. The defamatory letters were also given to the Mayor of Glenwood and at least one trustee. These letters were also distributed to the public of Glenwood. (Bramanti Dep. at 217-218, Defs.' Ex. B.)

102. These retaliatory actions have caused some of the Citizens to question Plaintiff Bramanti's abilities in the Village of Glenwood and caused Bramanti to suffer damages including but not limited to humiliation, damage to his integrity, reputation, emotional distress, embarrassment and humiliation. (Bramanti Dep. at 218-223, 227-228, 230, Defs.' Ex. B.)

103. After Bramanti resigned from the Village, Defendant Peterson had went to talk to Plaintiff Bramanti several times to offer him a job and about returning to the Village after his resignation. (Bramanti Dep. at 221-222, Defs.' Ex. B.)

104. After Plaintiff Bramanti resigned, Defendant Owen had instructed Lou Bednarek to ask Plaintiff Bramanti if he would take a consulting job with the Village to help Bob Carl out and that he would make $6000 to $8000 per year. Lou Bednarek did go and ask Plaintiff Bramanti about the consulting job. Defendant Owen at that time did not believe Plaintiff Bramanti was engaging in "ghost pay rolling". (Owen Dep. at 92-95, 137, Defs.' Ex. F.)

105. Plaintiff Bramanti, as a citizen and business owner in the Village of South Chicago Heights, was concerned about the diversion of public funds for private and political use. (Bramanti Dep. at 84, Defs.' Ex. B.)

### B. Fraudulent Water Bill

106. In or about May 2003, Plaintiff Bramanti received a fraudulent bill for water services in the form of a letter from Bob Carl in excess of the actual amount owed. (Bramanti Dep. at 126-130, Defs.' Ex. B; *see* Carl Letter, Ex. 24.)

107. Defendants sent Plaintiff Bramanti this bill in retaliation for his attempts to disclose Defendants' unlawful practices and in response to the letters Bramanti send to the residents of the Village of South Chicago Heights. (Bramanti Dep. at 126-130, Defs.' Ex. B; *see* Carl Letter, Ex. 24.)

108. Peterson testified that he had a conversation with Bob Carl in April 2003 **prior** to the letter being sent to Plaintiff. Bob Carl sent the letter after talking to Paul Peterson. Defendant Peterson authorized the letter from Bob Carl to Plaintiff Bramanti. (Peterson Dep. at 276, 278, Defs.' Ex. E; Carl Letter, Ex. 24; Bramanti Dep. at 126-130, Defs.' Ex. B.)

109. David Owen and Paul Peterson had a hand in the fraudulent water bill for water service at 175 East 34th Street. Plaintiff Bramanti testified that "Dave Owen's been with the village for over 30 years. Nothing happens there without him knowing about it" and that Peterson had a hand in it. (Bramanti Dep. at 125-127, Defs.' Ex. B.)

110. Peterson testified that if there were any problems with water billing he would be informed about them, in fact, he testified that he talked to Bob Carl about the issue regarding the water service and water bill at Bill Bramanti's property at 175 East 34th Street in April 2003. The letter from Carl was not sent until May 2003. (Peterson Dep. at 94, 106-109, 159, 164-165.)

111. David Owen testified that any problems or adjustments would have to get approved through him or through Peterson. (Owen Dep. at 44, Defs.' Ex. F.)

112. Plaintiff Bramanti responded to this letter and never received any bills, shut-off notices or correspondence after that. (Bramanti Dep. at 131-132, Defs.' Ex. B; Bramanti 6/2/03 Letter, Ex. 25.)

113. Plaintiff Bramanti made a second attempt at resolving this issue by sending another letter requesting a response. (Bramanti 8/18/03 Letter, Ex. 26.)

114. To date, Defendants have taken no action to correct the fraudulent water bill or send Plaintiff Bramanti a corrected bill. (Bramanti Aff., Ex. 32.)

### C. Defendants' Attempted to Interfere With Plaintiff Bramanti's Job at Village of Glenwood

115. Right after Plaintiff Bramanti filed the first FOIA requests, both Defendant Peterson and Defendant Owen went to the Village of Glenwood Mayor and Village administrator in an effort to humiliate and intimidate Plaintiff Bramanti, who worked for the Village of Glenwood. (Bramanti Dep. at 213-214, 244, Defs.' Ex. B.)

