## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

SANDRA L. VALENTINO and WILLIAM P.
BRAMANTI,

        Plaintiffs,

    v.

VILLAGE OF SOUTH CHICAGO HEIGHTS,
PAUL PETERSON, and MAYOR DAVID
OWEN, in their official and individual capacity,

        Defendants.

No. 04 C 2373

Honorable Judge William J. Hibbler

## PLAINTIFFS' RESPONSE TO DEFENDANT VILLAGE OF SOUTH CHICAGO HEIGHTS' RULE 56.1(a) STATEMENT OF FACTS AS TO PLAINTIFF BRAMANTI

NOW COMES Plaintiffs, through their undersigned counsel, and responds to Defendant Village of South Chicago Heights Rule 56.1(a) Statement of Facts as to Plaintiff William ("Bill") P. Bramanti, and for the reasons stated herein and in Plaintiffs' Response to Defendants' Motions for Summary Judgment, Plaintiff Valentino's Response to Defendant Village of South Chicago Heights 56.1(a) Statement of Facts, and Defendant Peterson and Owen's 56.1(a) Statement of Facts, and Plaintiff's Joint Additional Statement of Facts Pursuant to Rule 56.1(b) In Support of Plaintiffs' Responses to All Defendants' Motions for Summary Judgment, Plaintiffs respectfully request the Court deny Defendants' motions for summary judgment.

1.    William P. Bramanti was employed as a part-time building inspector by the Village of South Chicago Heights (See page 34 of Bramanti's deposition testimony);

**RESPONSE: Admitted.**

2.    Bramanti resigned his position in September of 2001 (See page 34 of Bramanti's deposition testimony);

**RESPONSE: Admitted.**

3.    As building inspector, his duties included making inspections when necessary (See page 34 of Bramanti's deposition testimony);

**RESPONSE: Admitted. Bramanti further states that his job duties as the part-time building inspector for the Village of South Chicago Heights included more than just making inspection when necessary. His job duties and the functions he performed included general but was not limited to responding to**

1

all correspondence and questions concerning the Building Department; making inspections when necessary, referring to new construction or rentals or remodeling, code enforcement. (Bramanti Dep. at 34, Defs.' Ex. B.)[1]

4.    Bramanti does not believe that any of the current elected officials in the Village of South Chicago Heights are being paid for work they did not perform (See page 40 of Bramanti's deposition testimony);

RESPONSE:    Plaintiffs move to strike as ¶ 4 in that it misstates and mischaracterizes Bramanti's testimony, and therefore should be stricken.  Subject to said objection and without wavier, Bramanti testified that based on the records there were questions about the payroll records for certain elected officials, who had appeared as being paid two separate checks for the same time period.  In addition, Bramanti testified that certain of the records were missing and have not been produced by Defendants.  (Bramanti Dep. 38-39, Defs.' Ex. B.)

5.    He does not believe that David Owen is being paid for work he did not perform (See page 40 of Bramanti's deposition testimony);

RESPONSE:    Plaintiffs move to strike as ¶ 5 does not address a contested issue of *material fact*.  Plaintiff further object in that Defendant David Owen's position as Mayor is only part time.  The issue relates more to the alleged ghost pay rolling practices around the moneys paid towards various family members and children of Defendant David Owen.  (*See* Complaint ¶¶ 24, 29, 34, Defs.' Ex. A)

Moreover, Bramanti testified that based on the records there were questions about the payroll records for certain elected officials, who had appeared as being paid two separate checks for the same time period.  In addition, Bramanti testified that certain of the records were missing and have not been produced by Defendants.  (Bramanti Dep. 38-39, Defs.' Ex. B.)

6.    He does not believe that the public treasury has been depleted by virtue of payments made to elected officials (See pages 41-42 of Bramanti's deposition testimony);

RESPONSE:    Plaintiffs move to strike as ¶ 6 in that it mischaracterizes and misstates Bramanti's testimony.  Bramanti testified that based on the records there were questions about the payroll records for certain elected officials, who had appeared as being paid two separate checks for the same time period,

---

[1]       References herein to "Defs.' Ex. __" (A, B, C, etc.) refer to exhibits filed by Defendants Owen and Peterson in support of Defendants Owen and Peterson's Statement of Facts.  Plaintiffs have incorporated those exhibits herein rather than filing duplicate deposition transcripts.  References to "Ex. _" refer to Plaintiffs' Exhibits attached to Plaintiff's 56.1(b) statement of facts or attached hereto.

**which would thereby deplete the public treasury   In addition, Bramanti testified that certain of the records were missing and have not been produced by Defendants.  (Bramanti Dep. 38-39, Defs.' Ex. B.)**

7.     Bramanti was not forced out of his position with the Village of South Chicago Heights (See page 49 of Bramanti's deposition testimony);

**RESPONSE: Admitted.  Plaintiff further states that Mr. Bramanti resigned his position because he had concerns about Mayor David Owen hiring his own family members for positions that were unnecessary or at a higher salary rate than budgeted for and as a result of the Mayor's family members "not working for the money they were getting paid."  (Bramanti Dep. at 77-78, Defs.' Ex. B.)**

8.     When he left the Village, he had no information or evidence which indicated that Village employees were engaged in "ghost pay rolling" (See page 49 of Bramanti's deposition testimony);

**RESPONSE: Plaintiffs move to strike as ¶ 8 does not address a contested issue of *material* fact.  Subject to said objection and without waiver, Plaintiff states that while he had no "evidence" at that time, he did believe that there was ghost pay rolling going on and also testified that before he resigned Ms. Valentino had told him that she believed certain employees were being paid for work they did not do. (Bramanti Dep. at 56-57, Defs.' Ex. B.)**

**Plaintiff further states that Mr. Bramanti resigned his position because he had concerns about Mayor David Owen hiring his own family members for positions that were unnecessary or at a higher salary rate than budgeted for and as a result of the Mayor's family members "not working for the money they were getting paid."  (Bramanti Dep. at 77-78, Defs.' Ex. B.)**

**Plaintiff Bramanti did in fact complain to Defendants Owen and Peterson about concerns he had about "ghost pay rolling". (Bramanti Dep. at 47-49, 68, Defs.' Ex. B.)**

**Plaintiff Bramanti also testified at length about the fact that Ms. Valentino reported to him that she believed that certain employees were engaging in ghost pay rolling, and that he became aware that Ms. Valentino had been taking notes.  (Bramanti Dep. at 59-65, Defs.' Ex. B.)**

9.     Bramanti defines "ghost pay rolling" as a person getting paid and not going to work or doing the work (See page 49 of Bramanti's deposition testimony).

**RESPONSE: Plaintiff admits that Mr. Bramanti defined ghost pay rolling as "A person getting paid and not going to work or doing the work."  (Bramanti Dep. at**

**49, Defs.' Ex. B.);** *see also Thompson v. Illinois Department of Professional Regulation*, **300 F.3d 750 (7th Cir. 2002) (defining ghost pay rolling where an employee is getting paid for time not worked).**

10.    In the year 2002, Bramanti never approached David Owen to advise him that employees were being paid for work that they did not perform (See page 67 of Bramanti's deposition testimony);

**RESPONSE: Plaintiff Bramanti admits only that he did not advise David Owen in 2002 about employees being paid for work they did not perform, but did speak to him and Peterson in other years about his concerns of employees being paid for work not done. (Bramanti Dep. at 9-10, 47-48, 68, Defs.' Ex. B.)**

11.    Bramanti supported Mayor Owen when he ran for re-election in 2001 (See page 72 of Bramanti's deposition testimony);

**RESPONSE: Plaintiffs move to strike as ¶ 11 does not address a contested issue of *material* fact. Subject to said objection and without waiver, Plaintiff admits that he supported Mayor Owen in the 2001 election, but did not support him in the subsequent elections. (Bramanti Dep. at 72, Defs.' Ex. B.)**

12.    Bramanti believes that the Village was "in dire financial straits" (See page 72-73 of Bramanti's deposition testimony);

**RESPONSE: Plaintiffs move to strike as ¶ 12 does not address a contested issue of *material* fact. Subject to said objection and without waiver, admitted. Plaintiff further states as a citizen and business owner in the Village of South Chicago Heights, he was concerned about the diversion of public funds for private and political use. (Bramanti Dep. at 84, Defs.' Ex. B.)**

13.    He concedes that keeping family members on the payroll does not violate state of federal law (See page 73 of Bramanti's deposition testimony);

