## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

SANDRA L. VALENTINO and WILLIAM P.
BRAMANTI,

        Plaintiffs,

    v.                                                      No. 04 C 2373

VILLAGE OF SOUTH CHICAGO HEIGHTS,        Honorable Judge William J. Hibbler
PAUL PETERSON, and MAYOR DAVID
OWEN, in their official and individual capacity,

        Defendants.

## PLAINTIFFS' RESPONSE TO DEFENDANT VILLAGE OF SOUTH CHICAGO HEIGHTS' RULE 56.1(a) STATEMENT AS TO PLAINTIFF VALENTINO

NOW COMES Plaintiffs , through their undersigned counsel, and responds to Defendant Village of South Chicago Heights Rule 56.1(a) Statement of Facts as to Plaintiff Sandra Valentino's Claims (Counts I and III), and for the reasons stated herein and in Plaintiff's Response to Defendants' Motions for Summary Judgment, Plaintiff Bramanti's Response to Defendant Village of South Chicago Heights 56.1(a) Statement of Facts, and Defendant Peterson and Owen's 56.1(a) Statement of Facts, and Plaintiff's Additional Statement of Facts Pursuant to Rule 56.1(b), Plaintiffs respectfully request the Court deny Defendants' motions for summary judgment.

1.     Sandra Valentino was never involved in an organization known as the Care Team (See page 20 of Sandra Valentino's deposition testimony attached hereto);

**RESPONSE: Admitted.**

2.     Sandra Valentino was never involved in an organization known as Citizens Against Corruption (See pages 19-20 of Valentino's deposition testimony);

**RESPONSE: Admitted.  Plaintiffs further state that when Ms. Valentino noticed the inconsistency of the Owen's children logging their time on the sign-in sheet Ms. Valentino expressed her concern to William "Bill" Bramanti. (Valentino Dep. at 122-123, Defs.' Ex. C.)[1]**

---

[1]    References herein to "Defs.' Ex. __" (A, B, C, etc.) refer to exhibits filed by Defendants Owen and Peterson in support of Defendants Owen and Peterson's Statement of Facts.  Plaintiffs have incorporated those exhibits herein rather than filing duplicate deposition transcripts.  References to "Ex. _" refer to Plaintiffs' Exhibits attached to Plaintiff's 56.1(b) statement of facts or attached hereto.

3.    Sandra Valentino was not actively involved in the 2003 municipal elections held in South Chicago Heights (See page 20 of Valentino's deposition testimony);

**RESPONSE: Admitted.**


4.    Sandra Valentino did not actively campaign for Joseph Kudra or support Joseph Kudra and the Care Team Party (See page 21 of Valentino's deposition testimony);

**RESPONSE: Admitted.**


5.    Paul Peterson never told Sandra Valentino that he was terminating her because she worked for Mr. Bramanti (See page 21 of Valentino' s deposition testimony);

**RESPONSE: Plaintiffs move to strike ¶ 5 in that it does not address a contested issue of *material* fact. The issue is not about Ms. Valentino working for Bill Bramanti, who owned a laundry mat and a construction company. The issue is that Plaintiff Valentino was terminated because she was providing information, which suggested that Defendants were engaging in ghost pay rolling, fraudulent water billing, and misuse of public funds and the public trust, to Bill Bramanti and because Defendants were afraid that she was going to expose the things they were doing. (*See* Pl.'s Complaint, Defs.' Ex. A; Valentino Dep. at 240-241, Defs.' Ex. C; *see* Pls.' 56.1(b) § V.)**


6.    David Owen never told Valentino that he was terminating her because she was working closely with Mr. Bramanti and his private business (See page 21 of Valentino's deposition testimony);

**RESPONSE: Plaintiffs move to strike ¶ 6 in that it does not address a contested issue of *material* fact. The issue is not about Ms. Valentino working for Bill Bramanti, who owned a laundry mat and a construction company. The issue is that Plaintiff Valentino was terminated because she was providing information, which suggested that Defendants were engaging in ghost pay rolling, fraudulent water billing, and misusing public funds and the public trust, to Bill Bramanti and because Defendants were afraid that she was going to expose the things they were doing. (*See generally* Pl.'s Complaint, Defs.' Ex. A; Valentino Dep. at 240-241, Defs.' Ex. C.) Subject to said objection and without waiver, Plaintiff Valentino admits that Defendant David Owen never told Valentino that he was terminating her because she worked for Bill Bramanti at his private businesses (which was the laundry mat and a construction company.) (Valentino Dep. at 20-21, Defs.' Ex. C.) *See also* Pls.' 56.1(b) §V.**

7.     Valentino was unable to identify any instances in which the mayor's children signed in late for work but were not docked (See page 34, 36 and 37 of Valentino's deposition testimony). She also has no proof which shows that the mayor's children were not docked;

**RESPONSE: Plaintiff moves to strike ¶ 7 in that it misstates and mischaracterizes Ms. Valentino's testimony and is not supported by the record citation. Subject to said objection and without waiver, Plaintiff Valentino testified that the daily sign-in sheets would reflect those instances in which the Mayor's children signed in late or did not sign in at all. (Valentino Dep. at 73-75, Defs.' Ex. C.)**

**The evidence in the record suggests that in fact Defendants were engaging in ghost pay rolling and other fraudulent and illegal acts, and thereby unlawfully depleting public funds. (Valentino hand written notes, Ex. 10; Faoro timesheets, Ex. 11; Valentino Dep. at 112, 36, 126, Ex. Defs.' Ex. C; Marrufo timesheet, Ex. 11; *see also* Pls.' 56.1(b) §§ V(D), VI, IX.)**

8.     Valentino never told Peterson that a property owner, who owned property at Jackson and 29th Street, failed to pay for water meters (See pages 39-40 of Valentino's deposition testimony);

**RESPONSE: Plaintiff Valentino admits that she never told Peterson because she was told by Tony Renzetti, the Director of Public Works, that per "the Mayor" (David Owen) they were not to be billed. (Valentino Dep. at 39-40, Defs.' Ex. C.)**

9.     Valentino never told Mayor Owen that Mr. Renzetti had told her not to bill the property owner at 29th and Jackson for the water meters (See page 42 of Valentino's deposition testimony);

**RESPONSE: Plaintiff Valentino admits that she never told Owen because she was told by Tony Renzetti, the Director of Public Works, that per "the Mayor" (David Owen) they were not to be billed. (Valentino Dep. at 39-40, Defs.' Ex. C.)**

10.     Valentino never complained to David Owen or Paul Peterson about Louis Bednarek's alleged failure to pay water hook-up fees (See pages 43-44 of Valentino's deposition testimony);

**RESPONSE: Plaintiffs move to strike ¶ 10 in that it misstates Plaintiff's testimony and is not supported by the record citation. Subject to said objection and without waiver, Plaintiffs state that Plaintiff Valentino in fact did tell Paul Peterson about Louis Bednarek not paying water hook-up fees. (Valentino Dep. at 44, Defs.' Ex. C.)**

3

11. Valentino started monitoring the Village Hall sign-in sheets in April of 2002 because she felt her check was being unfairly docked (See page 54 of Valentino's deposition testimony);

**RESPONSE: Plaintiffs move to strike ¶ 11 in that it misstates Ms. Valentino's testimony. Subject to said objection and without waiver, Plaintiffs state that Sandra Valentino testified that she questioned that because she was being docked if others were also being docked, so she paid closer attention to the sign-sheets. (Valentino Dep. at 125-126, Defs.' Ex. C.)**

**Ms. Valentino also started making copies of the sign-in sheets and putting them in her desk so she could verify her (and others time) and started keeping notes about those employees she believed were not being docked when they did not show up to work and were getting paid for time that they were not working. Ms. Valentino also told Bill Bramanti about this. (Valentino Dep. at 122-123, 127-145, Defs.' Ex. C.)**