116. On January 22, 2003, Defendant Peterson served a FOIA request on the Village of Glenwood, requesting records related to Plaintiff Bramanti's hire dates, hours expected to work, hours actually worked, salary, time sheets, time cards, sign-in sheets among other things. (Peterson 1/22/03 FOIA Request to Glenwood, Ex. 19.)

117. Defendant Peterson filed his FOIA request to Glenwood the day after Plaintiff Bramanti submitted his to the Village of South Chicago Heights. (Bramanti 1/21/03 FOIA requests, Ex. 13; (Peterson 1/22/03 FOIA Request to Glenwood, Ex. 19.)

118. Plaintiff Bramanti submitted additional FOIA requests and each time Defendant Peterson countered with requests of his own that mirrored what Plaintiff Bramanti had asked for. (Bramanti 1/23/03 and 1/31/03, Ex. 14-15; Peterson 1/23/03 and 1/31/03 FOIA Request to Glenwood, Ex. 20-21.)

119. Peterson testified that he submitted these FOIA requests because he wanted to find out information about Plaintiff Bramanti and was curious and he could not recall why all of sudden, after Plaintiff Bramanti filed a FOIA request, he wanted to find out information about Plaintiff Bramanti. (Peterson Dep. at 193-195, Defs.' Ex. E.)

## IX. Defendants Destroy and Alter Documents

### A. Plaintiff's Notes About Ghost Pay Rolling and Unlawful Water Billing Practices That Were In Her Desk

120. Plaintiff Valentino left various notes in her desk reflecting ghost pay rolling and fraudulent water billing practices. (Valentino Dep. at 181, 238-239, 263, Defs.' Ex. C)

121. Defendants have failed and refused to produce those notes, despite the fact that Defendants' admit that they took them out of Plaintiff's desk and terminated Plaintiff based on those notes. (Peterson Dep. at 316-317, Defs.' Ex. E; Defendant's 3rd Request to Admit Facts, No. 1, Ex. 23; Kurtz 37.2 Letters, Ex. 27.)

### B. Defendants' Alteration of Time-Sheets and Sign-In Sheets to Cover-Up the Fraud

122. Defendants produced a sign-in sheet for Sally Marrufo for September 17, 2002, despite the fact that she was out of the office sick that day. (Valentino hand written note, Ex. 10; Marrufo Sign-In Sheet, Ex. 12.)

123. Some of the time sheets appear to have been "whited" out and the time changed. (Time Sheets, Ex. 11.)

124. Defendants created sign-in sheets and timesheets after the fact to cover up the fraud. In several instances where Eric Faoro was not working, he later filled out a sign-in sheet and often times a corresponding time-sheet that only he signed. (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12; Faoro timesheets, Ex. 11.)

125. Other examples of the extensive discrepancies with Defendants' sign-in sheets and time sheets and the times in which Defendant Owen's children were actually working, are the sign-in sheets for Eric Faoro where in fact it appears that he was not even working that day, either the sign-in sheet was fabricated or the time sheet was, and even the sign-in sheet is inconsistent with the time that he actually worked. (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12; Faoro timesheets, Ex. 11.)

126. Defendants failed and refused to produce several of the payroll records and time-sheets that were requested in discovery and refused and failed to produce the originals for inspection, despite Plaintiffs' repeated requests. On many of the records, there appears to have white-out and other changes to the original, but the original was never produced. (*See* Sign-In Sheets, Ex. 12; Time Sheets, Ex. 11; Kurtz 37.2 Letters, Ex. 27.)

## X. Pattern and Practice of Retaliation Against Others

127. Defendants retaliated against other individuals and unlawfully threatened to shut off many of those individual's water services or retaliated against them in other ways, including Rosario DelGroso, George Bova, George Ellis, Rose Bautista, Terry Fiorenzo, and Darryl Boren, just to name a few. (*See* ¶¶ 128-148, *infra*.)

### Rosario DelGroso

128. During the 2001 election Rosario DelGroso was approached by Defendant Owen and asked why they had a sign supporting Joe Kudra. After that they were denied pickup of debris that otherwise normally would take place. (Joe Kudra Dep. at 13-15, 105-106, Ex. 2.)

129. Joe Kudra believes he was denied insurance benefits that he believed he was entitled to for running against Defendant Owen in the 2001 election. (Joe Kudra Dep. at 56, 111-112, Ex. 2.)