**RESPONSE: Plaintiffs move to strike as ¶ 13 does not address a contested issue of *material* fact. The issue is not "keeping family members on the payroll," but paying family members for time that they have not worked and Defendants' misuse of public funds, and retaliating against people who attempted to disclose such practices. Subject to said objection and without waiver, Plaintiff states that paying employees for time that they have not worked constitutes ghost pay rolling. (Bramanti Dep. at 49, Defs.' Ex. B.);** *see also Thompson v. Illinois Department of Professional Regulation*, **300 F.3d 750 (7th Cir. 2002) (defining ghost pay rolling where an employee is getting paid for time not worked).**

14.  Bramanti claims his tax bill went up $6,000 in either 2001 or 2002 (See pages 74-75 of Bramanti's deposition testimony);

**RESPONSE: Plaintiffs move to strike as ¶ 14 does not address a contested issue of *material* fact. Subject to said objection and without waiver, admitted that from 1997 or 1998 to four years later his tax bill went from $2,200 to $6,000. (Bramanti Dep. at 73, Defs.' Ex. B.) He also states that in 2000 his tax bill was increased again. (Bramanti Dep. at 76, Defs.' Ex. B.)**

15.  While he contends that the Village raised his property taxes, he cannot "put a figure on" the amount of the increase (See pages 75-76 of Bramanti's deposition testimony);

**RESPONSE: Plaintiffs move to strike as ¶ 15 does not address a contested issue of *material* fact. Subject to said objection and without waiver, Plaintiff Bramanti testified that he attributed the tax increase to the misuse of public funds by David Owen based on past history and the complaints he received from others. (Valentino Dep. at 169-176, 223-226, Defs.' Ex. C; Bramanti Dep. at 76, 237, Defs.' Ex. B.)**

16.  Bramanti is unable to determine the extent to which Mayor Owen and the Village were responsible for raising his property taxes and admits that other taxing bodies were responsible for raising his taxes (See pages 75-77 of Bramanti's deposition testimony).

**RESPONSE: Plaintiffs move to strike as ¶ 16 does not address a contested issue of material fact. Subject to said objection and without waiver, Plaintiffs state that Bramanti testified that he attributed the increase substantially to Mayor Owen and the misuse of public funds. Plaintiffs further states that the misuse of public funds would cause citizens taxes to be increased to cover the cost of the loss. (Bramanti Dep. at 75-76, Defs.' Ex. B.)**

17.  He had a political falling out with Mayor Owen when he resigned in September of 2001 (See page 76 of Bramanti's deposition testimony);

**RESPONSE: Plaintiffs deny that Bramanti resigned because of a "political falling out." Plaintiff states that the "political falling out" that occurred was in response to his resignation. Plaintiff further states that he resigned because he had concerns about Mayor David Owen hiring his own family members for positions that were unnecessary or at a higher salary rate than budgeted for and as a result of the Mayor's family members "not working for the money they were getting paid." (Bramanti Dep. at 76-78, 222, Defs.' Ex. B.)**

**Defendant Peterson went to talk to Plaintiff Bramanti several times to offer him a job and about returning to the Village after his resignation. (Bramanti Dep. at 221-222, Defs.' Ex. B.)**

**After Plaintiff Bramanti resigned, Defendant Owen had instructed Lou Bednarek to ask Plaintiff Bramanti if he would take a consulting job with the Village to help Bob Carl out and that he would make $6000 to $8000 per year. Lou Bednarek did go and ask Plaintiff Bramanti about the consulting job. Defendant Owen at that time did not believe Plaintiff Bramanti was engaging in "ghost pay rolling". (Owen Dep. at 92-95, 137, Defs.' Ex. F.)**

18.   Bramanti concedes that during the municipal election campaign held in February of 2003, he did not possess any records or materials which indicated the mayor's children were being paid for work they did not perform (See page 80 of Bramanti's deposition testimony);

**RESPONSE: Plaintiff admits that he did not possess any "records or material" in February 2003, but denies that he did not have any information.   Ms. Valentino had complained to him about the fact that certain of Owen's children were not showing up and not signing in, but were supposed to be working those hours and were purportedly being paid for those hours. (Valentino Dep. at 169-176, 223-226, Defs.' Ex. C; Bramanti Dep. at 60-65, 237, Defs.' Ex. B.)**

19.   Bramanti admits that he never hired a private detective or investigative agency to investigate the Village (See page 82 of Bramanti's deposition testimony)

**RESPONSE: Plaintiffs move to strike as ¶ 19 does not address a contested issue of material fact.   Subject to said objection and without waiver, Plaintiff admits that as of February 2003 he had not hired a private detective or investigative agency. However, Plaintiff Bramanti states that he had looked into hiring an investigative agency and was attempting to investigate the issue himself through service of the FOIA requests to the Village of South Chicago Heights. (Bramanti Dep. at 178, 181, Defs.' Ex. B.)**

20.   Bramanti formed an organization called Citizens Against Corruption in 2003 (See page 83 of Bramanti's deposition testimony);

**RESPONSE: Admitted.   Plaintiffs further state that the purpose for this organization was to find out the truth about exactly what was happening at the Village, to include ghost pay rolling, and the diverting of funds for political and private use. (Bramanti Dep. at 84, 247, Defs.' Ex. B.)**

21.   Bramanti claims that the FBI investigated the Village's finances. However, he has no knowledge as to whether or not the FBI found anything illegal or improper about the Village's finances (See pages 88-89 of Bramanti' s deposition testimony);

**RESPONSE: Plaintiffs admit that the FBI investigated the issue of misappropriation of Village funds and deception, including the "secret checks." Plaintiff testified that he did not know what the outcome was of the FBI's investigation or if the investigation was ever closed because the FBI does not provide that information. (Bramanti Dep. at 89, Defs.' Ex. B; Fiorenzo Dep. at 35-36, Ex. 1.)**

22.     In his answers to interrogatories, Bramanti identified Scott Owen (one of the mayor's sons) as an individual who allegedly engaged in fraudulent or unlawful conduct. Bramanti admits that he has no personal or firsthand knowledge as to whether Mr. Owen did in fact engage in fraudulent or unlawful conduct (See page 100 of Bramanti's deposition testimony)

**RESPONSE: Plaintiffs admit only that Scott Owen was one of the individuals that Bramanti believes was ghost pay rolled. While Plaintiff Bramanti did not have any "personal or firsthand" knowledge as to whether Scott Owen was being paid for time he did not work, he had received a complaint and information from Ms. Sandra Valentino and others that Scott Owen was not showing up and not signing in, but were supposed to be working those hours and were purportedly being paid for those hours. (Valentino Dep. at 169-176, 223-226, Defs.' Ex. C; Bramanti Dep. at 60-65, 237, Defs.' Ex. B.)**

23.     Bramanti does not whether Scott Owen worked directly with Sandra Valentino (See page 106 of Bramanti's deposition testimony);

**RESPONSE: Plaintiffs move to strike as ¶ 23 does not address a contested issue of *material* fact. Subject to and without wavier of said objection, Plaintiff admits that Bramanti did not know whether Scott Owen worked directly with Sandra Valentino, but did receive information from Sandra Valentino and others that suggested that Scott Owen was getting paid for time he did not work. (Valentino Dep. at 154-157, Defs.' Ex. C; Fiorenzo Page 74-75, Ex. 1; *see also* Pls.' 56.1(b) ¶¶ 55-57.)**

24.     While Bramanti claims that Yvette Owen engaged in fraudulent conduct, she [sic] could not identify with any specificity the fraudulent or illegal conduct in which she allegedly engaged (See pages 106-107 of Bramanti's deposition testimony);

**RESPONSE: Plaintiffs move to strike ¶ 24 in that it misstates and mischaracterizing Bramanti's testimony. Subject to said objection and without waiver, Bramanti testified that Ms. Sandra Valentino relayed to him that Yvette Owen seldom showed up to work despite the fact that she was on the payroll. (Bramanti Dep. at 61, Defs.' Ex. B.)**

25.     Bramanti agrees that federal law mandates that someone who works more than 40 hours per week must be paid overtime (See pages 110-111 of Bramanti's deposition testimony);

**RESPONSE: Plaintiffs move to strike as ¶ 25 does not address a contested issue of material fact. Subject to said objection and without waiver, admitted.**

26.     Bramanti claimed that Erika Owen was paid overtime in violation of the Village of South Chicago Heights' personnel policy (See page 112 of Bramanti's deposition testimony);

**RESPONSE: Admitted, and in fact Erika Owen was paid time and a half even when she worked less than the requisite 40 hours per week. Bramanti also testified that Erika Owen was supposed to be "part-time" and that part-time employees were not supposed to be paid overtime, and that the payroll records showed that Erika Owen was paid more overtime than the four full-time employees in the office put together. Bramanti also testified that Ms. Valentino reported to him that Erika Owen was not always signing on the sign-in sheets, and that she did not have any set hours. She came and went as she pleased. (Bramanti Dep. at 60-61, 78-79, 109-111, Defs.' Ex. B.)**