12. Valentino was just concerned for herself at that time and did not think it was fair that she should be docked for being one minute late (See pages 54-55 of Valentino's deposition testimony);

**RESPONSE: Plaintiffs move to strike ¶ 12 in that it misstates Ms. Valentino's testimony. Subject to said objection and without waiver, Plaintiffs state that Sandra Valentino testified that she questioned that because she was being docked if others were also being docked, so she paid closer attention to the sign-sheets. (Valentino Dep. at 125-126, Defs.' Ex. C.)**

**Ms. Valentino also started copies of the sign-in sheets in her desk so she could verify her (and others time) and started keeping notes about those employees she believed were not being docked when they did not show up to work and were getting paid for time that they were not working. Ms. Valentino also told Bill Bramanti about this. (Valentino Dep. at 122-123, 127-145, Defs.' Ex. C.)**

13. During her employment with the Village, Valentino worked exclusively in the Village Hall (See page 68 of Valentino's deposition testimony);

**RESPONSE: Admitted.**

14. Valentino was unable to recall any specific instances in which her paycheck was docked for being late but she was in fact on time (See page 73-74 of Valentino's deposition testimony)

**RESPONSE: Plaintiff moves to strike ¶ 14 in that it misstates and mischaracterizes Ms. Valentino's testimony and is not supported by the record citation. Subject to said objection and without waiver, Plaintiff Valentino testified that in fact she was docked. While she could not recall the specific dates, she would have to look at the sign-in sheets to refresh her recollection. (Valentino Dep. at 73-75, Defs.' Ex. C.)**

15.     Valentino never complained to either Paul Peterson or Mayor Owen about her check being improperly docked (See page 74 of Valentino's deposition testimony);

**RESPONSE: Plaintiff moves to strike ¶ 15 in that it misstates and mischaracterizes Ms. Valentino's testimony and is not supported by the record citation. Subject to said objection and without waiver, denied. Ms. Valentino complained to Defendant Peterson in April 2002 and asked to see her time sheet, because Peterson was filling them out from the daily sign-in sheets, and asked for copies of her sign-in sheets so that she could compare them with her pay check. (Valentino Dep. at 70-71, Defs.' Ex. C.)**

16.     On August 16, 2002, Erica Owen was docked for being late (See pages 83-87 of Valentino's deposition testimony);

**RESPONSE: Denied. Plaintiff admits only that the document shown to her in deposition seems to suggest that Erica Owen was to be docked, however, Ms. Valentino has not seen Erica Owen's pay stub for that time period to know whether or not she was in fact docket for being late. (Valentino Dep. at 86-87, Defs.' Ex. C.)**

        **Plaintiffs further state that Defendants have destroyed and altered documents in this case, and failed to produce the pay roll records for Erica Owen, among the other children of Mayor Owen. (*See* Pls.' 56.1(b) §§ V(D), IX.)**

17.     Valentino did not keep written records of the number of hours worked by Erica Owen, Scott Owen, April Faoro, Yvette Owen or Ron Diedrich (See pages 87-89 of Valentino's deposition testimony);

**RESPONSE: Plaintiffs admit that Ms. Valentino did not keep written records of the "number of hours worked by Erica Owen, Scott Owen, April Faoro, Yvette Owen, or Ron Diedrich." Plaintiffs further state that Valentino kept written notes on times she believed that Defendant Owen's children were supposed to be working and were on the pay roll, but were not at work. (*See* Pls.' 56.1(b) § V(D).)**

18.     Valentino never complained to Paul Peterson or Mayor Owen about Chief of Police Ron Diedrich's work habits (See page 90 of Valentino's deposition testimony);

**RESPONSE: Admitted.**


19.     Although Valentino believes that Police Chief Ron Diedrich was being paid for hours he did not work. However, her belief is based on what other people have told her (See page 94 of Valentino's deposition testimony).

**RESPONSE: Plaintiffs move to strike ¶ 19 in that the record citation does not support the stated proposition. Subject to said objection and without waiver, Plaintiff states that her belief that Police Chief Ron Diedrich was being paid for hours he did not work was based upon the fact that "several trustees and employees lived on the same block as him in the Village, and it's just from what they always seen and said," and based upon her own personal observations that "especially when it was nice outside, you never seen him around. If he got called in, it was always in his shorts, T-shirt. He looked like he was half asleep or half drunk." (Valentino Dep. at 94, Defs.' Ex. C.)**


20.     Valentino concedes that she does not know for fact whether Eric Faoro, the mayor's son-in-law, was paid for hours that he did not work (See pages 99-100 of Valentino's deposition testimony).

**RESPONSE: Plaintiffs move to strike ¶ 20 in that it misstates and mischaracterizes Valentino's testimony. Subject to said objection and without waiver, Plaintiff Valentino testified:**

> **He (Eric Faoro) was supposed to work 3:00 to 11:00. He wasn't consistent about coming in the same time every day. Sometimes he wasn't even there by the time I left at 5:00. Like I said, I did make notations. He even had worked sometimes in the daytime. I mean, it was not consistent. He brought in his baby many times with her playpen. And, I mean, it was like -- It wasn't the same. It wasn't his -- There were times that I said – that I documented that I didn't see him that I had in my notes. So it makes me believe that he wasn't there; he shouldn't get paid.**

> **(Valentino Dep. at 99-100, Defs.' Ex. C.)**

> **According to Plaintiff Valentino's "post-it" notes (those that she had not left in her desk) reflecting times when certain employees were not at work, it appears that in fact Eric Faoro was being paid for time that he did not work. (*See* Pls.' 56.1(b) § V(D).)**

21.     Valentino claimed there were evenings in which she drove past the Village parking lot but did not see Eric Faoro's car parked in the Village lot. During these drive-by's, she never walked into the Village hall to determine whether or not Mr. Faoro was inside working (See pages 114-115 of Valentino's deposition testimony).

**RESPONSE: Plaintiffs admit that Ms. Valentino drove past the Village parking lot and did not see Eric Faoro's car and that she did not physically walk into Village Hall because Eric Faoro had his own vehicle to transport him to work. (Valentino Dep. at 113, Defs.' Ex. C.)**

22.     She never advised Paul Peterson or Mayor Owen that Eric Faoro was being paid for hours he did not work (See pages 120-121 of Valentino's deposition testimony).

**RESPONSE: Plaintiff Valentino admits that she did not tell Paul Peterson or Mayor Owen about Eric Faoro specifically. Plaintiffs state, however, that Ms. Valentino kept written notes on times she believed that Defendant Owen's children were supposed to be working and were on the pay roll, but were not at work. Defendant Peterson knew that Plaintiff Valentino was keeping notes about those employees she believed were not being docked when they did not show up to work and were getting paid for time that they were not working. (Valentino Dep. at 122-123, 127-145, 238-241, Defs.' Ex. C; Pls.' 56.1(b) §§V(D), VI, VII.)**

23.     She never told Paul Peterson or David Owen that certain Village employees were being paid for hours they did not work (See page 121 of Valentino's deposition testimony).

**RESPONSE: Plaintiffs admit that Valentino never told Paul Peterson or David Owen specifically that Owen's children were being paid for hours they did not work. Plaintiffs further state that Defendant Peterson knew that Plaintiff Valentino was keeping notes about those employees she believed were not being docked when they did not show up to work and were getting paid for time that they were not working. (Valentino Dep. at 122-123, 127-145, 238-241, Defs.' Ex. C.) Defendants also knew that Plaintiff Valentino was giving information to Bill Bramanti and believed that she was providing him information that led Bramanti to submit the FOIA requests. (*See* Pls.' 56.1(b) §§ V(E), VI.)**

24.     Valentino never told Paul Peterson that she was in the process of gathering data and documents which would show that certain Village employees were being paid for hours they did not work (See pages 121-122 of Valentino's deposition testimony).