### George Bova

130. After the April 2003 election, Defendant Peterson fired Plaintiff's stepfather, Mr. Bova. (Bova Dep. at 64-66, Ex. 30.)

131. Mr. Bova supported the political opponent to Mayor Owen, Joe Kudra. (Bova Dep. at 48-49, Ex. 30.)

132. On June 26, 2003, Defendant Peterson sent Plaintiff's stepfather, Mr. Bova, a South Chicago Heights resident, a certified letter in which he unlawfully threatened to "cut off" Mr. Bova's water. (Bova Dep. at 45-46, Ex. 30; Valentino Dep. at 91, Defs.' Ex. C; Bramanti Dep. at 150, Defs.' Ex. B.)

133. Mr. Bova was not late on his water bill. (Bova Dep. at 46-47, Ex. 30.)

134. Peterson admitted that he sent the letter because he "was angry," and that it was wrong. (Peterson Dep. at 111-112, Defs.' Ex. E.)

### George Ellis

135. George Ellis was renting a house from Terry Fiorenzo. (Ellis Dep. at 30, Ex. 3.)

136. During the 1997 election George Ellis was asked three or four times by Lou Bednarek, at the direction of Defendant Owen, to move from his home because it did not look good to be working for the Village and living in the oppositions home. (Ellis Dep. at 30-32, 37-40, 66-67, Ex. 3.)

137. In these conversations Lou Bednarek expressed to George Ellis that if he should move "if he wants to keep his job" and then offered to find him a new place to live. (Ellis Dep. at 36, 38-40, Ex. 3.)

138. Mr. Ellis refused to move. (Ellis Dep. at 37-39, Ex. 3.)

139. In response to Mr. Ellis refusing to move, Lou Bednarek told George Ellis that "they" (referring to Dave Owen) would be getting rid of him, in regards to George Ellis' job with the Village. (Ellis Dep. at 33-35, Ex. 3.)

140. After the election, Defendant Owen sent Mr. Ellis a letter stating he was terminating Mr. Ellis. (Ellis Dep. at 49-50, Ex. 3; 7/7/97 Termination Letter from Owen, Ex. 29.)

141. George Ellis believed he was terminated in retaliation for not moving from his home. (Ellis Dep. at 49-50, Ex. 3; 7/7/97 Termination Letter from Owen, Ex. 29.)

142. Bill Brink who was the head of Public works told George Ellis that he believed that George Ellis was "...politically gotten rid of." (Ellis Dep. at 68, Ex. 3.)

143. George Ellis and Ron Diedrich had been long time friends and after the 1997 election Ron Diedrich told George Ellis he was told to stay away from him and not to talk to him. (Ellis Dep. at 72-73, Ex. 3.)

Rose Bautista

144. After Defendants terminated Sandra Valentino, they retaliated against Rose Bautista in violation of the First Amendment by removing her from the senior center and transferring her to the village hall because she supported Joe Kudra in the election. (Bova Dep. at 39-40, Ex. 30; Bautista Dep. 12-14, Ex. 4.)

Terry Fiorenzo

145. Terry Fiorenzo ran for Mayor of South Chicago Heights in the 1997 election against Defendant Owen. (Fiorenzo Dep. at 45-48, 65-68, 117, Ex. 1.)

146. During this election Terry Fiorenzo's windows were shot out, eggs thrown at house, his phone lines were cut, things were stolen off his truck, and damage to several supporters' tires including his own. (Fiorenzo Dep. at 45-48, 65-68, 117, Ex. 1.)

147. While at a party Terry Fiorenzo was led to believe that police officer Todd Krol may have been the one who did the damage since he lived right next door to their campaign headquarters. (Fiorenzo Dep. at 45-48, 65-68, 117, Ex. 1.)

Darryl Boren

148. Darryl Boren had given a donation of $100 to the Kudra's campaign in 2001. The mayor found out about it and fired Mr. Boren. (Bramanti Dep. at 145-146, Defs.' Ex. B.)

19

Respectfully Submitted,

SANDRA L. VALENTINO and
WILLIAM P. BRAMANTI

**s/ Dana L. Kurtz**

_____
*Electronically filed on February 24, 2006*

Attorney for Plaintiffs

Dana L. Kurtz, Esq.
KURTZ LAW OFFICES, LLC
414 South State Street
Lockport, Illinois 60441
Phone: 815.838.0968
Facsimile: 312.893.2239
E-mail: dkurtz@kurtzlaw.us