27.     Bramanti was unable to identify any specific instances in which April Faoro engaged in illegal or unlawful conduct (See page 112 of Bramanti's deposition testimony);

**RESPONSE: Plaintiffs admit that Bramanti was unable to identify any specific instances in which April Faoro engaged in unlawful conduct. Bramanti and Valentino testified that the payroll records and sign-in sheets would reflect whether April Faoro was improperly paid for time she did not work, and that Defendants did not produce those records. (Valentino Dep. 112-113, Defs.' Ex. C.)**

28.     Bramanti was also unable to identify the illegal or unlawful conduct allegedly engaged in by Eric Faoro (See page 117 of Bramanti's deposition testimony);

**RESPONSE: Plaintiffs move to strike ¶ 28 in that it misstates and mischaracterizes Plaintiff Bramanti's testimony in several instances. Subject to said objection and without waiver, Bramanti testified that there were several instances in which Eric Faoro was supposed to be working but did not show up to work or did not show up until much past his start time and was allegedly being paid by the Village for the time that he was not at work. Bramanti also testified that Eric Faoro was a full-time teacher and that it seemed strange that he would be able to work a full-time job as a teacher and put in a 40-hour week with the Village as well. The purpose of him submitting his FOIAs was to determine what Eric Faoro and others were actually being paid, to confirm the suspicions that there was a possibility that there might be ghost pay rolling. (Bramanti Dep. at 61-62, 65, 81, 118–121, 238, 248-251, Defs.' Ex. B.)**

29.    Bramanti admits that he is unable to recall how many building inspections he performed during the year 2000 (See page 124 of Bramanti's deposition testimony);

**RESPONSE: Plaintiffs move to strike as ¶ 29 does not address a contested issue of *material* fact. Subject to said objection and without waiver, Plaintiff states Plaintiff Bramanti admits that he could not recall how many inspections he conducted during the year 2000.**

**Bramanti further states that his job duties as the part-time building inspector for the Village of South Chicago Heights included more than just making inspection when necessary. His job duties and the functions he performed included general but was not limited to responding to all correspondence and questions concerning the Building Department; making inspections when necessary, referring to new construction or rentals or remodeling, code enforcement. (Bramanti Dep. at 34, Defs.' Ex. B.)**

30.    Likewise, Bramanti admits that he is unable to recall how many inspections he conducted during the year 2001 (See pages 124-126 of Bramanti's deposition testimony);

**RESPONSE: Plaintiffs move to strike as ¶ 30 does not address a contested issue of *material* fact. Subject to said objection and without waiver, Plaintiff states Plaintiff Bramanti admits that he could not recall how many inspections he conducted during the year 2001.**

**Bramanti further states that his job duties as the part-time building inspector for the Village of South Chicago Heights included more than just making inspection when necessary. His job duties and the functions he performed included general but was not limited to responding to all correspondence and questions concerning the Building Department; making inspections when necessary, referring to new construction or rentals or remodeling, code enforcement. (Bramanti Dep. at 34, Defs.' Ex. B.)**

31.    Bramanti has no evidence which indicates that David Owen directed Bob Carl to write a letter concerning Bramanti's failure to pay for water service at 175 East 34th Street (See pages 125-126 of Bramanti's deposition testimony).

**RESPONSE: Denied. Plaintiff Bramanti testified that David Owen and Paul Peterson had a hand in the fraudulent water bill for water service at 175 East 34th Street. Plaintiff Bramanti testified that "Dave Owen's been with the village for over 30 years. Nothing happens there without him knowing about it" and that Peterson had a hand in it. (Bramanti Dep. at 125-127, Defs.' Ex. B.)**

**Peterson testified that if there was any problems with water billing he would be informed about them, in fact, he testified that he talked to Bob Carl about the issue regarding the water service and water bill at Bill Bramanti's property at 175 East 34th Street in April 2003. The letter from Carl was not**

> sent until May 2003. (Peterson Dep. at 94, 106-109, 159, 164-165, Defs.' Ex. E.)
>
> David Owen testified that any problems or adjustments would have to get approved through him or through Peterson. (Owen Dep. at 44, Defs.' Ex. F.)

32.    Similarly, he has no information or evidence which indicates that Paul Peterson directed Bob Carl to send Bramanti a letter concerning Bramanti's failure to pay his water bill and charges associated with connecting Bramanti's property to the municipal water system (See page 126 of Bramanti's deposition testimony);

**RESPONSE: Denied.** Plaintiff Bramanti testified that David Owen and Paul Peterson had a hand in the fraudulent water bill for water service at 175 East 34th Street. Plaintiff Bramanti testified that "Dave Owen's been with the village for over 30 years. Nothing happens there without him knowing about it" and that Peterson had a hand in it. (Bramanti Dep. at 125-127, Defs.' Ex. B.)

Peterson testified that if there was any problems with water billing he would be informed about them, in fact, he testified that he talked to Bob Carl about the issue regarding the water service and water bill at Bill Bramanti's property at 175 East 34th Street in April 2003. The letter from Carl was not sent until May 2003. (Peterson Dep. at 94, 106-109, 159, 164-165, Defs.' Ex. E.)

David Owen testified that any problems or adjustments would have to get approved through him or through Peterson. (Owen Dep. at 44, Defs.' Ex. F.)

33.    Bramanti did not pay for the water meter installed at his property located at 175 East 34th Street(See pages 127-128 of Bramanti's deposition testimony);

**RESPONSE: Denied.** Plaintiff states that the water meter was paid for by M&J underground as part of the contract work. (Invoice showing payment made by M&J, Ex. 25; Bramanti Dep. at 135, Defs.' Ex. B.)

Paul Peterson testified that with respect to new construction such as that located at 175 East 34th Street, the contractor generally pays the deposit, the water hook-up fee, and the deposit for the water meter, and that a final water bill would be generated to the builder or contractor. Public works would do a final reading. (Peterson Dep. at 100-103, Defs.' Ex. E.)

34.    Bramanti was charged $450.00 for a sewer tap fee. Bramanti has never paid for water service provided to his property at 175 East 34th Street. Bramanti never paid the sewer tap fee (See pages 129-136 of Bramanti's deposition testimony);

**RESPONSE: Plaintiff moves to strike ¶ 34 in that it misstates and mischaracterizes Bramanti's testimony. Subject to said objection and without wavier, Plaintiffs state that Bramanti testified that he believed that the sewer tap fee was paid for by M&J Underground. (Bramanti Dep. at 129-136, Defs.' Ex. B.)**

**Plaintiff further states that he paid M&J Underground for the sewer tap fee as part of the contract work they did. (Invoice showing payment made by M&J, Ex. 25.)**

35.     Bramanti concedes that it is possible that the Village did not receive payment for the sewer tap fee. He assumes that M&J Underground (a contractor) paid the sewer tab fee (See pages 134-135 of Bramanti's deposition testimony);

**RESPONSE: Plaintiffs state that the sewer tap fee was in fact paid by M&J Underground. (Invoice showing payment made by M&J, Ex. 25.) Plaintiffs further state that Paul Peterson testified that with respect to new construction, such as that located at 175 East 34th Street, the contractor, such as M&J, generally pays these fees. (Peterson Dep. at 100-103, Defs.' Ex. E.)**

36.     The Village has not denied Bramanti any municipal services (See page 137 of Bramanti's deposition testimony)

**RESPONSE: Plaintiff admits only that the Village did not deny him municipal services but states that the Village and Defendants retaliated against him in other ways, including:**
**(a) Sending a FOIA requests to the Village of Glenwood about Bramanti, which mirrored the requests Bramanti submitted to the Village of South Chicago Heights immediately following the requests submitted by Bramanti, (Bramanti 1/23/03 and 1/31/03, Ex. 14-15; Peterson 1/23/03 and 1/31/03 FOIA Request to Glenwood, Ex. 20-21.);**
**(b) Defaming him by making statements calling him a "Gutless Wonder," stating that he was fired because "…he wanted me to ghost payroll him.", and claiming that he did not work for the money he was paid as an inspector, (March 2003 Letter from Mayor Owen to Residents, Ex. 9); and**
**(c) By sending him a fraudulent water bill for water service in excess in the actual amounts owed and refusing to provide him with a true, accurate, and correct bill for water services despite his request or take any other action to correct the situation, (Bramanti Ans. to Village Interrogatory Requests, No. 2, Ex. 34; Bramanti Dep. at 126-132, Defs.' Ex. B.).**