**RESPONSE: Plaintiff Valentino admits that she never told Paul Peterson specifically that she was "in the process of gathering data and documents which would show that certain Village employees were being paid for hours they did not work." (Valentino Dep. at 121-122, Defs.' Ex. C.) Plaintiffs state however, Plaintiffs**

further state that Defendant Peterson knew that Plaintiff Valentino was keeping notes about those employees she believed were not being docked when they did not show up to work and were getting paid for time that they were not working. (Valentino Dep. at 122-123, 127-145, 238-241, Defs.' Ex. C.) Defendants also knew that Plaintiff Valentino was giving information to Bill Bramanti and believed that she was providing him information that led Bramanti to submit the FOIA requests. (*See* Pls.' 56.1(b) §§ V(E), VI.)

25.     Valentino never advised either David Owen or Paul Peterson that David Owen's children were paid for hours they did not work (See page 122 of Valentino's deposition testimony).

**RESPONSE: Plaintiffs admit that Valentino never told Paul Peterson or David Owen specifically that Owen's children were being paid for hours they did not work. Plaintiffs state however, that Defendant Peterson knew that Plaintiff Valentino was keeping notes about those employees she believed were not being docked when they did not show up to work and were getting paid for time that they were not working. (Valentino Dep. at 122-123, 127-145, 238-241, Defs.' Ex. C.) Defendants also knew that Plaintiff Valentino was giving information to Bill Bramanti and believed that she was providing him information that led Bramanti to submit the FOIA requests. (*See* Pls.' 56.1(b) §§ V(E), VI.)**

26.     Valentino never complained to David Owen about the alleged failure of Mayor Owen's daughter, Erica, to sign out properly (See pages 136-137 of Valentino' s deposition testimony).

**RESPONSE: Plaintiff admits that she never complained to David Owen about Erica Owen's failure to sign in and out. (Valentino Dep. at 136-137, Defs.' Ex. C, *but see* Pls.' 56.1(b) §§ V(E), VI (evidence that Defendants' knew Plaintiff Valentino was keeping notes and reporting this information to Bill Bramanti).)**

27.     Valentino never complained to Paul Peterson about the mayor's children being late for work (See page 137 of Valentino's deposition testimony).

**RESPONSE: Plaintiff admits that she never complained to Paul Peterson about the mayor's children being late for work. (Valentino Dep. at 136-137, Defs.' Ex. C, *but see* Pls.' 56.1(b) §§ V(E), VI (evidence that Defendants' knew Plaintiff Valentino was keeping notes and reporting this information to Bill Bramanti).)**

28.    Valentino never complained to Paul Peterson or Mayor Owen about Paul Peterson's work attendance (See page 165 of Valentino's deposition testimony).

**RESPONSE: Plaintiff Valentino admits that she never complained to Peterson or Owen about Peterson, her boss's, work attendance. However, Plaintiff Valentino complained to Terry Fiorenzo and Joe Kudra (Village Trustees) about Defendant Peterson's work attendance and being paid. (Valentino Dep. at 163-167, Defs.' Ex. C.)**

29.    Valentino admits that the docking of her paycheck was not a matter of public concern (See page 171 of Valentino's deposition testimony).

**RESPONSE: Plaintiffs admits that the docking of her paycheck was not a matter of public concern, but denies that her complaints were only about the "docking of her paycheck" and states that her complaints were about matters of public concern, *e.g.,* about Owen's kids and Peterson's nieces and nephews being paid for time that they did not work, the water billing practices, and misuse of public funds for political and personal gain. (*See* Pls.' Responses to Defendants' Motions for Summary Judgment; *see also* Pls.' 56.1(b) §§ V(D), VI, VII.)**

30.    Valentino never advised Paul Peterson that she was assisting Mr. Bramanti with his FOIA request (See page 175 of Valentino's deposition testimony).

**RESPONSE: Plaintiffs admit that Valentino never told Paul Peterson specifically that she was assisting Mr. Bramanti with his FOIA requests. However, Defendant Peterson knew that Plaintiff Valentino was giving information to Bill Bramanti and believed that she was providing him information that led Bramanti to submit the FOIA requests. (*See* Pls.' 56.1(b) §§ V(D), V(E), VI.)**

31.    At the end of February of 2003, Valentino began making copies of the sign-in sheets on a regular basis. She did that because she wanted to make sure that her check was not being unfairly docked (See pages 176-77 of Valentino's deposition testimony).

**RESPONSE: Plaintiffs move to strike ¶ 31 in that it misstates Ms. Valentino's testimony. Subject to said objection and without waiver, Ms. Valentino started making copies of the sign-in sheets and putting them in her desk so she could verify her (and others time) and started keeping notes about those employees she believed were not being docked when they did not show up to work and were getting paid for time that they were not working. Ms. Valentino also told Bill Bramanti about this. Valentino also testified that she questioned that because she was being docked if others were also being docked, so she paid closer attention to the sign-sheets. (Valentino Dep. at 122-123, 125-126, 127-145, Defs.' Ex. C.)**

9

32.     Valentino believes that Village employee Joseph Minotti is lazy (See page 179 of Valentino's deposition testimony).

**RESPONSE: Plaintiffs move to strike ¶ 32 in that it does not address a contested issue of *material* fact. The issue is not about whether Minotti is lazy, but with respect to Minotti that Minotti engaged in what plaintiff believed were fraudulent practices and failed to perform his duties in shutting off people's water for political gain for Defendant Mayor Owen, which Defendants condoned and consented despite Plaintiff Valentino's reports of the improprieties. (Valentino Dep. at 39, 178-180, 184-185, 192-193, 198-202, 206, 267, Defs.' Ex. C; Peterson Dep. at 136-137, Defs.' Ex. E; Valentino Aff. ¶¶ 4-7, Ex. 31; 9/13/02 Valentino Memo, Ex. 5.) Subject to said objection and without waiver, Valentino testified that she believed that Minotti was lazy.**

33.     Valentino never told David Owen that Lou Bednarek absolutely refused to pay for a water meter at his house (See page 183 of Valentino's deposition testimony).

**RESPONSE: Admitted; however, Valentino complained to Peterson about Mr. Bednarek's failure to pay the water hookup fees. (Valentino Dep. at 44, Defs.' Ex. C; Pl. Valentino's Ans. to Defendant SCH Interrog. Request No. 5, Ex. 6.)**

34.     Valentino was unable to recall whether she ever told Paul Peterson that Lou Bednarek refused to pay for his water meter (See page 183 of Valentino's deposition testimony).

**RESPONSE: Denied. Plaintiff did in fact speak to Peterson in regards to Mr. Bednarek not paying his bills (water hookup fees). (Valentino Dep. at 44, Defs.' Ex. C; Pl. Valentino's Ans. to Defendant SCH Interrog. Request No. 5, Ex. 6.)**

35.     Valentino admits that she is unable to recall any instances in which David Owen approached her and instructed her to refrain from cutting off a particular resident's water service because that resident is a friend or supporter (See page 186-188 of Valentino's deposition testimony).

**RESPONSE: Admitted. However, Plaintiff Valentino was told by Tony Renzetti, the Director of Public Works, that per "the Mayor" (David Owen) certain political supporters were not to be billed. (Valentino Dep. at 39-40, Defs.' Ex. C.)**

36.     Valentino admits that she never told Mayor Owen or Paul Peterson that she intended to expose illegal water billing practices in the Village of South Chicago Heights (See pages 190-191 of Valentino' s deposition testimony).