**(*See also* Pls.' Joint 56.1(b) ¶¶ 99-119.)**

37.  Sandra Valentino had no involvement in the FOIA requests that Bramanti submitted to the Village of South Chicago Heights (See pages 143-144 of Bramanti's deposition testimony)

**RESPONSE: Denied.  Ms. Valentino provided information to Bill Bramanti that she believed Mayor Owen's children were getting paid for time they did not work.  (Valentino Dep. at 169-176, 223-226, Defs.' Ex. C; Bramanti Dep. at 60-65, 237, Defs.' Ex. B.)  The purpose of him submitting his FOIAs were to determine what Eric Faoro and others were actually being paid, to confirm the suspicions that there was a possibility that there might be ghost payrolls.  (Bramanti Dep. at 61-62, 65, 81, 118–121, 238, 248-251, Defs.' Ex. B.)**

38.  Bramanti concedes that Joseph Minotti's alleged failure to shut off non-paying water customers was not illegal (See page 152 of Bramanti's deposition testimony)

**RESPONSE: Plaintiff admits that the act in and of itself of failing to shut off non-paying water customers is not illegal, but states that it would be illegal if it is done to secure political votes for the Mayor, which is what Minotti was doing.  (Valentino Dep. at 180, 186, 188, 191, Defs.' Ex. C.)**

39.  Bramanti admits that he has no evidence of any wrongdoing that occurred with regard to the award of a TIFF financing package, which was developed for Michael Rose (See pages 164-165 of Bramanti's deposition testimony);

**RESPONSE: Plaintiffs move to strike ¶ 39 in that it misstates and mischaracterizes Plaintiff Bramanti's testimony.  Subject to said objection and without waiver, Plaintiffs stated that Bramanti testified that he believed that Michael Rose received a TIFF in exchange for political contributions.  (Bramanti Dep. at 164, Defs.' Ex. B.)**

40.  Bramanti also admits he has no evidence or information which indicates that the TIFF awarded for the Walgreens development was improper, illegal or fraudulent (See page 164 of Bramanti's deposition testimony);

**RESPONSE: Plaintiffs move to strike as ¶ 40 does not address a contested issue of *material* fact.  Subject to said objection and without waiver, Plaintiffs admit that Bramanti testified that he did not have any personal knowledge of whether the TIFF was improper, but that he believed that Michael Rose received a TIFF in exchange for political contributions.  (Bramanti Dep. at 164, Defs.' Ex. B.)**

41.  Bramanti was the "interim chairman" of citizens against corruption. As interim chairman, he was "the official letter writer" (See pages 171-172 of Bramanti's deposition testimony)

**RESPONSE: Plaintiff admits that he was listed as the "interim chairman" of the organization he formed called Citizens Against Corruption. (Bramanti Dep. at 83, 144, 247, Defs.' Ex. B.)**

42.     During the 2003 municipal election campaign, Bramanti sent letters out to the residents of South Chicago Heights (See page 174 of Bramanti's deposition testimony);

**RESPONSE: Plaintiff admits that he sent letters out to the residents of the Village of South Chicago Heights and denies that the letters were political propaganda, but were to advise the residents and taxpayers of the Village of South Chicago Heights of the issues of concern about possible fraud and misuses of public funds, ghost pay rolling, and "wrongdoing at Village Hall and the Public Works Department." The letter expressed concern about, among other things, "how the Mayor and the trustees spend our money," and that "[t]hey continually stall to supply this information," *i.e.*, the information Bramanti requested in the FOIAs. (See Def. Village's Ex. A and B; Bramanti Dep. at 247-249, Defs.' Ex. B.)**

43.     In each of the letters Bramanti sent out, he raised the issue of ghost pay rolling in a very public and open manner (See page 174 of Bramanti's deposition testimony);

**RESPONSE: Plaintiff admits that he sent letters out to the residents of the Village of South Chicago Heights and denies that the letters were political propaganda, but were to advise the residents and taxpayers of the Village of South Chicago Heights of the issues of concern about possible fraud and misuses of public funds, ghost pay rolling, and "wrongdoing at Village Hall and the Public Works Department." The letter expressed concern about, among other things, "how the Mayor and the trustees spend our money," and that "[t]hey continually stall to supply this information *i.e.*, the information Bramanti requested in the FOIAs. (See Def. Village's Ex. A and B; Bramanti Dep. at 247-249, Defs.' Ex. B.)**

44.     Sandra Valentino had no involvement in preparing the letters authored by Mr. Bramanti (See page 177 of Bramanti's deposition testimony);

**RESPONSE: Plaintiff denies that Sandra Valentino had no involvement because she provided information to Bill Bramanti that was the subject of the letters. (Valentino Dep. at 169-176, 223-226, Defs.' Ex. C; Bramanti Dep. at 237, Defs.' Ex. B.)**

45.     Citizens Against corruption never hired an investigative agency. As a result, the report identified in Bramanti's February 2003 letter (Exhibit A) did not exist and no report was ever issued (See pages 178-182 of Bramanti's deposition testimony);

**RESPONSE:** Plaintiffs move to strike as ¶ 45 does not address a contested issue of material fact and is duplicative of ¶ 19. Subject to said objection and without waiver, Plaintiff admits that as of February 2003 he had not hired a private detective or investigative agency. However, Plaintiff Bramanti states that he had looked into hiring an investigative agency and was attempting to investigate the issue himself through service of the FOIA requests to the Village of South Chicago Heights. (Bramanti Dep. at 178-181, Defs.' Ex. B.)

Plaintiff further states that while no formal report was ever issued, he was attempting to finalize a report based on his own investigation and sought the information from the Village through his FOIA's in an effort to obtain that information. (Bramanti Dep. at 178-181, Defs.' Ex. B.)

Plaintiffs further state that the fact that Defendants would not produce what was otherwise public information in response to the FOIA's and failed to produce those documents in this case is evidence of the great extent defendants have gone to conceal any evidence that leads to the truth about the ghost pay rolling and misuse of public funds. (Bramanti Dep. at 237, 247-249, Defs.' Ex. B.)

46. Bramanti admits that his statement in his letter to the effect "when the final report was received, it was obvious that there was something that was not right" is misleading (See pages 180-182 of Bramanti's deposition testimony);

**RESPONSE:** Plaintiffs move to strike ¶ 46 in that it misstates and mischaracterizes Bramanti's testimony. Subject to said objection and without wavier, Bramanti testified in response to Defendant's counsel's question: "That particular statement is misleading, it is not," that "it could be taken that way." Plaintiffs further state that Plaintiff Bramanti testified that he had looked into hiring an investigative agency and was attempting to investigate the issue himself through service of the FOIA requests to the Village of South Chicago Heights, and that he was attempting to finalize a report based on his own investigation and sought the information from the Village through his FOIA's in an effort to obtain that information. (Bramanti Dep. at 178-181, Defs.' Ex. B.)

Plaintiffs further state that the fact that Defendants would not produce what was otherwise public information in response to the FOIA's and failed to produce those documents in this case is evidence of the great extent defendants have gone to conceal any evidence that leads to the truth about the ghost pay rolling and misuse of public funds. (Bramanti Dep. at 237, 247-249, Defs.' Ex. B.)

47. By sending out his February 28, 2002 letter, Bramanti was injecting himself into a very public controversy. Under no circumstance did Mr. Bramanti wish to remain anonymous (See pages 184-185 of Bramanti's deposition testimony);

**RESPONSE: Plaintiff denies that he was "injecting himself into a very public controversy," but admits that it was not his intention to be anonymous, he simply forgot to sign his name on the first letter that he sent to the residents of the Village of South Chicago Heights. His hope in sending the letter was to generate public outcry for the misuse of public funds by Defendant Mayor Owen and have the Village respond to his FOIA requests. (Bramanti Dep. at 84, 181, 187, 189, 247, Defs.' Ex. B.)**

48.     By sending out letters on behalf of Citizens Against Corruption (See exhibits A&B). Bramanti was inviting attention to himself albeit unintentionally (See pages 188-189 of Bramanti's deposition testimony);

**RESPONSE: Plaintiffs move to strike ¶ 48 as it is nonsensical. Subject to said objection and without waiver, Plaintiff states that his purpose in sending out the letter was generate public outcry for the misuse of public funds by Defendants Owen and Peterson and have the Village respond to his FOIA requests. (Bramanti Dep. at 84, 181, 187, 189, 247, Defs.' Ex. B.)**