**RESPONSE: Plaintiffs admit that Valentino never specifically told Mayor Owen or Paul Peterson that she "intended to expose illegal water billing practices in the Village of South Chicago Heights." However, Valentino did complain about what she believed was unlawful billing practices and provided information to Bill Bramanti that certain employees, family members of Defendants Owen and Peterson, were getting paid for time that they had not worked, and in response Bill Bramanti submitted to Defendants several Freedom of Information Act ("FOIA") Requests requesting information that would have proven these practices were occurring. (Valentino Dep. at 38, 92-94, 112-114, 122-123, 156, 168-170, 172-173, 220-221, 240-241, Defs.' Ex. C; Bramanti Dep. at 77, 142, Defs.' Ex. B; Bramanti 1/21/03 FOIA Requests, Ex. 13-; *see also* Pls.' 56.1(b) §§ V, VI, VII, IX.)**

37. While Valentino had suspicions about alleged "ghost payrolling" at the Village of South Chicago Heights, she never expressed those suspicions to either David Owen or Paul Peterson (See page 191 of Valentino's deposition testimony).

**RESPONSE: While Plaintiff Valentino never specifically told Mayor Owen or Paul Peterson that she "had suspicions about alleged 'ghost pay rolling,'" Valentino did complain about what she believed was unlawful billing practices and provided information to Bill Bramanti that certain employees, family members of Defendants Owen and Peterson, were getting paid for time that they had not worked, and in response Bill Bramanti submitted to Defendants several Freedom of Information Act ("FOIA") Requests requesting information that would have proven these practices were occurring. (Valentino Dep. at 38, 92-94, 112-114, 122-123, 156, 168-170, 172-173, 220-221, 240-241, Defs.' Ex. C; Bramanti Dep. at 77, 142, Defs.' Ex. B; Bramanti 1/21/03 FOIA Requests, Ex. 13; *see also* Pls.' 56.1(b) §§ V, VI, VII, IX.)**

38. Neither David Owen nor Paul Peterson ever told Valentino that she should not bill Lou Bednarek for a water meter (See page 197 of Valentino's deposition testimony).

**RESPONSE: Admitted. It was by Tony Renzetti, the Director of Public Works, that told her that per "the Mayor" (David Owen) he was not to be billed. (Valentino Dep. at 39-40, Defs.' Ex. C.)**

39. Valentino listed 31 individual who had not paid their water bills and allegedly gave the list to Joseph Minotti (See page 198 of Valentino's deposition testimony).

**RESPONSE: Admitted.**

40.     Valentino does not know whether these 31 individuals were supporters of David Owen (See page 198 of Valentino's deposition testimony).

**RESPONSE: Plaintiff admits that she was unable to determine whether or not the 31 individuals were supporters of David Owen because Defendants destroyed and failed to produce in discovery the notes that were in her desk drawer reflecting, among other things, the 31 individual's names. (Peterson Dep. at 316-317, Defs.' Ex. E; Defendant's 3rd Request to Admit Facts, No. 1, Ex. 23; Kurtz 37.2 Letters, Ex. 27.)**

41.     Valentino is aware of no evidence or information which indicates either David Owen or Paul Peterson directed Joe Minotti to refrain from shutting off water service to non-paying customers (See page 200 of Valentino's deposition testimony).

**RESPONSE: Denied.   The circumstantial evidence that Peterson and Owen directed (and/or consented) includes but is not limited to the following:  the fact that Minotti was hired because he was the "vote getter." (Valentino Dep. at 180, Defs.' Ex. C; Owen Dep. at 48-50, Defs.' Ex. F.)  The fact that Minotti engaged in what plaintiff believed were fraudulent practices and failed to perform his duties in shutting off people's water for political gain for Defendant Mayor Owen, which Defendants condoned and consented despite Plaintiff Valentino's reports of the improprieties. (Valentino Dep. at 39, 178-180, 184-185, 192-193, 198-202, 206, 267, Defs.' Ex. C; Peterson Dep. at 136-137, Defs.' Ex. E; Valentino Aff. ¶¶ 4-7, Ex. 31; 9/13/02 Valentino Memo, Ex. 5.)  Plaintiff Valentino repeatedly complained, and her complaints fell on deaf ears.   Peterson and Owen failed to take any action to ensure that Minotti performed his duties in (among other things) conducting the shut-offs.  (*See* Pls.' 56.1(b) §§ V(A), V(B), V(C), and ¶¶ 84, and 85.)**

42.     On or about September 13, 2002, Valentino and Joseph Minotti were involved in an argument at the Village Hall. Valentino prepared a written memorandum that contains her version of what occurred and what led up to the September altercation with Mr. Minotti (See pages 202-204 of Valentino's deposition testimony and).

**RESPONSE: Plaintiffs admit that on or about September 13, 2002, Plaintiff Valentino became aware that Joe Minotti had unlawfully closed on a home he had purchased, without receiving a final water bill, a final inspection, other certificates, and payment of escrow.  When Plaintiff questioned the employee about the unlawfulness of this, he flew into a rage and responded: "deal with my attorney."  (Valentino Dep. at 39, 178, 192, 201-202, 206, Defs.' Ex. C.)  Plaintiff Valentino again complained to Defendant Peterson about what she believed to be fraudulent and unlawful practices, about Mr. Minotti failing to pay the necessary fees and fill out the necessary paperwork for his house closing, which resulted in money lost to the Village of South Chicago Heights. (Valentino Dep. 193, Defs.' Ex. C; 9/13/02 Valentino Memo, Ex. 5; Peterson Dep. at 136, Defs.' Ex. E.)  In her memorandum of September 13, 2002,**

**Valentino complained to Paul Peterson about Joe Minotti not doing his job and how he closed on a house without a final water bill, a final inspection, $1000 escrow, occupancy permit and other things that are required by the Village. (Valentino Dep. at 204, 206, Defs.' Ex. C; Valentino 9/13/02 Memo, Ex. 5.)**

43.     In her memorandum of September 13, 2002, Valentino complained to Paul Peterson about Joseph Minotti's failing to do his job. Valentino's September 13, 2002 memorandum does not mention ghost payrolling (See pages 206-207 of Valentino's deposition testimony).

**RESPONSE: Plaintiffs admit only that Valentino's memorandum of September 13, 2002 indicated that Joe Minotti was not doing his job and how he closed on a house without a final water bill, a final inspection, $1000 escrow, occupancy permit and other things that are required by the Village. (Valentino Dep. at 204, 206, Defs.' Ex. C; Valentino 9/13/02 Memo, Ex. 5.) Plaintiff admits that the memorandum does not mention "ghost pay rolling."**

44.     Valentino received a verbal warning in connection with the altercation/argument she had with Joseph Minotti (See pages 227-230 of Paul Peterson's deposition testimony).

**RESPONSE: Plaintiff admits that she received a verbal warning, but denies that she had an altercation or argument with Minotti, and states that it was Minotti that flew into a rage. Plaintiff further states that the verbal warning she received was retaliatory for her memorandum of September 13, 2002, in which she complained about Minotti not conducting the shut-offs, closing on a house without a water bill or a final inspection, without the $1,000 escrow or occupancy permit, and the other things that were required. (Valentino Dep. at 204, 206, Defs.' Ex. C; Valentino 9/13/02 Memo, Ex. 5; Valentino Dep. at 207-210, 214, Defs.' Ex. C; 9/18/02 Valentino Verbal Warning, Ex. 7; *see also* Pls.' 56.1(b) §§ V(A), V(B), V(C).)**

45.     Joseph Minotti received a written warning in connection with the altercation he had with Sandra Valentino (See pages 227-230 of Paul Peterson deposition testimony).

**RESPONSE: Denied.   The evidence suggests that Defendants created the "written warning" for Minotti after the fact in an effort to cover up their retaliatory motive. On the "written warning" for Minotti, it appears that the date was written in retroactively as reflected by the handwriting over the date. (Minotti Written Warning, Ex. 8.) The language in the "written warning" for Minotti is exactly the same as the language in the "verbal warning" issued to Plaintiff Valentino on September 18, 2002. (*Compare* Valentino Verbal Warning, Ex. 7; *with* Minotti Written Warning, Ex. 8.) The "written warning" Peterson claims he issued to Minotti is contrary to Peterson's own testimony. The written warning provides that "you (referring to Minotti)**

13

> continued to shout at and abuse another employee in my presence, making
> wholly unjustified accusations of incompetence and misconduct …", (Minotti
> Written Warning, Ex. 8.), whereas Peterson testified that while Minotti said
> "some things" to Ms. Valentino, he said them "in a quiet tone," (Peterson
> Dep. at 217-220, Defs.' Ex. E).