49.     Exhibit C was not written on Village stationary (See pages 191-192 of Bramanti's deposition testimony);

**RESPONSE: Plaintiff admits that Exhibit C was not written on Village stationary.**

50.     Bramanti has no information or evidence which indicates that Exhibit C was written by Village personnel working on Village time (See pages 191-193 of Bramanti's deposition testimony)

**RESPONSE: Denied. Plaintiff states that it was the standard practice of Defendant Owen to use Village resources and services to send out this and similar campaign literature and to work on his campaign, and employees were "expected" to purchase fund raiser tickets to support Mayor Owen's campaign and were also given a certain number of tickets to sell which they often did while working on Village time. (Ellis Dep. at 72-75, Ex. 3.)**

51.     Exhibit C is campaign literature (See pages 191-196 of Bramanti's deposition testimony)

**RESPONSE: Denied. Plaintiff states that Defendant David Owen sent out Exhibit C directly in response to Plaintiff Bramanti's February 2003 letter to the residents of the Village of South Chicago Heights. (Bramanti Dep. at 198, Defs.' Ex. B; Owen Dep. at 248-250, 308-311, Defs.' Ex. F.)**

52.     Bramanti admits he does not know whether asking for the opportunity to engage in "ghost pay rolling" is a crime (See pages 193-194 of Bramanti's deposition testimony)

**RESPONSE: Plaintiff admits that he testified that he does not know whether asking for the opportunity to engage in "ghost pay rolling" is a crime, but the statement made by Defendant Owen in his letter to the citizens and residents of the Village of South Chicago Heights, which states "It strikes me as odd that these charges are likely coming from someone I had to fire *because he wanted me to ghost payroll him.*"  Defendant Owen again slandered and defamed Plaintiff Bramanti by sending out another letter to the citizens of the Village of South Chicago Heights that stated in part:  "It is Mr. Bill Bramanti, the person who wanted me to ghost payroll him," "he did not get pay for no work from the Village and all of []us bear witness to his revenge.  I thought you should know we have discovered that in the year 2001, he performed only 11 inspections for the Village of South Chicago Heights, suggesting that he was involved in ghost pay rolling himself."  Defendant Owen made these false statements to the public in retaliation for Plaintiff Bramanti's attempts to discover and disclose the fraudulent and unlawful conduct by Defendants. (Bramanti Dep. at 192-195, Defs.' Ex. B; Owen Dep. at 250-251, Defs.' Ex. F; 3/11/03 Owen letter, Def. Village's Ex. C; 3/03 Owen Letter, Def. Village's Ex. D.)**

53.     Bramanti has no information or evidence which indicates that the Village trustees approved Exhibit C (See pages 195-196 of Bramanti's deposition testimony)

**RESPONSE: Denied.  The names of the trustees are listed on the letterhead and approved of the letter.  Plaintiffs state that Defendant Owen testified as to Defendant's Exhibit C (March 2003 letter from Mayor Owen on Citizens for Progress Party letterhead) that "*We* put in the letter 'Mr. Glenwood,'" and that the letter was drafted by Mayor Owen.  (Owen Dep. at 248-250, Defs.' Ex. F; *see also* Def. Village's Ex. C.)  As to Defendant's Exhibit D, which is also dated March 2003, Defendant Owen testified that he sent out this letter in his capacity as Mayor.  He had this letter approved by Robert Bush, who was the town attorney.  He also testified that the trustees were aware that the letter was being sent out and supported it "fully."  (Owen Dep. at 308-311, Defs.' Ex. F.)**

54.     Bramanti admits he has no information which indicates Village funds or resources were used to prepare Exhibit C (See pages 192-198 of Bramanti's deposition testimony);

**RESPONSE: Denied.  Plaintiff states that it was the standard practice of Defendant Owen to use Village resources and services to send out this and similar campaign literature and to work on his campaign, and that employees were "expected" to purchase fund raiser tickets to support Mayor Owen's campaign and were also given a certain number of tickets to sell which they often did while working on Village time. (Ellis Dep. at 72-75, Ex. 3.)  Plaintiffs further state**

that Exhibit D, a similar letter sent out by Defendant Mayor Owen, in response to Plaintiff Bramanti's FOIA requests and in response to Bramanti's letters to the residents, was in fact sent out on Village stationary and was approved and paid for by the Village of South Chicago Heights. Moreover, Mayor Owen testified that he sent out this letter in his capacity as Mayor. (Owen Dep. at 308-311, Defs.' Ex. F.)

55. Bramanti believes that the Village of South Chicago Heights and the political party known as "Citizens for Progress" are one and the same (See page 201 of Bramanti's deposition testimony).

**RESPONSE: Plaintiffs move to strike as ¶ 55 does not address disputed issues of fact. Subject to said objection and without waiver, Plaintiff states that his testimony that he considers the Village of South Chicago Heights and the Citizens for Progress Party to be one and the same based on the fact that Mayor Owen has been in power since 1989 and has run the town in such a manner as to retaliate against individuals that have gone against him politically or otherwise or have questioned conduct by him and his family that appears to be in violation of the public trust and misuse of public funds. (Bramanti Dep. at 232, Defs.' Ex. B; Owen Dep. at 16-17, Defs.' Ex. F.)**

56. Bramanti does not know whether Paul Peterson was involved in creating either Exhibits C or D (See pages 201-203 of Bramanti's deposition testimony);

**RESPONSE: Plaintiffs move to strike ¶ 56 in that it does not address disputed issues of fact and irrelevant to Plaintiff Bramanti's claims against Defendant Owen and the Village of South Chicago Heights. Subject to said objection and without waiver, Plaintiffs state that Defendant Owen testified as to Defendant's Exhibit C (March 2003 letter from Mayor Owen on Citizens for Progress Party letterhead) that "We put in the letter. . . ." (Owen Dep. at 248-250, Defs.' Ex. F; see also Def. Village's Ex. C.) As to Defendant's Exhibit D, which is also dated March 2003, Defendant Owen testified that he sent out this letter in his capacity as Mayor. He had this letter approved by Robert Bush, who was the town attorney. He also testified that the trustees were aware that the letter was being sent out and supported it "fully." (Owen Dep. at 308-311, Defs.' Ex. F.)**

57. David Owen's correspondence (Exhibit C, marked as Bramanti Exhibit 6) did not deter Bramanti from exercising his First Amendment rights (See pages 203-206 of Bramanti's deposition testimony).

**RESPONSE: Plaintiffs move to strike ¶ 57 in that it misstates and mischaracterized Plaintiff Bramanti's testimony. Subject to said objection and without waiver, Plaintiff states that while Plaintiff testified that Defendant Owen's correspondence – in which Defendant Owen stated: "It strikes me as odd that**

17

these charges are likely coming from someone I had to fire because he wanted me to ghost payroll him," and "It is Mr. Bill Bramanti, the person who wanted me to ghost payroll him." – did not prevent Plaintiff Bramanti from sending another letter, it did have the effect of deterring and silencing speech. (Bramanti Dep. at 203-206, Defs.' Ex. B); *see also DeGuiseppe v. Village of Bellwood*, 68 F.3d 187, 192 (7th Cir.1995) (conduct "need merely create *the potential* for chilling employee speech on matters of public concern.") (emphasis added); *see also Walsh v. Ward*, 991 F.2d 1344, 1345 (7th Cir.1993) ("A campaign of petty harassment may achieve the same effect as an explicit punishment."); *Smith v. Fruin*, 28 F.3d 646, 649 (7th Cir.1994) ("even minor forms of retaliation can support a First Amendment claim, for they may have just as much of a chilling effect as more drastic measures"); *McGill v. Board of Educ. of Pekin Elementary School*, 602 F.2d 774, 780 (7th Cir.1979). Lesser retaliation such as "false accusations" all may suffice. *See, e.g., Dahm v. Flynn*, 60 F.3d 253 (7th Cir.1994); *Pieczynski v. Duffy*, 875 F.2d 1331, 1333 (7th Cir.1989).

58.     Exhibit D does not mention William P. Bramanti by name.

**RESPONSE:** Plaintiff admits that Defendant Owen's letter to the Residents of the Village of South Chicago Heights does not refer to Plaintiff Bramanti by name specifically, but it does make reference and provide enough information where it is clear that Defendant Owen is referring to Plaintiff Bramanti, including but not limited to making reference to Plaintiff's then current employer, the Village of Glenwood, and referring to him as "Mr. Glenwood" and stating "coming from someone I had to fire because he wanted me to ghost payroll him; let's call him 'Mr. Glenwood,'" and referring to the fact that "'Mr. Glenwood' used to be a part-time inspector." Plaintiff was a part-time inspector for the Village of South Chicago Heights and was the only part-time inspector for the Village of South Chicago Heights in the last 10 years. The defamatory letters were also given to the Mayor of Glenwood and at least one trustee. These letters were also distributed to the public of Glenwood. (Bramanti Dep. at 217-218, Defs.' Ex. B; Def. Village's Exhibit D; Bramanti Dep. at 22, 34, Def. Village's Ex. B; *see also* Pls.' Resp. ¶ 84, *infra*.)