46.    She does not believe that Paul Peterson issued a verbal warning to her because she had
complained about illegal or unlawful water billing practices (See page 213 of Valentino's
deposition testimony).

**RESPONSE: Plaintiff states that she believed it was retaliatory for her memorandum of
September 13, 2002, in which she complained about Minotti not conducting
the shut-offs, closing on a house without a water bill or a final inspection,
without the $1,000 escrow or occupancy permit, and the other things that
were required. (Valentino Dep. at 204, 206, Defs.' Ex. C; Valentino 9/13/02
Memo, Ex. 5; Valentino Dep. at 207-210, 214, Defs.' Ex. C; 9/18/02 Valentino
Verbal Warning, Ex. 7; *see also* Pls.' 56.1(b) §§ V(A), V(B), V(C).)**

47.    Valentino believes the verbal warning was unfair because Mr. Minotti was the one who
caused the confrontation, not her (See page 213 of Valentino's deposition testimony).

**RESPONSE: Admitted.**

48.    At no time prior to September 18, 2002 did Valentino ever tell Paul Peterson that she
believed that Village employees were engaging in ghost payrolling (See page 212 of
Valentino's deposition testimony).

**RESPONSE: Plaintiff admits that prior to September 18, 2002 did not tell Paul Peterson
that she believed that Village employees were engaging in ghost pay rolling.
(*But see* Pls.' 56.1(b) §§ V(D), V(E), VI.)**

49.    David Owen never told Valentino that Joe Minotti was a "vote getter" and that is "why he
was hired" (See page 219 of Valentino's deposition testimony).

**RESPONSE: Denied. Misstates the testimony, Plaintiff actually stated that she could not
recall and did not specifically tell her. (page 219) Plaintiff further states that
she was told this by both Joe Minotti and Tony Renzetti (Village Trustee).
(Valentino Dep. at 180, Defs.' Ex. C.)**

50.    Valentino was not copying the daily timesheets so that she could give them to Mr.
Bramanti (See page 224 of Valentino's deposition testimony).

**RESPONSE: Admitted.**

51.     She was making the copies for her own personal use in connection with the docking of her paycheck (See pages 224-225 of Valentino's deposition testimony).

**RESPONSE: Plaintiffs move to strike ¶ 51 in that it misstates Ms. Valentino's testimony and is duplicative of ¶¶ 11 and 12. Subject to said objection and without waiver, Ms. Valentino also started copies of the sign-in sheets in her desk so she could verify her (and others time) and started keeping notes about those employees she believed were not being docked when they did not show up to work and were getting paid for time that they were not working. Ms. Valentino also told Bill Bramanti about this. (Valentino Dep. at 122-123, 127-145, Defs.' Ex. C.)**

52.     Valentino never opened a water account for Mr. Bramanti's property at 175 East 34th Street (See page 230 of Valentino's deposition testimony).

**RESPONSE: Plaintiff admits that Sandra Valentino never set up a water account for Bill Bramanti's property at 175 East 34th Street, but further states that Tony Renzetti was supposed to give Sandra Valentino the work order to set up the account, but never did. (Bramanti Dep. at 255, Defs.' Ex. B; Valentino Dep. at 233, Defs.' Ex. C.)**

53.     When she left the Village's employment in February of 2003, no water account had been established for Mr. Bramanti's property at 175 East 34th Street, South Chicago Heights, IL (See page 232 of Valentino's deposition testimony).

**RESPONSE: Plaintiffs admit that Sandra Valentino did not set up a water account for Bill Bramanti's property at 175 East 34th Street, because Tony Renzetti was supposed to give Sandra Valentino the work order to set up the account, but never did. (Bramanti Dep. at 255, Defs.' Ex. B; Valentino Dep. at 233, Defs.' Ex. C.)**

54.     When she was terminated, there were no notes in Valentino's desk which addressed the issues of "alleged ghost payrolling practice" (See page 239 of Valentino's deposition testimony).

**RESPONSE: Plaintiffs move to strike ¶ 54 in that it misstates Ms. Valentino's testimony. Ms. Valentino testified that she could not remember every single note that she did keep in her desk. Plaintiff further states that she did have the sign-in sheets in her desk with notes on them, and notes of the unlawful water billing practices, her notes about those employees she believed were not being docked when they did not show up to work and were getting paid for time that they were not working, notes about Joe Minotti, Lou Bednarek, and the fraudulent water billing practices. (Valentino Dep. at 122-123, 127-145, 238-241, Defs.' Ex. C.)**

55.     Valentino never told Mayor David Owen that she was giving information to Mr. Bramanti about alleged ghost payrolling (See page 241 of Valentino's deposition testimony).

**RESPONSE: Admitted. However, Defendant Owen knew that she was providing information to Mr. Bramanti about the things that he had requested in the FOIA requests. (*See* Pls.' 56.1(b) §§ V and VI.)**

56.     Valentino never told Mr. Peterson that she was giving information to Mr. Bramanti about alleged ghost payrolling (See age 241 of Valentino's deposition testimony).

**RESPONSE: Admitted. However, Defendant Owen knew that she was providing information to Mr. Bramanti about the things that he had requested in the FOIA requests. (*See* Pls.' 56.1(b) §§ V and VI.)**

57.     George Bova never complained to either Mayor Owen or Paul Peterson about the matter in which the Village was being run (See page 48 of George Bova's deposition testimony).

**RESPONSE: Plaintiffs move to strike ¶ 57 in that it does not address a contested issue of *material* fact. Subject to and without waiver of said objection, admitted.**

58.     Mr. Bova admits that he has no knowledge of any instances in which the Village has retaliated against individuals based on their political association (See page 39 of Bova's deposition testimony).

**RESPONSE: Plaintiffs object to ¶ 58 in that it misstates and mischaracterizes Mr. Bova's testimony. Subject to said objection and without waiver, Plaintiff states that the testimony was as follows:**

> **10      The letter in which he threatened to**
> **11    turn off your water had nothing to do with politics,**
> **12    correct?**
> **13      A   I think it did, I think it did, because who**
> **14    would threaten to shut off somebody's water, which is**
> **15    illegal, over a bill that has nothing to do -- the**
> **16    only reason he can pull -- disconnect my water is for**
> **17    nonpayment of a water bill, and that's it, period,**
> **18    and my water bill was paid.**
> **19      Q   Was he retaliating against you?**
> **20      A   What would you call it?**
> **21      Q   But why was he retaliating against you?**
> **22      A   Ask him. I don't know. He was retaliating.**
> **23    I -- I felt as though I was being retaliated against,**
> **24    and I felt as though I was being threatened, because**
> **1    he not only was threatening me, he was threatening my**

16

2  family.
3     Q    Do you believe he was threatening you
4  because you exercised your First Amendment Rights?
5     MS. KURTZ:  I'll object.  It's a legal
6  conclusion.
7  BY MR. RUBERRY:
8     Q    You can answer.
9     A    What's the legal -- what's my First
10  Amendment Rights?  I'm not a lawyer.  Go ahead,
11  explain that to me.

**(Bova Dep. at 46-47, Ex. 30.)  Mr. Bova also testified that he believed other people were retaliated against by Defendants, including Rose Batista.  (Bova Dep. at 40-41, Ex. 30.)**

59.    Mr. Bova does not believe his termination has anything to do with Sandra Valentino's firing (See page 59 of Bova's deposition testimony).