59.     As of March 28, 2003, there was a major controversy concerning the politics and the way business was done in the Village of South Chicago Heights (See page 208 of Bramanti's deposition testimony);

**RESPONSE: Plaintiffs move to strike ¶59 in that it misstates and mischaracterized Plaintiff Bramanti's testimony. Subject to said objection and without waiver, Plaintiffs state that the "controversy" was the fact that Bramanti was attempting to get information from the Village of South Chicago Heights through FOIA requests and as a result of what Plaintiff believed was fraud, ghost pay rolling, and misuse of public funds being committed by Defendants Owen and Peterson. (Bramanti Dep. at 84, 181, 187, 189, 208, 247-249, Defs.' Ex. B.)**

60.     In paragraph 59 of his complaint, Bramanti states "Defendant Owen's statements were not reasonably related to his duties of Mayor of the Village of South Chicago Heights" (See page 210 of Bramanti' s deposition testimony)

**RESPONSE: Plaintiffs move to strike ¶ 60 in that it misstates Plaintiff Bramanti's testimony. Defendant's counsel simply asked Plaintiff to read ¶ 59 of Plaintiffs' complaint. As to the defamation count, Paragraph 59 of Plaintiff's complaint states: "Defendant OWEN'S statements were not reasonably related to his duties of Mayor of the Village of South Chicago Heights." (Plaintiffs' Complaint ¶ 59, Defs.' Ex. A.)**

61.     Bramanti believes that Defendant Owen's statements were not reasonably related to his duties as Mayor of the Village of South Chicago Heights (See pages 210-212 of Bramanti's deposition testimony)

**RESPONSE: Plaintiffs move to strike ¶ 61 in that it misstates Plaintiff Bramanti's testimony. Subject to said objection and without waiver, Plaintiff states that it is clear from his testimony that he did not understand the question. Moreover, Defendants Owen and Peterson admit that their actions were taken under color of law. (Defendants Peterson and Owen's Answer to Plaintiff's Complaint, ¶ 71, Ex. 33.)**

62.     Bramanti acknowledges that he has, in his lawsuit, accused Eric Faoro of theft (See page 223 of Bramanti's deposition testimony)

**RESPONSE: Plaintiffs move to strike ¶ 62 in that it does not address a contested issue of *material* fact. Subject to said objection and without waiver, Plaintiff admits that by claiming that Defendants engaged in conduct that would constitute ghost pay rolling by paying Eric Faoro for time that he did not work, would constitute theft. (*See also* Pls.' 56.1(b) ¶¶ 43-50.)**

63.     Bramanti concedes that he has no evidence of any kind which indicates that Mr. Faoro was paid for work he did not perform (See pages 223-224 of Bramanti's deposition testimony)

**RESPONSE: Denied. The questioning by Defendants' counsel is not clear and the term "evidence" is a legal term not normally understood by lay persons. Subject to said objection and without wavier, Plaintiff admits that he had no independent evidence that Eric Faoro was being paid for work that he did not perform. He did however believe based upon past history of Defendants Owen and Peterson, based upon prior complaints about the Chief of Police Ron Diedrich, and based upon the information he received from Sandra Valentino that there was ghost pay rolling occurring in the Village and that there was a misuse of public funds. (*Compare* Bramanti Dep. at 223-224, *with e.g.,* Bramanti Dep. at 32, 33, 37-39, 118-119, Defs.' Ex. B; Pl.'s 56.1(b) ¶¶ 42-65.)**

64. Bramanti acknowledged that he did not have any evidence which indicated that Yvette Owen was paid for hours she did not work (See page 225 of Bramanti's deposition testimony)

**RESPONSE: Denied. The questioning by Defendants' counsel is not clear and the term "evidence" is a legal term not normally understood by lay persons. Subject to said objection and without wavier, Plaintiff admits that he had no independent evidence that Yvette Owen was being paid for work that he did not perform. He did however believe based upon past history of Defendants Owen and Peterson, based upon prior complaints about the Chief of Police Ron Diedrich, and based upon the information he received from Sandra Valentino that there was ghost pay rolling occurring in the Village and that there was a misuse of public funds. (*Compare* Bramanti Dep. at 223-224, *with e.g.,* Bramanti Dep. at 32, 33, 37-39, 118-119, Defs.' Ex. B.)**

65. Bramanti has not been able to determine the extent of any business loss he allegedly sustained as a result of conduct described in his complaint (See page 227 of Bramanti's deposition testimony)

**RESPONSE: Plaintiffs move to strike ¶ 65 in that it is too restrictive on Plaintiff's claims for damages and misstates and misrepresents the evidence in this case. Subject to said objection and without waiver, Plaintiff admits that in answer to Defendant's counsel's very limited question as to the "quantif[ication] of any *business losses*" he has sustained, he was not able to quantify such loss. However, there is evidence in the record of damages suffered by Plaintiff Bramanti including damage to his integrity, reputation, emotional distress, embarrassment and humiliation. (Bramanti Dep. at 223, 227-228, Defs.' Ex. B; *see also* Plaintiff Bramanti Ans. to Village Interrog. No. 7, Ex. 34.)**

**Plaintiff also testified that the conduct of Defendants affected everything. He was receiving harassing phone calls at home and hang-up calls. His wife, who was at home, would get calls from her friends and they would ask her about the letters sent out by Defendant Owen. "[T]his was not confined to just South Chicago Heights. This became well spread in Chicago Heights**

and the surrounding communities, and as I said before, even in Glenwood, because someone physically sent letters to certain people, key people in Glenwood." (Bramanti Dep. at 229-230, Defs.' Ex. B.)

Moreover, because the statements made by Defendant Owen constitute defamation *per se*, damages are assumed. *Zych v. Tucker*, No. No. 1-05-1906, --- N.E.2d ----, 2006 WL 408229 (Ill.App. 1st Dist. 2006) *Van Horne v. Muller*, 195 Ill.2d 299, 307 (1998); *Bryson v. News America Publications, Inc.*, 174 Ill.2d 77, 86 (1996).

66.  When asked to identify any relationship, if any, between David Owen's newsletter (Exhibit C) and the Village of South Chicago Heights, Bramanti stated "Dave Owen is South Chicago Heights. He is the town" (See page 232 of Bramanti's deposition testimony)

**RESPONSE: Plaintiffs move to strike ¶ 66 in that it does not address a contested issue of *material* fact. Subject to said objection and without waiver, Plaintiff states that his testimony is based on the fact that Mayor Owen has been in power since 1989 and has run the town in such a manner as to retaliate against individuals that have gone against him politically or otherwise or have questioned conduct by him and his family that appears to be in violation of the public trust and misuse of public funds. (Bramanti Dep. at 232, Defs.' Ex. B.)**

67.  Bramanti sent out FOIA requests to prove, one way or another, whether Eric Faoro and the Owens children were being paid for time they did not work (See page 252 of Bramanti's deposition testimony);

**RESPONSE: Plaintiffs admit that Plaintiff Bramanti submitted FOIA's to the Village of South Chicago Heights requesting the (1) time cards and/or sign in sheets for Scott Owen, Erika Owen and Yvette Owen for the months of June 2002, July 2002 and August 2002 also their hourly salary, (2) The check register for payroll and all bills and services paid by the Village for fiscal years 2001 to 2002 and 2002 to present, and (1) The actual bills and not statement for a list of items, which was attached to the FOIA (the "bill list" was attached); and (2) The names of the person or if more than one person their names and the breakdown of the salary on the appropriation ordinance #02-ORD-08. (Valentino Dep. at 38, 92-94, 112-114, 122-123, 156, 168-170, 172-173, 220-221, 240-241, Defs.' Ex. C; Bramanti Dep. at 77, 142, Defs.' Ex. B; Bramanti FOIA Requests, Exs. 13, 14, 16; *see* ¶¶ 42-63, *supra*.)**

**Plaintiff submitted these FOIA requests in an attempt to investigate the fraud and ghost pay rolling that he believed was occurring based upon past history of Defendants Owen and Peterson, based upon prior complaints about the Chief of Police Ron Diedrich, and based upon the information he received from Sandra Valentino that there was ghost pay rolling occurring in**

the Village and that there was a misuse of public funds. (Bramanti Dep. at 32, 33, 37-39, 118-119, Defs.' Ex. B; Pl.'s 56.1(b) ¶¶ 69-78.)