**RESPONSE:  Plaintiffs object to ¶ 59 in that it misstates and mischaracterizes Mr. Bova's testimony.  Subject to said objection and without waiver, Plaintiff states that the testimony was as follows:**

10          The letter in which he threatened to
11  turn off your water had nothing to do with politics,
12  correct?
13     A    I think it did, I think it did, because who
14  would threaten to shut off somebody's water, which is
15  illegal, over a bill that has nothing to do -- the
16  only reason he can pull -- disconnect my water is for
17  nonpayment of a water bill, and that's it, period,
18  and my water bill was paid.
19     Q    Was he retaliating against you?
20     A    What would you call it?
21     Q    But why was he retaliating against you?
22     A    Ask him.  I don't know.  He was retaliating.
23  I -- I felt as though I was being retaliated against,
24  and I felt as though I was being threatened, because
1  he not only was threatening me, he was threatening my
2  family.
3     Q    Do you believe he was threatening you
4  because you exercised your First Amendment Rights?
5     MS. KURTZ:  I'll object.  It's a legal
6  conclusion.
7  BY MR. RUBERRY:

> 8   Q   You can answer.
> 9   A   What's the legal -- what's my First
> 10  Amendment Rights?  I'm not a lawyer.  Go ahead,
> 11  explain that to me.

**(Bova Dep. at 46-47, Ex. 30.)**

60.   Mayor Owen has never tried to punish George Bova for anything he said (See page 56 of Bova's deposition testimony).

**RESPONSE: Plaintiffs move to strike ¶ 60 in that it does not address a contested issue of *material* fact.  Subject to said objection and without waiver, see Plaintiffs' response to ¶ 59, *supra*.**

61.   The Village has never punished George Bova for anything he has said (See page 59 of Bova's deposition testimony).

**RESPONSE: Plaintiffs move to strike ¶ 60 in that it does not address a contested issue of *material* fact.  Subject to said objection and without waiver, see Plaintiffs' response to ¶ 59, *supra*.**

62.   On August 1, 2003, Erica Owen was late for work and was docked 15 minutes (See Exhibit A, Bates No. 1185).

**RESPONSE: Plaintiff admits only that according to this document Erica Owen was docked 15 minutes. Plaintiff further states that this does not confirm whether or not she was paid, in order to do that Plaintiff would require a copy of the pay roll records and sign in sheets for Erica Owen.  Defendants failed and refused to produce several of the payroll records and time-sheets that were requested in discovery and refused and failed to produce the originals for inspection, despite Plaintiffs' repeated requests.  On many of the records, there appears to have white-out and other changes to the original, but the original was never produced. (*See* Sign-In Sheets, Ex.12; Time Sheets, Ex. 11; Kurtz 37.2 Letters, Ex. 27; *see* Pls.' 56.1(b) §IX.)  Thus, Plaintiffs are entitled to an adverse inference.  *See Neihus v. Liberio*, 973 F.2d 526, 531 (7th Cir. 1992) (inference from destruction of documents); *Alliance to End Repression v. Rochford*, 75 F.R.D. 438, 440-441 (N.D. Ill. 1977).**

63.   On August 16, 2002, Erica Owen was tardy and was docked 15 minutes (See Exhibit B, Bates No. 1184).

**RESPONSE: Plaintiff admits only that according to this document Erica Owen was docked 15 minutes. Plaintiff further states that this does not confirm whether or not she was paid, in order to do that Plaintiff would require a copy of her payroll**

records for Erica Owen. **Defendants failed and refused to produce several of the payroll records and time-sheets that were requested in discovery and refused and failed to produce the originals for inspection, despite Plaintiffs' repeated requests. On many of the records, there appears to have white-out and other changes to the original, but the original was never produced. (*See* Sign-In Sheets, Ex.12; Time Sheets, Ex. 11; Kurtz 37.2 Letters, Ex. 27; *see* Pls.' 56.1(b) §IX.) Thus, Plaintiffs are entitled to an adverse inference. *See Neihus v. Liberio*, 973 F.2d 526, 531 (7th Cir. 1992) (inference from destruction of documents); *Alliance to End Repression v. Rochford*, 75 F.R.D. 438, 440-441 (N.D. Ill. 1977).**

64. Valentino complains that Co-worker Sally Marufo was late for work on August 16, 2002. Valentino admits that she does not know whether Sally Marufo's paycheck was docked for being late to work on August 16th (See pages 134-136 of Valentino's deposition testimony).

**RESPONSE: Plaintiffs admit that Valentino complained that Sally Marrufo was often late for work or did not show up for work during her scheduled work hours and that Valentino believed that Marrufo was being paid for hours that she did not work. Plaintiffs further acknowledge that Valentino did not know whether Marrufo's paycheck was docked for the August 16th date in which she was late for work because Defendants failed and refused to produce several of the payroll records and time-sheets that were requested in discovery and refused and failed to produce the originals for inspection, despite Plaintiffs' repeated requests. On many of the records, there appears to have white-out and other changes to the original, but the original was never produced. (*See* Sign-In Sheets, Ex.12; Time Sheets, Ex. 11; Kurtz 37.2 Letters, Ex. 27.)**

**As evidence of the ghost pay rolling practices of Defendants with respect to certain employees, including Sally Marrufo, Defendants produced a sign-in sheet for Sally Marrufo for September 17, 2002, despite the fact that she was out of the office sick that day. (Valentino hand written note, Ex. 10; Marrufo Sign-In Sheet, Ex. 12.) *See also* Pls.' 56.1(b) §§ V, IX.**

65. Valentino claims that Eric Faoro's car was not in the parking lot on September 23, 2002. Valentino admits she has no information which indicates that Eric Faoro was paid for working on September 23, 2002 (See pages 143-144 of Valentino's deposition testimony).

**RESPONSE: Plaintiffs admit that Valentino's notes reflected that Eric Faoro's car was not in the parking lot on September 23, 2002, and that she believed that he did not show up to work that day or was not there during his regularly scheduled hours. While Valentino acknowledged in her deposition that she did not know if Eric Faoro was paid for working on September 23, 2002, this is because Defendants failed and refused to produce several of the payroll**

records and time-sheets that were requested in discovery and refused and failed to produce the originals for inspection, despite Plaintiffs' repeated requests. On many of the records, there appears to have white-out and other changes to the original, but the original was never produced. (*See* Sign-In Sheets, Ex.12; Time Sheets, Ex. 11; Kurtz 37.2 Letters, Ex. 27.)

As evidence of the ghost pay rolling practices of Defendants with respect to certain employees, including Eric Faoro, the following are a few examples of times when Eric Faoro was not at work, but was paid by Defendants: (a) On September 6, 2002, Eric Faoro's car was not parked in back yet he was paid for 8 hours. (Valentino hand written note, 10; Faoro timesheets, Ex. 11); (b) On September 11, 2002, Eric Faoro's car was not parked in back yet there is a time sheet indicating he was paid for 8 hours. (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12; Faoro timesheets, Ex. 11); (c) On September 13 2002, Eric Faoro's car was not parked in back yet he was paid for 8 hours. (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12; Faoro timesheets, Ex. 11); (d) On September 25, 2002, Eric Faoro was not there at 7:05 pm but his sign-in sheet states he left at 8:00pm and was paid for 5 hours. (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12; Faoro timesheets, Ex. 11); (e) On October 3, 2002, Eric Faoro was not at work yet he was paid for 8 hours. (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12; Faoro timesheets, Ex. 11.); (f) On October 17, 2002, Eric Faoro did not arrive to work until 4:10 pm yet signed in at 3:00pm. (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12; Faoro timesheets, Ex. 11.); (g) On October 31, 2002, Eric Faoro came into work early with his daughter and on his sign-in sheet marked that he worked from 12 pm – 7 pm and did not take a lunch and his timesheet shows he was paid for 8 hours when he should have only been paid for 7 hours. (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12; Faoro timesheets, Ex. 11.); (h) On November 15, 2002, Eric Faoro came in at 11 am with his daughter and worked for only part of the day. His sign-in sheet for this day suggests that he came in and worked 8 am – 5 pm, when in fact he only worked part of the day. No timesheet for this period was produced to determine what he was paid. (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12.); (i) Many of the time sheets approving Eric Faoro's time when he was not actually at work were signed by him without a supervisor's approving authority. (*See* Faoro sign-in sheets, Ex. 12.) *See also* Pls.' 56.1(b) §§ V, IX.