Plaintiff further states as a citizen and business owner in the Village of South Chicago Heights, he was concerned about the diversion of public funds for private and political use. (Bramanti Dep. at 84, Defs.' Ex. B.)

68.    Bramanti admits having no personal knowledge as to whether or not Scott Owen was paid for hours he did not work (See page 253 of Bramanti's deposition testimony);

RESPONSE: Plaintiff admits only that he did not have any "personal knowledge" as to whether in fact Scott Owen was being paid for hours that he did not work. Plaintiff further states that he did however believe based upon past history of Defendants Owen and Peterson and based upon the information he received from Sandra Valentino that Scott Owen was being paid for time that he did not work, that there was ghost pay rolling occurring in the Village, and that there was a misuse of public funds. (*Compare* Bramanti Dep. at 223-224, *with e.g.,* Bramanti Dep. at 32, 33, 37-39, 118-119, Defs.' Ex. B; Pl.'s 56.1(b) ¶¶ 55-78.)

69.    Sandra Valentino never set up a water account for Bramanti' s property at 175 East $_{34}$th Street (See page 255 of Bramanti' s deposition testimony);

RESPONSE: Plaintiff admits that Sandra Valentino never set up a water account for Bill Bramanti's property at 175 East 34th Street, but further states that Tony Renzetti was supposed to give Sandra Valentino the work order to set up the account, but never did. (Bramanti Dep. at 255, Defs.' Ex. B; Valentino Dep. at 233, Defs.' Ex. C.)

70.    Bramanti has absolutely no personal knowledge as to what Paul Peterson allegedly said to Joseph Christofanelli, the Village manager of Glenwood (See page 259 of Bramanti's deposition testimony);

RESPONSE: Plaintiffs move to strike ¶ 70 in that it does not address a contested issue of *material* fact. Subject to said objection and without waiver, Plaintiffs admit that Bill Bramanti did not have any personal knowledge as to what Paul Peterson said to Joseph Christofanelli in the conversation that Peterson had with Christofanelli outside Bramanti's presence. (Bramanti Dep. at 259, Defs.' Ex. B.) Plaintiffs state that Bill Bramanti testified that Joe Christofanelli told Bramanti that Paul Peterson had contacted him and the Mayor of Glenwood about getting Bill Bramanti to stop coming in for the FOIAs. (Bramanti Dep. at 244, Defs.' Ex. B.)

71.     Bramanti does not know whether Paul Peterson slandered or libeled him during his
        conversations with Joseph Christofanelli and the mayor of Glenwood (See page 263 of
        Bramanti' s deposition testimony).

**RESPONSE: Plaintiffs move to strike ¶ 71 in that it does not address a contested issue of
*material* fact. Subject to said objection and without waiver, Plaintiffs admit
that Bill Bramanti does not have any personal knowledge that in Peterson's
telephone conversation with Christofanelli – where Peterson was attempting
to get Christofanelli to stop Bill Bramanti from submitting the FOIA
requests – that Peterson said anything that was defamatory. (Bramanti Dep.
at 244, 259, 263, Defs.' Ex. B.)**

72.     A local political party known as the Care Team held fundraisers to finance Mr.
        Bramanti's litigation against the Village (See pages 25-29 of Terry Fiorenzo's deposition
        testimony);

**RESPONSE: Plaintiffs move to strike ¶ 72 in that it does not address a contested issue of
*material* fact. Subject to said objection and without waiver, denied. Plaintiff
Bramanti states that he borrowed some money to pay some expenses in this
case. (Bramanti Aff. ¶¶, Ex. 32.)**

73.     No law enforcement agency ever filed any type of complaint against David Owen in
        connection with investigation of certain manual checks that were written during the years
        1991 through 1995 (See pages 34-37 of Terry Fiorenzo's deposition testimony);

**RESPONSE: Plaintiffs move to strike ¶ 73 in that it misstates the deposition testimony and
is unsupported by the record citation. Subject to said objection and without
waiver, in response to Defendants' counsel's question: "To your knowledge,
*is there* any type of law enforcement investigation ongoing concerning the
Village of South Chicago and these so-called secret checks?" Terry Fiorenzo
testified "I wouldn't know." (Fiorenzo Dep. at 36, Ex. 1.) Terry Fiorenzo
also testified that he went to the FBI regarding the "secret checks" and the
FBI was investigating the matter. (Fiorenzo Dep. at 35-36, Ex. 1.)**

74.     Mr. Fiorenzo has no evidence or information which indicates that Mayor Owen or Paul
        Peterson were responsible for shooting out his windows, egging his house, or perpetrating
        other acts of vandalism (See pages 45-48 of Terry Fiorenzo's deposition testimony);

**RESPONSE: Denied. Mr. Fiorenzo testified that during the election in which he was
running for mayor in 1997, his window was shot out, eggs thrown at his
house, his phone lines were cut, things were stolen off his truck, and damage
to several supporters' tires. People who put up signs supporting him were
"called and sometimes harassed about putting my sign in their yard." He
also testified: "sometime after that I went to a party in which two police
officers led me to believe who did it. I was led to believe that it was another**

police officer, Todd Krol, that – who lived right next-door to our headquarters, did all the damage. I complained to the police department about all the police, because they were going down behind our headquarters probably every 15 minutes. . . . I might have told Lance Knolls that I – I was suspect of him (Todd Krol). . . . I told him I thought it was Todd Krol since he lived directly next-door and had access to quickly do things. . . . He didn't – he didn't deny that. He said – I can't remember exactly what he said, but he led me to believe that it could have been Todd. . . . that Todd was not probably above doing those sorts of things. In my opinion, Todd was given a job as a policeman [by David Owen]. I don't know how qualified Todd was to be a police officer." (Fiorenzo Dep. at 45-48, 65-68, 117, Ex. 1.)

75. During the municipal election campaign in 2003, Fiorenzo's property was not vandalized (See page 56 of Terry Fiorenzo's deposition testimony);

**RESPONSE: Plaintiffs admit that Terry Fiorenzo testified that in 2003 his property was not vandalized; however, Mr. Fiorenzo did not run in 2003 election. (Fiorenzo Dep. at 49, 56, Ex. 1.)**

76. Mr. Fiorenzo has no factual basis to support his belief that Joseph Minotti was hired to get votes (See pages 147 of Terry Fiorenzo's deposition testimony);

**RESPONSE: Denied. Mr. Fiorenzo had already testified that he had heard from others that Joseph Minotti was hired to get votes. He also understood that Joe Minotti left the village for a period of time because of a driver's license issue and that he was brought back just before the election, and he couldn't understand why they would do that since nobody seemed to like Joe Minotti. (Fiorenzo Dep. at 135, 147, Ex. 1.)**

77. Terry Fiorenzo is unaware of any instance in which the mayor publicly appeared before the Board and begged the Board to approve certain manual checks that were written during the years 1991-1995 (See pages 143-144 of Terry Fiorenzo's deposition testimony);

**RESPONSE: Plaintiffs move to strike ¶ 77 in that it does not address a contested issue of *material* fact. Subject to said objection and without waiver, Terry Fiorenzo testified that he was not aware of the Mayor appearing "publicly" before the Board, but that he was aware of meetings the Mayor held with the trustees in private, on his gazebo. Joseph Kudra told him that Mayor Owen had pleaded with them to approve the "secret checks" at the advise of Rob Bush (Village attorney) that they had to approve the secret checks, even after they were two-and-a-half years old, to save the mayor. (Fiorenzo Dep. at 143-145, Ex. 1.)**

78.     Mr. Fiorenzo admits he was not "harassed" during the 2003 municipal elections cycle
        (See page 123 of Terry Fiorenzo ' s deposition testimony);

**RESPONSE: Plaintiffs admit that Terry Fiorenzo testified that in 2003 he was not aware
of any harassment, such as tires being slashed, phone lines being cut, or
property being vandalized; however, Mr. Fiorenzo did not run in 2003
election. (Fiorenzo Dep. at 49, 56, 123, Ex. 1.)**


79.     George Bova does not believe that Paul Peterson retaliated against him when he sent him
        a letter advising that his water would be shut off if he did not pay a $3.25 bill (See pages
        44-48 of George Bova's deposition testimony);

**RESPONSE: Plaintiffs object to ¶ 79 in that it calls for a legal conclusion as to the term
"retaliation" and moves to strike in that it misstates and mischaracterizes
Mr. Bova's testimony.  Subject to said objection and without waiver, Plaintiff
states that the testimony was as follows:**

    10          The letter in which he threatened to
    11  turn off your water had nothing to do with politics,
    12  correct?
    13      A   I think it did, I think it did, because who
    14  would threaten to shut off somebody's water, which is
    15  illegal, over a bill that has nothing to do -- the
    16  only reason he can pull -- disconnect my water is for
    17  nonpayment of a water bill, and that's it, period,
    18  and my water bill was paid.
    19      Q   Was he retaliating against you?
    20      A   What would you call it?
    21      Q   But why was he retaliating against you?
    22      A   Ask him.  I don't know.  He was retaliating.
    23  I -- I felt as though I was being retaliated against,
    24  and I felt as though I was being threatened, because
    1   he not only was threatening me, he was threatening my
    2   family.
    3       Q   Do you believe he was threatening you
    4   because you exercised your First Amendment Rights?
    5       MS. KURTZ:  I'll object.  It's a legal
    6   conclusion.
    7   BY MR. RUBERRY:
    8       Q   You can answer.
    9       A   What's the legal -- what's my First
    10  Amendment Rights?  I'm not a lawyer.  Go ahead,
    11  explain that to me.