66.  Valentino claims that Eric Faoro came into work early on October 31, 2002 with his baby (See page 145 of Valentino's deposition testimony). Valentino admits that she does not know whether Eric Faoro was paid for hours he did not work on that day (See page 145 of Valentino's deposition testimony). Valentino admits she does not have any evidence or information which indicates that Eric Faoro fabricated any sign in sheet for October 31, 2002 (See page 147 of Valentino' s deposition testimony).

RESPONSE: Plaintiffs admit that Valentino's notes reflected that Eric Faoro came into work early on October 31, 2002 with his baby; Plaintiffs deny that they do not have any evidence or information that indicates Eric Faoro was paid for hours that he did not work. On October 31, 2002, Eric Faoro came into work early with his daughter and on his sign-in sheet marked that he worked from 12 pm – 7 pm and did not take a lunch and his timesheet shows he was paid for 8 hours when he should have only been paid for 7 hours. (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12; Faoro timesheets, Ex. 11.) *See also* Pls.' 56.1(b) §§ V, IX.

Because Defendants failed and refused to produce several of the payroll records and time-sheets that were requested in discovery and refused and failed to produce the originals for inspection, despite Plaintiffs' repeated requests, Plaintiffs are unable to determine the extent of the alleged fraud and ghost pay rolling practices. (*See* Sign-In Sheets, Ex.12; Time Sheets, Ex. 11; Kurtz 37.2 Letters, Ex. 27.)

67. The Village did not provide free water meters for a property located at Jackson and 29th Street (See pages 105-112 of Anthony Renzetti's deposition testimony as well as Renzetti Exhibit 1 dated 4/15/05 attached hereto).

RESPONSE: Denied. Tony Renzetti, the Director of Public Works, that per "the Mayor" (David Owen) they were not to be billed; se was not to charge for each meter for that apartment building for each unit. (Valentino Dep. at 39-41, Defs.' Ex. C.) Moreover, there is no evidence in the record that the check cited by Defendants was payment for the water meters at the Jackson location. (Valentino Dep. at 194, Defs.' Ex. C ("This wasn't the Wherle's house. It was the building that they owned.").)

68. Steven J. Wien and Lori L. Wien paid $720.00 for water meters that were installed at the property located at 29th and Jackson, South Chicago Heights, IL (See Exhibit C).

RESPONSE: Denied. Tony Renzetti, the Director of Public Works, that per "the Mayor" (David Owen) they were not to be billed; se was not to charge for each meter for that apartment building for each unit. (Valentino Dep. at 39-41, Defs.' Ex. C.) Moreover, there is no evidence in the record that the check cited by Defendants was payment for the water meters at the Jackson location. (Valentino Dep. at 194, Defs.' Ex. C ("This wasn't the Wherle's house. It was the building that they owned.").)

69. While Rose Bautista worked at the Senior Center, the center was open five days a week (See page 105 of Rose Bautista's deposition testimony).

RESPONSE: Admitted.

70.     The Village's Senior Center is no longer open five days a week (See page 105 of Rose Bautista's deposition testimony).

**RESPONSE: Plaintiffs move to strike ¶ 70 in that it misstates Ms. Bautista's testimony. Subject to and without waiver of said objection, Ms. Bautista testified that she did not know how many days the senior center was open. (Bautista Dep. at 105-106, Ex. 4.)**

71.     Rose Bautista was transferred from the Village's Senior Center to the Village Hall in June of 2001 (See page 95 of Rose Bautista's deposition testimony).

**RESPONSE: Plaintiffs move to strike ¶ 71 in that the record citation does not support the stated proposition. Ms. Bautista was removed from her position at the Senior Center and transferred to Village Hall two (2) months after the election in 2001. Ms. Bautista testified that she "felt that they were making things hard on me because I felt that they thought I supported Joe Kudra." She "felt that was why [she] was being moved." (Bautista Dep. at 12-17, Ex. 4.)**

72.     No one replaced Rose Bautista at the Senior Center after she was transferred to the Village Hall (See pages 105-106 of Rose Bautista's deposition testimony).

**RESPONSE: Admitted.**

73.     Rose Bautista views her transfer to the Village Hall as a positive career development (See page 106 of Rose Bautista's deposition testimony).

**RESPONSE: Denied. Bautista testified that she viewed the transfer as retaliation. It was not until just prior to her deposition (after she had been listed as a witness favorable to Plaintiffs in this case) did Defendants offer her additional duties, which she viewed as positive. (Bautista Dep. at 12-17, 21-24, 106, Ex. 4.)**

74.     Rose Bautista never told David Owen that Ms. Valentino was keeping copies of the sign-in sheets (See page 109 of Rose Bautista's deposition testimony).

**RESPONSE: Admitted.**

75.     Rose Bautista never told Paul Peterson that Sandra Valentino was keeping copies of the daily sign- in sheets (See page 109 of Rose Bautista's deposition testimony).

**RESPONSE: Admitted.**

76. Joseph Kudra admits that David Owen has never penalized him for exercising his First Amendment Rights (See pages 75-79 of Joseph Kudra's deposition testimony).

**RESPONSE: Denied. Joe Kudra believes he was denied insurance benefits that he believed he was entitled to for running against Defendant Owen in the 2001 election. (Joe Kudra Dep. at 56, 111-112, Ex. 2.)**

77. The Village did not retaliate against Joseph Kudra because he ran against David Owen's slate in 2003. He is not aware of any instance of the Village retaliating against anyone who supported him during the 2003 election cycle (See pages 76-77 of Joseph Kudra's deposition testimony).

**RESPONSE: Denied. Joe Kudra believes he was denied insurance benefits that he believed he was entitled to for running against Defendant Owen in the 2001 election. (Joe Kudra Dep. at 56, 111-112, Ex. 2.) There are several examples of individuals that believed they were retaliated against by Defendants because they supported Kudra, including: (a) Rosario DelGroso was approached by Defendant Owen and asked why they had a sign supporting Joe Kudra. After that they were denied pickup of debris that otherwise normally would take place. (Joe Kudra Dep. at 13-15, 105-106, Ex. 2.); (b) Ms. Bautista was removed from her position at the Senior Center and transferred to Village Hall two (2) months after the election in 2001. Ms. Bautista testified that she "felt that they were making things hard on me because I felt that they thought I supported Joe Kudra." She "felt that was why [she] was being moved." (Bautista Dep. at 12-17, Ex. 4.) *See also* Pls.' 56.1(b) § X.**

78. He is not aware of any instances in which David Owen retaliated against people for engaging in First Amendment activity including, but not limited to, election activity (See pages 75-79 of Joseph Kudra's deposition testimony).

**RESPONSE: Denied. Joe Kudra believes he was denied insurance benefits that he believed he was entitled to for running against Defendant Owen in the 2001 election. (Joe Kudra Dep. at 56, 111-112, Ex. 2.) There are several examples of individuals that believed they were retaliated against by Defendants because they supported Kudra, including: (a) Rosario DelGroso was approached by Defendant Owen and asked why they had a sign supporting Joe Kudra. After that they were denied pickup of debris that otherwise normally would take place. (Joe Kudra Dep. at 13-15, 105-106, Ex. 2.); (b) Ms. Bautista was removed from her position at the Senior Center and transferred to Village Hall two (2) months after the election in 2001. Ms. Bautista testified that she "felt that they were making things hard on me because I felt that they thought I supported Joe Kudra." She "felt that was why [she] was being moved." (Bautista Dep. at 12-17, Ex. 4.) *See also* Pls.' 56.1(b) § X.**

79.     Joseph Kudra, a former trustee, is not aware of any instances in which the Board of Trustees has retaliated against an individual for speaking out on matters of public concern (See page 74 of Joseph Kudra's deposition testimony).