**(Bova Dep. at 46-47, Ex. 30.)**

80.     Mr. Bova does not believe that Paul Peterson "retaliated against him" because he campaigned for Joseph Kudra (See page 49 of Mr. Bova' s deposition testimony);

**RESPONSE: Plaintiffs object to ¶ 80 in that it calls for a legal conclusion as to the term "retaliation" and moves to strike in that it misstates and mischaracterizes Mr. Bova's testimony. Subject to said objection and without waiver, Mr. Bova testified that in 2003 he did support Joseph Kudra who was running against Defendant David Owen. The letter from Peterson occurred on the heels of the election. (Bova Dep. at 46-49, Ex. 30; *See also* Pls.' Response to ¶ 79, *supra*.)**

81.     Bramanti does not know whether Paul Peterson wrote the newsletter (Exhibits D & E) (See pages 202-203 of Bramanti's deposition testimony);

**RESPONSE: Plaintiffs move to strike in that Defendant Village's Exhibit E is not a newsletter but an affidavit by Peterson which should be stricken. Plaintiffs further move to strike in that ¶ 81 is duplicative of ¶ 56. (*See* Pls.' Response to ¶56, *supra.*)**

82.     The issue of corruption in the water department was not raised in the any of the letters Bramanti sent on behalf of Citizens Against Corruption (See Exhibit A & B);

**RESPONSE: Denied. Plaintiffs state that the letters reference the FOIA requests Bill Bramanti served on the Village of South Chicago Heights, which include requests for (4) Account activity, checking account register and balance sheets for the Lake Michigan bond issue since its inception, and (5) All bond, financial, contracts and bills documents relating to the Lake Michigan water project; and (1) List of all commercial and industrial water users including addresses, (Valentino Dep. at 38, 92-94, 112-114, 122-123, 156, 168-170, 172-173, 220-221, 240-241, Defs.' Ex. C; Bramanti Dep. at 77, 142, Defs.' Ex. B; Bramanti 1/21/03 FOIA Requests, Ex. 13; Bramanti 1/23/03 FOIA Requests, Ex. 14; *see* ¶¶ 42-63, *supra*.)**

**The letters also refer to "possible wrongdoing at Village Hall and the Public Works Department." The letter expressed concern about, among other things, "how the Mayor and the trustees spend our money," and that "[t]hey continually stall to supply this information." (See Def. Village's Ex. A and B.)**

83.     Bramanti conducted 11 building inspections during the year 2001 and was paid $13,000.00 by the Village (See affidavit of Paul Peterson);

**RESPONSE: Plaintiff moves to strike ¶ 83 in that the affidavit provided by Defendant Peterson is inconsistent with his deposition testimony. (Peterson Dep. at 44-46, 56, Defs.' Ex. E.) Plaintiffs also move to strike in that the affidavit is does**

not establish that Peterson has any personal knowledge as to the number of inspections conducted by Bramanti and is based on pure speculation and hearsay. Therefore, the affidavit should be stricken.  Plaintiff further moves to strike in that "conclusory statements or mere speculation cannot be the basis of either the grant or denial of summary judgment." *Medina v. City of East Chicago*, 184 F. Supp. 2d 805, 814 (N.D. Ill. 2001) (*citing Abioye v. Sundstrand Corp.*, 164 F.3d 364, 368 (7th Cir. 1998) (statements cannot be based upon rumor or more speculation).  Over and above said objection, denied.  (*See* Pl.'s 56.1(b) ¶¶ 78-124.)

Bramanti conducted more than 11 building inspections during the year 2001, and performed more work for the Village of South Chicago Heights than just "inspections."  His job duties and the functions he performed included general but was not limited to responding to all correspondence and questions concerning the Building Department; making inspections when necessary, referring to new construction or rentals or remodeling, code enforcement. (Bramanti Dep. at 34, Defs.' Ex. B.)

84.  When he received Exhibit A, David Owen did not know who wrote it (See pages 246-247 of Owen's deposition testimony);

RESPONSE: Plaintiff moves to strike ¶ 84 in that it misstates Defendant Owen's testimony.  Subject to said objection and without waiver, Plaintiffs state that Defendant Owen testified that he had referred to Mr. Bramanti in his letter in response to this letter, and had referred to Mr. Bramanti as "Mr. Glenwood."  In fact he testified:  "We put in the letter Mr. Glenwood," and that he knew that the letter was from Mr. Bramanti, "deduction made it so."  Defendant Owen further testified that he made the correlation that the letter was from Mr. Bramanti because Mr. Bramanti had sent FOIA's to the Village of South Chicago Heights requesting information on payroll and other matters.  (Owen Dep. at 248-250, Defs.' Ex. F.)

85.  Typically the Village of South Chicago Heights issues 200 to 300 building permits per year (See page 304 of David Owen's deposition testimony);

RESPONSE: Plaintiffs move to strike ¶ 85 in that it does not address a contested issue of *material* fact.  Plaintiff moves to strike it is based on pure speculation and not supported by any evidence in the record or documents produced by Defendants.  In fact Defendant Owen testified that he did not know what the building inspectors filled out for the different kinds of inspections.  (Owen Dep. 304, 320, Defs.' Ex. F.)  Moreover, building inspections are different than building permits.

86.     The Village Board never took a vote to determine whether the Village should respond to the charges made by "Citizens Against Corruption" (See pages 30-306 of David Owen's deposition testimony);

**RESPONSE: Plaintiff moves to strike ¶ 86 in that it misstates Defendant Owen's testimony.  Subject to said objection and without waiver, Plaintiffs state that the names of the trustees are listed on the letterhead and approved of the letter.  Plaintiffs state that Defendant Owen testified as to Defendant's Exhibit C (March 2003 letter from Mayor Owen on Citizens for Progress Party letterhead) that "*We* put in the letter 'Mr. Glenwood,'" and that the letter was drafted by Mayor Owen.  (Owen Dep. at 248-250, Defs.' Ex. F; *see also* Def.'s Ex. C.)  As to Defendant's Exhibit D, which is also dated March 2003, Defendant Owen testified that he sent out this letter in his capacity as Mayor.  He had this letter approved by Robert Bush, who was the town attorney.  He also testified that the trustees were aware that the letter was being sent out and supported it "fully."  (Owen Dep. at 308-311, Defs.' Ex. F.)**

87.     When he responded to Bramanti's tax, David Owen was not relying on any authority that was invested in him by the State of Illinois (See pages 307-308 of David Owen's deposition testimony).

**RESPONSE: Plaintiff moves to strike ¶ 87 in that it misstates Defendant Owen's testimony.  Subject to said objection and without waiver, Plaintiffs state that Defendant Owen testified he sent out the letter in his capacity as Mayor.  He had this letter approved by Robert Bush, who was the town attorney.  He also testified that they trustees were aware that the letter was being sent out and supported it "fully."  (Owen Dep. at 308-311, Defs.' Ex. F.)  Defendants Owen and Peterson admit that their actions were taken under color of law. (Defendants Peterson and Owen's Answer to Plaintiff's Complaint, ¶ 71, Ex. 33.)**

Respectfully submitted,

SANDRA L. VALENTINO and WILLIAM P. BRAMANTI

**s/Dana L. Kurtz**

*Electronically filed on February 28, 2006*

_____

Attorney for Plaintiffs

Dana L. Kurtz (6256245)
KURTZ LAW OFFICES, LLC
414 South State Street
Lockport, Illinois 60441
Phone: (815) 383-0968
Facsimile: (312) 893-2239
E-mail: dkurtz@kurtzlaw.us