**RESPONSE: Denied. Joe Kudra believes he was denied insurance benefits that he believed he was entitled to for running against Defendant Owen in the 2001 election. (Joe Kudra Dep. at 56, 111-112, Ex. 2.) There are several examples of individuals that believed they were retaliated against by Defendants because they supported Kudra, including: (a) Rosario DelGroso was approached by Defendant Owen and asked why they had a sign supporting Joe Kudra. After that they were denied pickup of debris that otherwise normally would take place. (Joe Kudra Dep. at 13-15, 105-106, Ex. 2.); (b) Ms. Bautista was removed from her position at the Senior Center and transferred to Village Hall two (2) months after the election in 2001. Ms. Bautista testified that she "felt that they were making things hard on me because I felt that they thought I supported Joe Kudra." She "felt that was why [she] was being moved." (Bautista Dep. at 12-17, Ex. 4.) *See also* Pls.' 56.1(b) § X.**

80.     As a resident and former Board member, Kudra is not aware of any specific ordinance, regulation or enactment whereby the Village retaliates against individuals who speak out on matters of public concern (See page 71 of Joseph Kudra's deposition testimony).

**RESPONSE: Plaintiffs move to strike ¶ 80 in that it calls for a legal conclusion. Subject to said objection and without waiver, Plaintiffs admit that Kudra testified that he was not aware of a specific ordinance or regulation.**

81.     Joseph Kudra's wife, Betsy, worked nights in the Village Hall as the employee responsible for accounts payable (See page 81 of Joseph Kudra's deposition testimony).

**RESPONSE: Plaintiffs move to strike ¶ 81 in that it does not address a contested issue of *material* fact. Subject to said objection and without waiver, Plaintiffs state that Betsy Kudra testified that she sometimes worked nights because her hours overlapped with her hours at Parker Junior High, so she would do coding of the bills in the evening. (Betsy Kudra Dep. at 9, Ex. 35.)**

82.     Joseph Kudra's wife Betsy worked nights in the Village's accounts payable position on a regular basis (See page 82 of Joseph Kudra's deposition testimony).

**RESPONSE: Plaintiffs move to strike ¶ 81 in that it does not address a contested issue of *material* fact. Subject to said objection and without waiver, Plaintiffs state that Betsy Kudra testified that she sometimes worked nights because her hours overlapped with her hours at Parker Junior High, so she would do coding of the bills in the evening. (Betsy Kudra Dep. at 9, Ex. 35.)**

83.     In the year 2003, Joseph Kudra ran for a Trustee seat in the Village of South Chicago Heights (See pages 75-77 of Joseph Kudra's deposition testimony).

**RESPONSE: Admitted.**

84.     The Board of Trustees eliminated the position of foreman at the Public Works Department on July 8, 1997 (See page 63 of Joseph Kudra's deposition testimony).

**RESPONSE: Denied.  Joseph Kudra had no personal knowledge as to whether the foreman position was eliminated and was simply reading from a document provided by Defendant's counsel.  The document lacked foundation and the testimony was based on speculation.  (*See* Kudra Dep. at 63.)  Plaintiffs further state that Lou Bednarek told George Ellis that "they" (referring to Dave Owen) would be getting rid of him, in regards to George Ellis' job with the Village, because he refused to move, where he was renting a house from Terry Fiorenzo.  (Ellis Dep. at 33-35, Ex. 3.)  After the election, Defendant Owen sent Mr. Ellis a letter stating he was terminating Mr. Ellis.  (Ellis Dep. at 49-50, Ex. 3; 7/7/97 Termination Letter from Owen, Ex. 29.)  George Ellis believed he was terminated in retaliation for not moving from his home. (Ellis Dep. at 49-50, Ex. 3; 7/7/97 Termination Letter from Owen, Ex. 29.) Bill Brink who was the head of Public works told George Ellis that he believed that George Ellis was "...politically gotten rid of." (Ellis Dep. at 68, Ex. 3.)**

85.     Joseph Kudra voted in favor of abolishing the foreman position at the Public Works Department, effective July 8, 1997 (See pages 62-64 of Joseph Kudra's deposition testimony).

**RESPONSE: Denied.  Joseph Kudra had no personal knowledge as to whether the foreman position was eliminated and was simply reading from a document provided by Defendant's counsel.  The document lacked foundation and the testimony was based on speculation.  (*See* Joe Kudra Dep. at 63, Ex. 2.)**

86.     Valentino does not know why Pam Palanca was fired (See pages 248-249 of Valentino's deposition testimony).

**RESPONSE: Admitted.**

87.     Pam Palanca never told Valentino that she had been fired for exercising her First Amendment rights (See pages 248-249 of Valentino's deposition testimony).

**RESPONSE: Admitted.**

88.    Pam Palanca has sued the Village claiming that her termination violated the Americans
       with Disabilities Act. Palanca does not claim that the Village terminated her for engaging
       in protected speech (See Palanca's complaint, Exhibit D).

RESPONSE: **Plaintiffs admit that Pamela Palanca has a case pending for wrongful
          termination based upon her disability.**

89.    Valentino does not believe that the defendants (including the Village, retaliated against
       her because she was complaining about Joe Minotti (See pages 239-241 of Valentino's
       deposition testimony).

RESPONSE: **Plaintiffs admit only that Valentino was not retaliated against for
          complaining about Mr. Minotti but rather for exposing his fraudulent
          activities and the Villages. (Valentino Dep. at 240, Defs.' Ex. C; *see also* Pls.'
          56.1(b) §§ V, VI.)**

90.    Valentino never told Mayor Owen that she was giving information to Mr. Bramanti about
       alleged ghost payrolling (See page 241 of Valentino's deposition testimony).

RESPONSE: **Plaintiffs admit that Valentino never told Paul Peterson or David Owen
          specifically that Owen's children were being paid for hours they did not
          work. Plaintiffs further state that Defendant Peterson knew that Plaintiff
          Valentino was keeping notes about those employees she believed were not
          being docked when they did not show up to work and were getting paid for
          time that they were not working. (Valentino Dep. at 122-123, 127-145, 238-
          241, Defs.' Ex. C.) Defendants also knew that Plaintiff Valentino was giving
          information to Bill Bramanti and believed that she was providing him
          information that led Bramanti to submit the FOIA requests. (*See* Pls.'
          56.1(b) §§ V(E), VI.)**

91.    She never told Paul Peterson that she was giving information to Mr. Bramanti about
       alleged ghost payrolling (See page 241 of Valentino's deposition testimony).

RESPONSE: **Plaintiffs admit that Sandra Valentino never told Paul Peterson that she was
          giving information to Bill Bramanti. However, Defendants knew that
          Plaintiff Valentino was giving information to Bill Bramanti and believed that
          she was providing him information that led Bramanti to submit the FOIA
          requests. (*See* Pls.' 56.1(b) §§ V(E), VI.)**

Respectfully submitted,

SANDRA L. VALENTINO and WILLIAM P. BRAMANTI

**s/Dana L. Kurtz**

*Electronically filed on February 28, 2006*

_____

Attorney for Plaintiffs

Dana L. Kurtz (6256245)
KURTZ LAW OFFICES, LLC
414 South State Street
Lockport, Illinois 60441
Phone: (815) 383-0968
Facsimile: (312) 893-2239
E-mail: dkurtz@kurtzlaw.us