**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SANDRA L. VALENTINO and WILLIAM P. BRAMANTI, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | No. 04 C 2373 |
| | ) | |
| VILLAGE OF SOUTH CHICAGO HEIGHTS, PAUL PETERSON, and MAYOR DAVID OWEN, in their official and individual capacity, | ) | Honorable Judge William J. Hibbler |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' JOINT RESPONSE TO
PLAINTIFFS' ADDITIONAL STATEMENT OF FACTS IN
SUPPORT OF PLAINTIFFS' RESPONSES TO ALL DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

Pursuant to local Rule 56.1 (a)(3), Defendants Village of South Chicago Heights, Paul Peterson, and Mayor David Owen state the following facts in opposition to Plaintiffs' Additional Statement of Facts in Support of Plaintiffs' Responses to All Defendants' Motions for Summary Judgment. Subject to the Court's ruling on Defendants' Joint Motion to Strike Certain Paragraphs of Plaintiffs' 56.1(b) Statement of Additional Facts, defendants respond as follows:

I.     Introduction

1.     Plaintiffs Sandra Valentino and William ("Bill") Bramanti bring this action to redress the retaliatory acts of Defendants in response to Defendants' belief that Plaintiffs did and would expose Defendants' ghost rolling practices, fraud, and other illegal and unlawful conduct, including violations of Plaintiffs' First Amendment rights as protected under the United States Constitution for speaking out about matters of public concern (Count III); retaliatory discharge against Plaintiff Valentino in violation of public policy under Illinois law (Count I); defamation and slander against Plaintiff Bramanti for speaking out about Defendants' ghost pay rolling practices (Count II).

**RESPONSE**: Defendants admit that the Complaint alleges such acts, but deny the truth of these allegations.  (Answer, Defs.' Ex. A).[1]

---

[1] Citations to "Defs.' Ex. ___" are to the exhibits filed by defendants Peterson and Owen in support of their Local Rule 51.6 Statement of Undisputed Facts.  Citations to "Pltfs.' Ex. ___" are to the exhibits filed by plaintiffs in support of their Additional Statement of Facts in Support of their Responses to all Defendants' Motions for Summary Judgment.

II.     The Parties

2.      Plaintiff Sandra Valentino was employed by the Village of South Chicago Heights ("Village") from in or about 1989 to March 3, 2003. Plaintiff Valentino was terminated on March 3, 2003. (Valentino Dep. at 60, 233-235, Defs.' Ex. C).

**RESPONSE:** Admitted.

3.      Plaintiff William Bramanti was employed by the Village of South Chicago Heights from June 1993 to September 2001. (Bramanti Dep. at 22, 34, Defs.' Ex. B).

**RESPONSE**: Denied. Bramanti worked at the Village from 1983 to 1989 and from 1993 to 2001 as a building inspector. (Peterson dep. at 11-13, Defs.' Ex. E)

4.      In September 2001, Plaintiff Bramanti resigned from his position with the Village of South Chicago Heights because he had concerns about Mayor David Owens hiring his own family members for positions that were unnecessary or at a higher salary rate than budgeted for and as a result of the Mayor's family members "not working for the money they were getting paid." (Bramanti Dep. at 77-78, Defs.' Ex. B.)

**RESPONSE**: Denied. Bramanti resigned because he refused to accept a position with the Village as a consultant, when his poor work record as a building inspector came to light. (Peterson dep. at 14-15, Defs.' Ex. E; Owen dep. at 20-21, Defs.' Ex. F)

5.      Defendant Mayor Owen became the Mayor of the Village of South Chicago Heights in 1989 and has held that position through the present. The position of Mayor of the Village is part-time. (Owen Dep. 16-17, Defs.' Ex. F.)

**RESPONSE**: Admitted.

6.      Defendant Paul Peterson, who is the brother-in-law to Defendant Owen, holds the position of Village Administrator, and he held the position of Office Manager from 1989-1990 until he was appointed Village Administrator. (Peterson 30 (b)(6) Dep. at 19-20, Defs.' Ex. D.)

**RESPONSE**: Admitted.

7.      Eric Faoro is the son-in-law of Defendant Mayor David Owen, and the husband to April Faoro (Owen). During all relevant times, Eric Faoro worked for the Village of South Chicago Heights. (Peterson 30 (b)(6) Dep. at 21, 186-187, Defs.' Ex. D.)

2

**RESPONSE**: Defendants admit that Eric Faoro is Mayor Owen's son-in-law and husband to April Faoro, and further state the Eric Faoro worked full-time for the Village from June 2002 to August 2003, while taking a year's leave of absence from his teaching position, and part-time for the Village after August 2003. (Peterson dep. at 134-135, Defs.' Ex. D)

8.      April Faoro (Owen) is the daughter of Defendant David Owen and the niece of Defendant Peterson.  During all relevant times, April Faoro worked for the Village of South Chicago Heights.  (Peterson 30(b)(6) Dep. at 21-23, Defs.' Ex. D.)

**RESPONSE**: Defendants admit that April Faoro is Mayor Owen's daughter and Peterson's niece, and further state that she worked for the Village part-time during the summers up until 1994-1995.  Since then, she has been secretary to the Zoning Board, which meets perhaps five times per year and she did five hours of work for the Beautification Committee setting up computers.  (Peterson dep. at 27-28, Defs.' Ex. D)

9.      Scott Owen is the son of Defendant Owen and the nephew of Defendant Peterson.  During all relevant times, Scott Owen worked for the Village of South Chicago Heights.  (Peterson 30(b)(6) Dep. at 21, 70, Defs.' Ex. D.)

 **RESPONSE**:  Defendants admit that Scott Owen is Mayor Owen's son and Peterson's nephew, and further state that he worked part-time for the Village from 1992 to 1996 while he was in high school during summer breaks and from 2000 to 2003 while he was attending college.  (Peterson dep. at 167, Defs.' Ex. D; Scott Owen Dep. at 10-13, 21-25, Defs.' Ex. G)

10.      Erika Owen is the daughter of Defendant Owen and the niece of Defendant Peterson.  During all relevant times, Erica Owen works for the Village of South Chicago Heights.  (Peterson 30 (b)(6) Dep. at 21, 37, Defs.' Ex. D.)

**RESPONSE**: Defendants admit that Erika Owen is Mayor Owen's daughter and Peterson's niece, and further state that she worked part-time during the summers for the Village from 1999 to 2003.  (Peterson dep. at 158-161, Defs.' Ex. D)

11.      Yvette Owen is the daughter to Defendant Owen and the niece of Defendant Peterson.  During all relevant times, Yvette Owen works for the Village of South Chicago Heights.  (Peterson 30 (b)(6) Dep.  at 21, 37, Defs.' Ex. D.)

**RESPONSE**:  Defendants admit that Yvette Owen is Mayor Owen's daughter and Peterson's niece, and further state that she worked part-time for the Village up to August of 2003 during summer breaks from school.  (Peterson dep. at 185, Defs.' Ex. D)

12.      Defendant Mayor Owen had final policy making authority as to the termination of employees from the Village Hall.  (Owen Dep. at 18-20, Defs.' Ex. F; Peterson Dep. at 84, Defs.' Ex. E; Fiorenzo Dep. at 148, Ex. 1.)

**RESPONSE**: Denied. As mayor, Owen may appoint and remove Village officers with the consent of the board of trustees. 65 ILCS 5/ 3.1-30-5. The mayor has authority to hire and terminate Village employees. (Owen dep. at 18, Defs.' Ex. F) As a matter of law, final policy-making authority for all Village operations is vested in the Village Board of Trustees. See *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1991).

13.    Defendant Mayor Owen delegated Peterson with final policy making authority with respect to the termination of employees. (Owen Dep. at 18-20, Defs.' Ex. F; Peterson Dep. at 84, Defs.' Ex. E; Fiorenzo Dep. at 148, Ex. 1).

**RESPONSE**: Denied. Final policy making authority is vested in the Village Board of Trustees as a matter of law. See Response, ¶ 12.

14.    The Village Board of Trustees is not the final policy making authority with respect to the termination of employees for the Village. Former Trustee Terry Fiorenzo testified that the Board of Trustees cannot hire or fire. This can only be done by Mayor Owen or Paul Peterson, to whom he has delegated the final policy making authority. (Owen Dep. at 18-20, Defs.' Ex. F; Peterson Dep. at 84, Defs.' Ex. E; Fiorenzo Dep. at 148, Ex. 1)

**RESPONSE**: Denied. Final policy-making authority is vested in the Village Board of Trustees as a matter of law. See Response, ¶ 12.

### III. Defendant's History of Being Accused of Fraud

15.    When Terry Fiorenzo was a Village Trustee (from April 1989 to 1997), he was aware of facts and circumstances that led him to believe that Defendants Owen and Peterson were engaging in fraud and mismanagement of public funds. (Fiorenzo Dep. at 19, 69, Ex. 1.)

**RESPONSE**: Defendants admit that Fiorenzo believed such acts occurred, and deny that they ever engaged in any fraud and mismanagement, and deny that any evidence of such acts ever came to light. Fiorenzo made these accusations in 1995, long before the acts alleged in the Complaint occurred. The FBI inquired into these alleged irregularities. No official FBI investigation occurred. (Owen dep. at 150-160, Defs.' Ex.F) Defendants further object to this paragraph on the basis of relevance and because it does not state a material fact.

16.    Terry Fiorenzo and others found that Defendants Mayor and Paul Peterson were using "secret" checks, not disclosed to the Village Board of Trustees, to pay for personal expenses and expenses that had not been authorized by the Village Board. (Fiorenzo Dep. at 35-36., Ex. 1.)

**RESPONSE**: Denied. In 1995, manual checks not listed on the warrants approved by the board of trustees were approved by the mayor; after Fiorenzo's accusations, the trustees approved manual checks. (Owen dep. at 158, 161-162, Defs.'

Ex. F) Defendants further object to this paragraph on the basis of relevance and because it does not state a material fact.

17.     For example, Paul Peterson admitted that he and Defendant Mayor Owen had used the Village credit card for personal expenses, for such things nylon stockings for his daughter, among other things. (Peterson 30(b) (6) Dep. at 82, Defs.' Ex. D; Fiorenzo Dep. at 35-36, 69-70, 143-145, Ex. 1.)

**RESPONSE**:  Denied. Owen and Peterson separated out the charges on village credit cards for village expenses, campaign expenses, and personal items, and wrote separate checks to pay for each of these categories of expense.  (Owen dep. at 154-159, Ex. F; Peterson dep. at 82, Defs.' Ex. D)  Defendants further object to this paragraph on the basis of relevance and because it does not state a material fact.

18.     Terry Fiorenzo also testified that he was aware that certain people that were supposed to be on salary were getting two checks when they were only supposed to received one, including Paul Peterson.  (Fiorenzo Page 73-74, Ex. 1)

**RESPONSE**:  Defendants admit that Fiorenzo so testified, and further state that several employees, including Peterson, received two paychecks for performing separate functions.  Mayor Owen received two checks for his salary as mayor and as liquor commissioner.  Bob Carl received two checks as building inspector and code enforcement officer.  Tony Renzetti received two checks as public works director and animal control officer.  (Peterson dep. at 249-251, Defs.' Ex. D)  Defendants further object to this paragraph on the basis of relevance and because it does not state a material fact.

19.     Terry Fiorenzo went to the FBI regarding the "secret checks" and the FBI was investigating the matter.  (Fiorenzo Dep. at 35-36, ex. 1.)

**RESPONSE**:  Defendants admit that Fiorenzo "went to the FBI" in 1995 with his allegations, but deny that any evidence of "secret checks" came to light or that the FBI conducted any investigation.  (Owen dep. at 150-160, Defs.' Ex. F)  Defendants further object to this paragraph on the basis of relevance and because it does not state a material fact.

20.     Terry Fiorenzo also spoke with the State's Attorney about the "secret checks" and fraud he believed was occurring in the Village.  It was relayed to Terry Fiorenzo that the "secret checks" and things he reported constitute "fraud by deception." (Fiorenzo Dep. at 69-70, Ex. 1.)

**RESPONSE**:  Defendants admit that Fiorenzo spoke with the State's Attorney in 1995, and further state that the State's Attorney took no action to investigate or prosecute either Owen or Peterson for any alleged wrongdoing.  (Fiorenzo dep. at 70-72, Pltfs.' Ex. 1) Defendants further object to this paragraph on the basis of relevance and because it does not state a material fact.

21.     After Terry Fiorenzo went to FBI and the FBI was investigating the matter of the "secret checks" and misuse of the public funds, Defendant held private meetings in his gazebo where he pleaded with the Trustees to approve of the "secret checks" at the advise of Robert Bush (Village attorney) even after the "secret checks" were over two-and-a-half years old.  (Fiorenzo Dep. at 143-145, Ex. 1.)

RESPONSE:  Defendants deny that the FBI investigated any misuse of public funds and deny that any meeting occurred in which Owen "pleaded with trustees" to approve checks, on the advice of Bush.  Fiorenzo testified that he believed the mayor met with trustees at his gazebo, but Fiorenzo was not there and does not know what happened at that meeting.  (Fiorenzo dep. at 143, Pltfs.' Ex. 1)  Defendants further object to this paragraph on the basis of relevance and because it does not state a material fact.

22.     Defendant Owen had requested them to approve the "secret checks" in order to save himself. (Fiorenzo Dep. at 143-145, Ex. 1.)

 RESPONSE:  Denied.  Fiorenzo testified that Joe Kudra, one of Fiorenzo's political allies, told him this story.  (Fiorenzo dep. at 144-145, Pltfs.' Ex. 1)  Defendants further object to this paragraph on the basis of hearsay and relevance,and because it does not state a material fact.

23.     In or about January 2002, Bill Bramanti had a meeting with Defendant Paul Peterson and Joe Christophenelli.  Prior to this meeting, several trustees had approached Bramanti about coming back to work for the Village.  In this meeting with Peterson, Bramanti told him that he was not going to come back to work for Owen because if he could not work with such dishonesty, that he was not going to go to jail for them.  (Bramanti Aff. E. 32.)

 RESPONSE:  Defendants admit that Bramanti met with Peterson and Christophenelli, Lou Bednarek and others, but deny that Bramanti told Peterson that he would not return because of Owen's dishonesty.  According to Bednarek's report, Bramanti flew into a tirade, started cussing, called Owen names, said he would ever work for Owen again and Owen could shove it.  (Owen dep. at 92, Defs.' Ex. F) Bramanti said "no" many times and "I will not meet with Mayor Owen" at the meeting with Peterson and Christophenelli.  (Peterson dep. at 25, Defs.' Ex. E)

## IV. <u>Joe Minotti</u>

24.     In or about November 2002, Defendant South Chicago Heights hired Minotti and told Plaintiff Valentino that he was hired because he was the "vote getter." (Valentino Dep. at 180, Defs.' Ex. C; Owen Dep. at 48-50, Defs.' Ex. F.)

**RESPONSE**: Denied. Neither Peterson nor Owen ever told Valentino that Minotti was a vote getter. Joe Minotti himself told Valentino that he was a vote-getter. (Valentino dep. at 180-181, Defs.' Ex. C; Owen dep. at 49, Defs.' Ex. F)

25. Minotti engaged in what plaintiff believed were fraudulent practices and failed to perform his duties in shutting off people's water for political gain for Defendant Mayor Owen, which Defendants condoned and consented despite Plaintiff Valentino's reports of the improprieties. (Valentino Dep. at 39, 178-180, 184-185, 192-193, 198-202, 267, Defs.' Ex. C; Peterson Dep. at 136-137, Defs.' Ex. E; Valentino Aff. ¶¶ 4-7, Ex. 31; 9/13/02 Valentino Memo, Ex. 5)

**RESPONSE**: Defendants admit that Valentino had such beliefs and deny that they had any knowledge, other than Valentino's complaints, that Minotti failed to perform his duties. Peterson talked to Tony Renzetti, Minotti's supervisor and director of Public Works, about whether the shut-offs were being done, and was assured that they were. (Peterson dep. at 137, Defs.' Ex. E) Renzetti never had any problems with Minotti not doing the shut-offs he was supposed to do. (Renzetti dep. at 59, Ex. 1, attached hereto)

## V. Plaintiff's Complaints on Matters of Public Concern

### A. Plaintiff Valentino's Complaints About Unlawful Water Billing Practices

26. On or about September 2002, Plaintiff Valentino gave Joe Minotti a list of approximately 31 names of individuals who had not paid water bills and whose water should have been shut off for non-payment. The employee failed to perform his duties in conducting the shut-offs for non-payment. (Valentino Dep. at 184-185, 198-199, Defs.' Ex. C)

**RESPONSE**: Defendants admit that plaintiff gave Minotti a list of water service accounts that were overdue, but deny that Minotti failed to perform his duties in conducting shutoffs. (Peterson dep. at 137, Defs.' Ex. E)

27. In or about December 2002 Valentino complained to Peterson about Mr. Bednarek's failure to pay the water hookup fees. (Valentino Dep. at 44, Defs.' Ex. C; Pl. Valentino's Ans. to Defendant SCH Interrog. Request No. 5, Ex. 6)

**RESPONSE**: Denied. Valentino testified that she told Peterson once that Bednarek had not paid water hookup fees, and that nobody from the Village ever told her that she should not charge him for these fees. (Valentino dep. at 44-45, Defs.' Ex. C)

28. Plaintiff Valentino complained to Defendant Paul Peterson, and Trustees Terry Matthews and Tony Renzetti that Joe Minotti was not fulfilling his assigned duties and was refusing to enforce compliance with shut off procedures and bill payment. (Valentino Dep. at 179-180, 267, Defs.' Ex. C; Peterson Dep. at 136-137, Defs.' Ex. E.)

**RESPONSE**: Defendants admit that Valentino complained to Peterson about Minotti during a confrontation in Peterson's office and to Trustees Terry Matthews and Tony Capua. (Peterson dep. at 217-223, Defs.' Ex E)  Defendants further note that the citation to Peterson's deposition at 136-137 does not support the alleged fact.

29.    Plaintiff Valentino again questioned Joe Minotti about enforcement of the unpaid water bills and the status of the shut-offs, to which he responded that he had not shut off anyone's water.  (Valentino Aff. ¶ 5, Ex. 31.)

**RESPONSE**: Without more specific information from Valentino's affidavit, defendants have no knowledge of plaintiff's questioning of Minotti but deny that Minotti had not shut off anyone's water.  See Response, ¶ 25.

30.    Plaintiff Valentino believed that Minotti was not shutting off certain individual's water in order to sway them to vote for Mayor Owen or the trustee candidates that he slated during the elections.  (Valentino Aff. ¶6, Ex. 31.)

**RESPONSE**: Defendants admit that plaintiff held such beliefs but deny that water shutoffs were not done properly.  See Response, ¶ 25.

31.    Minotti's failure to conduct the shut offs and failure to perform his duties, resulted in lost revenue for the Village of South Chicago Heights.  (Valentino Aff. ¶ 7, Ex. 31.)

**RESPONSE**: Denied.  Water shut-offs were done properly according to Minotti's supervisor.  See Response, ¶ 25.

32.    Defendants Peterson and Owen condoned and consented to this employee's failure to ensure that certain individuals paid their water bills by failing to conduct any investigation and by failing to discipline Minotti.  (Valentino Dep. at 39, 178-180, 184-185, 192-193, 198-202, 267 Defs.' Ex. C; Peterson Dep. at 136-137, Defs.' Ex. E; Valentino Aff. ¶ 4-7, Ex. 31; 9/13/02 Valentino Memo, Ex. 5.)

**RESPONSE**: Denied.  Peterson discussed plaintiff's charges with plaintiff's supervisor Tony Renzetti, who said shutoffs were being properly performed.  See Response, ¶ 25.

<u>B. Plaintiff Valentino's Complaints About Other Unlawful Conduct by Minotti</u>

33.    On or about September 13, 2002, Plaintiff Valentino became aware that Joe Minotti had unlawfully closed on a home he had purchased, without receiving a final water bill, a final inspection, other certificates, and payment of escrow.  When Plaintiff questioned the employee about the unlawfulness of this, he flew into a rage and responded: "deal with my attorney."  (Valentino Dep. at 39, 178, 192, 201-202, 206, Defs.' Ex. C.)

**RESPONSE**: Defendants admit that Valentino had such a belief and further state that Valentino's complaints led to a series of arguments and a confrontation in Peterson's office, which resulted in discipline for both Valentino and Minotti. (Peterson dep. at 217-229, Defs.' Ex. E)

34.     On or about September 13, 2002, Plaintiff Valentino again complained to Defendant Peterson about what she believed to be fraudulent and unlawful practices, about Mr. Minotti failing to pay the necessary fees and fill out the necessary paperwork for his house closing, which resulted in money lost to the Village of South Chicago Heights. (Valentino Dep. 193, Defs.' Ex. C; 9/13/02 Valentino Memo, Ex. 5; Peterson Dep. at 136, Defs.' Ex. E)

**RESPONSE**: Defendants admit that Valentino held such beliefs but deny any fraudulent or unlawful practices. See Response, ¶ 33.

35.     In her memorandum of September 13, 2002, Valentino complained to Paul Peterson about Joe Minotti not doing his job and how he closed on a house without a final water bill, a final inspection, $1,000 escrow, occupancy permit and other things that are required by the Village. (Valentino Dep. at 204, 206, Defs.' Ex. C; Valentino 9/13/02 memo, Ex. 5)

**RESPONSE**: Defendants admit that plaintiff's memorandum speaks for itself but deny that water shut-offs were not being done properly. See Response, ¶¶ 25, 33.

<u>C. Defendant Peterson Disciplines Plaintiff Valentino in Retaliation</u>

36.     Within days, on or about September 18, 2002, Defendant Peterson subjected Plaintiff Valentino to false and unwarranted disciplinary action without justification in retaliation for her complaints. (Valentino Dep. at 207-210, 214, Defs.' Ex. C; 9/18/02 Valentino Verbal Warning, Ex. 7.)

**RESPONSE**: Denied. Peterson issued verbal and written warnings both to plaintiff and to Minotti for their behavior on September 13, 2002, in a confrontation at Village hall. (Peterson dep. at 228-232, Defs.' Ex. E)

37.     Defendant Peterson testified that he never disciplined Plaintiff Valentino for yelling and screaming. Then later testified that he did. (Peterson Dep. at 220, 229, Defs.' Ex. E)

**RESPONSE**: Denied. Peterson testified to a confrontation in which plaintiff was standing over Minotti yelling and screaming at him that he was lazy and not doing his job. Peterson issued disciplinary warnings both to plaintiff and to Minotti for their conduct during this confrontation. (Peterson dep. at 217-228, Defs.' Ex. E)

38.     While defendants may claim that Minotti was also disciplined, circumstantial evidence suggests that Defendants created the "written warning" for

Minotti after the fact in an effort to cover up their retaliatory motive. (See ¶¶ 39-40, *infra*.)

**RESPONSE**:  Denied.  Defendants further state that the document speaks for itself.

39.     On the "written warning" for Minotti, it appears that the date was written in retroactively as reflected by the handwriting over the date. (Minotti Written Warning, Ex. 8.)

**RESPONSE**:  Denied.  Defendants further state that the document speaks for itself.

40.     The language in the "written warning" for Minotti is exactly the same as the language in the Verbal Warning, Ex. 7; *with* Minotti Written Warning, Ex. 8)

**RESPONSE**:  Admitted.  Defendants further state that identical warnings were issued to plaintiff and to Minotti, because both were equally at fault. (Peterson dep. at 223-229, Defs.' Ex. E)

41.     The "written warning" Peterson claims he issued to Minotti is contrary to Peterson's own testimony.  The written warning provides that "you (referring to Minotti) continued to shout at and abuse another employee in my presence, making wholly unjustified accusations of incompetence and misconduct…", (Minotti Written Warning, Ex. 8), whereas Peterson testified that while Minotti said "some things" to Ms. Valentino, he said them "in a quiet tone," (Peterson Dep. at 217-220 Defs.' Ex. E).

**RESPONSE**:  Denied. At the particular point in the argument when Minotti was sitting in Peterson's office with plaintiff screaming at him, Minotti said very little and said it in a quiet tone.  (Peterson dep. at 217-218, Defs.' Ex. E)

### D. Plaintiff Valentino's Speech About Alleged Ghost Pay Rolling

42.     Plaintiff Valentino also became aware that certain employees, family members of Defendants Owen and Peterson, were getting paid for time that they had not worked.  (Valentino Dep. at 92-94, 112, 156, Defs.' Ex. C.)

**RESPONSE**: Denied.  Valentino did not keep a record of the work hours of Erika Owen, Scott Owen, April Faoro, Yvett Owen or Chief Diederich  (Valentino dep. at 88-89, Defs.' Ex. C)  Valentino's belief that Diederich was getting paid for hours not worked is based on gossip, and she does not have any records to substantiate her belief. (Valentino dep. at 94, 96, Defs.' Ex. C)  Valentino has no personal knowledge that Erika Owen did not work the hours reported on timesheets for August 1 and August 16, 2003. (Valentino dep. at 86, Defs.' Ex. C)  Valentino does not know if Sally Marrufo was paid for hours she did not work on August 16, 2002 or October 18, 2002.  (Valentino dep. at 135, 140, Defs.' Ex. C)  Valentino has not seen any documents indicating that Eric Faoro

was paid for hours he did not work. (Valentino dep. at 100, Defs.' Ex. C) Valentino has no knowledge of how much the Village paid Yvette Owen for hours she allegedly did not work. (Valentino dep. at 161, Defs.' Ex. C)

43. Plaintiff Valentino believed that Eric Faoro was being ghost pay rolled. (Valentino Dep. at 112, Defs.' Ex. C)

**RESPONSE**: Defendants admit that Valentino may have believed this, but state further that her belief is based on occasionally driving by the Village Hall to see if his car was parked in the lot. (Valentino dep. at 102, Defs.' Ex. C) Valentino believes that the fact that Faoro was not consistent in the times he came to work each day is evidence of ghost payrolling. (Valentino dep. at 99, 141, Defs.' Ex. C)

44. For example, in 2003 Eric Faoro's schedule shift was from 3:00 p.m. to 11:00 p.m. (Valentino Dep. at 112, Defs.' Ex. C; Peterson 30 (b) (60 Dep. at 14-115, Defs.' Ex. D.)

**RESPONSE**: Denied. Faoro's normal daily schedule was 3:00 to 11:00, but that schedule might vary considerably. (Peterson dep. at 114-115, Defs. Ex. D)

45. While Defendant David Owen represented that his son-in-law was only hired for one year only (on a full-time temporary basis), Eric Faoro worked longer than a year. (Owen March 2003 Letter, Ex. 9; Peterson 30(b)(6) Dep. at 21, 186-187, Defs.' Ex. D)

**RESPONSE**: Denied. When Owen wrote the March 2003 letter, Faoro had been hired for a full-time position for one year. Faoro worked full-time for the Village on payroll and accounts receivable from June, 2002 to August, 2003, during a year's leave of absence from his position as a school teacher, and thereafter worked part-time. (Peterson 30(b)(6) dep. at 134-135, Defs.' Ex. D)

46. Defendant Peterson attempted to claim in his deposition that Eric Faoro only worked for the Village on a full-time basis when he was not working as a teacher. (Peterson Dep. at 107, 111 Defs.' Ex. E.)

**RESPONSE**: Denied. Peterson did not "attempt to claim," he testified under oath that Faoro worked part-time after August of 2003, when he returned to his teaching position. (Peterson dep. at 135, Defs.' Ex. E)

47. In fact, Eric Faoro was working full time for the Village of South Chicago Heights while at the same time working as a school teacher full time. (Valentino Aff. ¶ 8, Ex. 31.)

**RESPONSE**: Denied. Faoro worked part-time after August of 2003, when he returned to his teaching position. (Peterson dep. at 135, Defs.' Ex. E)

11

48.     Eric Faoro did not sign in or out on the signed-in sheet and his car was not at Village hall when he was to be at work.  (Valentino Dep. at 112, Defs.' Ex. C.)

**RESPONSE**:  Denied.  Faoro signed in on a sheet in the back of the office where he normally worked, at Peterson's instruction.  (Peterson 30(b)(6) dep. at 99, 120, Defs.' Ex. D)  Valentino believes that if Faoro's car was not in the parking lot, then he was not at work.  During her drive-bys to check on Faoro's car, Valentino never went inside Village Hall to see if Faoro was actually at work.  (Valentino dep. at 113-114, Defs.' Ex. C)

49.     According to Plaintiff Valentino's "post-it" notes (those that she had not left in her desk) reflecting times when certain employees were not at work, the following are a few examples of times when Eric Faoro was not at work, but was paid by Defendants:

a.      On September 6, 2002, Eric Faoro's car was not parked in back yet he was paid for 8 hours.  (Valentino hand written note, 10; Faoro timesheets, Ex. 11.)

b.      On September 11, 2002, Eric Faoro's car was not parked in back yet there is a time sheet indicting he was paid for 8 hours.  (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12; Faoro timesheets, Ex. 11)

c.      On September 13, 2002, Eric Faoro's car was not parked in back yet he was paid for 8 hours.  (Valentino hand written note, Ex. 10; Faoro sign-in sheets Ex. 12; Faoro timesheets Ex. 11)

d.      On September 25, 2002, Eric Faoro was not there at 7:05 pm but his sign-in sheet states he left at 8:00 pm and was paid for 5 hours.  (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12; Faoro timesheets, Ex. 11.)

e.      On October 3, 2002, Eric Faoro was not at work yet he was paid for 8 hours.  (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12; Faoro timesheets, Ex. 11.)

f.      On October 17, 2002, Eric Faoro did not arrive to work until 4:10 pm yet signed in at 3:00 pm.  (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12; Faoro timesheets, Ex. 11.)

g.      On October 31, 2002, Eric Faoro came into work early with his daughter and on his sign-in sheet marked that he worked from 12 pm – 7 pm and did not take a lunch and his timesheet shows that he was paid for 8 hours when he should have only be paid for 7 hours.  (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12; Faoro timesheets, Ex. 11.)

      h.     On November 15, 2002, Eric Faoro came in a t 11 am with his daughter and worked for only part of the day. His sign-in sheet for this day suggests that he came in and worked 8 am – 5 pm, when in fact he only worked part of the day. No timesheet for this period was produced to determine what he was paid. (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12.)

      **RESPONSE**: Denied. Faoro's daily sign-in sheets document the dates and times he was at work. See Exhibits referenced in sub-parts a through h above.

      50.    Many of the time sheets approving Eric Faoro's time when he was not actually at work were signed by him without a supervisor's approving authority. (*See* Faoro sign-in sheets, Ex. 12.)

      **RESPONSE**: Denied. Faoro, along with Marrufo and Peterson filled out bi-weekly time sheets based on the daily sign-in sheets, which each of them initialed in the process of preparing payroll. Peterson reviewed Faoro's and Marrufo's work to check on their accuracy. (Peterson 30(b)(6) dep. at 123, Defs.' Ex. D)

      51.    Sandra Valentino also believed that Erika Owen was improperly being paid by Defendants for time that she did not work. (Valentino Dep. at 31, 52, Defs.' Ex. C)

      **RESPONSE**: Defendants admit that Valentino believed this, but state further that Valentino has no personal knowledge that Erika Owen did not work the hours recorded on time sheets for pay periods ending on August 1, 2003, and August 16, 2003. (Valentino dep. at 86, Defs.' Ex. C)

      52.    Erika Owen's sign-in sheets are suspected as well. In many instances she wrote in at the end of the time sheet, "1 hr" or "1 hr + 30 min cleaning. This was an apparent effort, after the filing of this lawsuit, to correct for the time she had already been paid. Valentino never saw Erika cleaning, and certainly never saw her staying after hours to clean. (Erika Owen Sign-In Sheets, Ex. 12; Valentino Aff. ¶¶ 9, Ex. 31.)

      **RESPONSE**: Denied. On one time sheet, Erika wrote such a note. (Ex. 12, S000233) Erika worked at the senior center and at the Village hall, as well as going on various errands for Peterson, and she made notations on the sign-in sheets reflecting that activity. Peterson saw her cleaning at Village hall between 5:00 p.m. and 8:00 p.m. on several occasions. (Peterson 30(b)(6) dep. at 178, 188, 191, 192, Defs. Ex. D)

      53.    By way of another example, on July 19, 2002, while there was room for Erika to sign in on the daily time schedule as required by Peterson, Defendants produced a separate document in discovery in this case that which Erika purportedly signed off on. Her signature does not appear on the sign in sheet that was posted in the office. (*Compare* Sign-In Sheet, S000204 with S000203, Ex. 12.)

**RESPONSE**: Denied. Occasionally, Erika would sign in on the daily time sheet used by Faoro in the back of the office. She should have been signing in on the sheet in the front office, but Peterson approved the time she recorded on this sheet on this one occasion. (Peterson 30(b)(6) dep. at 120-121, Ex. D)

54. By way of another example, on August 13, 2002, at the bottom of the sign-in sheet, Erika wrote down her name three times for 6:00, 7:00, and 8:00 in an apparent attempt to justify the fact that she had been paid for several hours that she had not worked. (Sign-In Sheets, S000240, Ex. 12.)

**RESPONSE**: Denied. On S000240, Ex. 12, Erika's name appears four times. She signed in at 1:40, out at 6:00, back in again at 7:00, and out at 8:00. The time sheet documents the time she worked that day.

55. Plaintiff Valentino believed that Scott Owen was being ghost pay rolled. (Valentino Dep. at 154-157, Defs.' Ex. C; Peterson 30(b)(6) Dep. at 33, 35, Defs.' Ex. D.)

**RESPONSE**: Defendants admit that Valentino believed Scott Owen was paid for hours not worked because he is the mayor's son. Valentino dep. at 156, Defs.' Ex. C) Defendants state further that plaintiffs' citation to Peterson's 30(b)(6) deposition does not support the alleged fact.

56. Bill Brink, the Director of Public Works, was told that Defendant Peterson would be handling Scott Owen's time sheet contrary to Brink's duty as director to fill out his employee's time sheets. (Valentino Dep. at 154-157, Defs.' Ex. C; Peterson 30(b)(6) Dep. at 33, 35, Defs.' Ex. D.)

**RESPONSE**: Denied. Scott Owen never worked for Bill Brink in Public Works. (Peterson 30(b)(6) dep. at 220, Defs.' Ex. D) Plaintiffs' citation to Peterson's 30(b)(6) deposition does not support the alleged fact.

57. Terry Fiorenzo testified that when he was Trustee he was aware that either Scott Owen or April Owen's time sheets and sign-in sheets for the Public Works Department had been changed. He started tracking some of the payroll, and saw the payroll sheets for public works. When he checked the payroll sheet again at the Village Hall, the amount of hours in the payroll sheets had been changed. (Fiorenzo Dep. at 74-75, Ex. 1.)

**RESPONSE**: Denied. Fiorenzo testified that, a long time ago, he saw some worksheets at the Public Works Department. He then checked a payroll sheet at Village Hall, and the amount of hours had been changed. He only remembers the name Owen on that sheet. (Fiorenzo dep. at 74-75, Pltfs.' Ex. 1.)

58.     Plaintiff Valentino believed Sally Marrufo was being ghost pay rolled. (Valentino Dep. at 36, 126, Defs.' Ex. C.)

**RESPONSE**:  Defendants admit that Valentino held such a belief, but deny that Marrufo was being ghost pay rolled.

59.     Sally Marrufo had been receiving 3 checks in a month.  (Valentino Dep. at 36, 126, Defs.' Ex. C)

**RESPONSE**:  Denied.  On occasion, Marrufo may have received three checks— two payroll checks and a third payment for waiving medical insurance.  (Peterson 30(b)(6) dep., pp. 131-132, Defs.' Ex. D)

60.     As another example, according to one of Plaintiff Valentino's post-it" notes reflecting times when certain employees were not at work, she noted that Sally Marrufo was out sick on September 17, 2002." Despite the fact that Sally Marrufo was not at work she was paid for 6.5 hours on that day.  (Valentino hand written note, Ex. 10; Marrufo timesheet, Ex. 11.)

**RESPONSE**:  Denied.  The daily sign-in sheet for September 17, 2002, shows Marrufo signing in at 8:00 a.m., out at 11:30 a.m., in again at 12:01 p.m., out at 2:00 p.m., in at 5:45 p.m., and leaving at 6:15 p.m.  (S000299, Pltfs.' Ex. 11)

61.     Plaintiff Bramanti was aware and discussed with a number of trustees about complaints they had regarding Ron Diedrich (Police Chief) being ghost pay rolled. (Bramanti Dep. at 44-46, Defs.' Ex. B)

**RESPONSE**:  Denied.  In 1999, Bramanti knew of trustees who were complaining about Chief Deiderich.  (Bramanti dep. at 48, Defs.' Ex. B)  When he saw Diederich at home, Bramanti does not know if Diederich was taking a sick day, vacation day, or personal day.  (Bramanti dep. at 12-13, Defs.' Ex. B)

62.     Trustee Joe Kudra recalls issues being raised by other Trustees about Chief of Police (Ron Diedrich) and whether or not he was putting in his time. (Joe Kudra Dep. at 29, Ex. 2.)

**RESPONSE**:  Denied.  Kudra recalls there was concern about the Chief of Police actually putting in his time, but does not know if this was a concern specifically about ghost pay rolling.  (Kudra dep. at 29, Pltfs.' Ex. 2)

63.     Plaintiff Valentino complained to Terry Fiorenzo and Joe Kudra (Village Trustees) about Defendant Peterson's work attendance and being paid.  (Valentino Dep. at 163-167, Defs.' Ex. C.)

**RESPONSE**:  Denied.  Valentino has no documents or materials showing that Peterson was paid for hours not worked.  She did not keep a written record of Peterson's

hours and cannot say how may days he missed. (Valentino dep., at 162-164, Defs.' Ex. C)

64.    As for the "daily time schedules" ("sign-in" sheets), only those that appear to be suspect are those for Mayor Owen's children (Erika, Eric, and Scott, mainly) and Sally Marrufo. The handwriting with respect to those "completed" by Mayor Owen's children are all in the same handwriting as if they were all completed at the same time and filled in at the bottom and not in sequential order. (See Sign-In Sheets, ex. 12)

**RESPONSE**: Denied. The fact that an individual's signature is in the same handwriting gives rise to no "suspicion." Plaintiffs give no specific citation to any allegedly suspect handwriting.

65.    Plaintiff Sandra Valentino began reporting the issues of what she believed was ghost pay rolling and the fraudulent water billing practices to Bill Bramanti. (*See* ¶¶ 42-63, *supra*; *see also* Valentino Dep. at 92-94, 156, Defs.' Ex. C; Bramanti Dep. at 77, Defs.' Ex. B.)

**RESPONSE**: Denied. Plaintiffs' citation to Valentino's deposition does not support the alleged fact. Bramanti testified that he was hearing about "the hiring of his [Owen's] family members, and it appeared that they were not working for the money they were getting," but Bramanti had no personal knowledge that the allegation was true. (Bramanti dep. at 77, Defs.' Ex. B)

<u>Plaintiff Valentino Docked When Owen's Children Were Not</u>

66.    In February 2002, Plaintiff Valentino began noticing that her paycheck was incorrect and did not reflect the correct number of hours worked. (Valentino Dep. at 70-71, Defs.' Ex. C.)

**RESPONSE**: Denied. Valentino testified that in April, 2002, she first noticed that her paycheck was being docked and asked Peterson to see her time sheets. (Valentino dep. at 70, Defs.' Ex. C)

67.    Plaintiff complained in April 2002 and requested to see her timesheets. Initially, Plaintiff's request was refused. Plaintiff was finally given her time sheet in December 2002. (Valentino Dep. at 70-71, Defs.' Ex. C.)

**RESPONSE**: Denied. Peterson never told Valentino that she could not have copies of her time sheets. Peterson told Sally Marrufo to provide the timesheets that Valentino requested and to distribute time sheets in all employees' paycheck envelopes. (Peterson dep. at 237-239, Defs.' Ex. E)

68.    In several instances, while Plaintiff Valentino's time was docked 15 minutes when she was only 5-10 minutes late, Defendant Owen's children were not

docked for similar infractions. (*Compare* Sign-In Sheets, Ex. 12, *with* Time Sheets, ex. 11.)

**RESPONSE**: Denied. Erika Owen is the only one of Mayor Owen's children whose name appears on the sign-in sheets in plaintiffs' Exhibit 12. No time sheets for Erika Owen appear in Exhibit 11. Plaintiffs' citations do not support the alleged fact.

E. Plaintiff Bramanti's Freedom on Information Act (FOIA) Requests

69.     In response to Plaintiff Sandra Valentino reporting him issues of ghost pay rolling and the fraudulent water billing practices, on or about January 21, 2003, Plaintiff Bill Bramanti submitted to Defendants several Freedom of information Act ("FOIA") Requests, which sought the following:

> (1) time cards and/or sign in sheets for Scott Owen and Yvette Owen for the months of June 2002, July 2002 and August 2002, also their hourly salary,

> (2) Copy of the Contract and/or Ordinance on the purchasing of water from the city of Chicago Heights,

> (3) A list of all accounts held by the Village including but not limited to – checking, savings, money market and C.D.'s

> (4) Account activity, checking account register and balance sheets for the Lake Michigan bond issue since its inception, and

> (5) All bond, financial, contracts and bills documents relating to the Lake Michigan water project.

(Valentino Dep. at 38, 92-94, 112-114, 122-123, 156, 168-170, 172-173, 220-221, 240-241, Defs.' Ex. C; Bramanti Dep. at 77, 142, Defs.' Ex. B; Bramanti 1/21/03 FOIA Requests, Ex. 13-; *see* ¶¶ 42-63, *supra*.)

**RESPONSE**: Defendants admit that Bramanti filed five separate FOIA requests on January 21, 2003, for the records listed in subparts 1 through 5. Defendants deny that he filed these in response to Valentino's reports to him of alleged ghost payrolling and fraud. (Peterson dep. at 190, Defs.' Ex. E)

70.     On or about January 23, 2003, Plaintiff Bramanti sent another set of FOIA requests seeking the following:

> (1) List of all commercial and industrial water users including addresses, (Bramanti 1/23/03 FOIA Requests, ex. 14.), and

(2) The check register for payroll and all bills and services paid by the Village for fiscal years 2001 to 2002 and 2002 to present, (Bramanti 1/23/03 FOIA Requests, Ex. 14.).

**RESPONSE**: Admitted.

71.     On or about January 30, 2003, Plaintiff Bramanti received a letter from Defendant Peterson denying his FOIA request for time-cards and sign-in sheets for various employees and members of Defendant Owen's and Peterson's family who Plaintiffs believed were getting paid for hours that they had not worked. (1/30/03 Peterson FOIA denial letter, Ex. 17; Valentino Dep. at 92-94, 156, Defs.' Ex. C.)

**RESPONSE**: Denied. The letter denied Bramanti's request for time cards and sign-in sheets for Scott Owen and Yvette Owen, because the records were exempt from disclosure as an unwarranted invasion of personal privacy under the Freedom of Information Act. (Pltfs.' Ex. 17) When Bramanti appealed this denial, Mayor Owen reversed the decision in part and provided records responsive to the request within the limitations of the Freedom of Information Act. (Peterson dep., Ex. 24, Defs.' Ex. E)

72.     On or about February 3, 2003, Plaintiff Bramanti received another letter from Defendant Peterson denying his FOIA request for payroll information (2/3/03 Peterson FOIA denial letter, Ex. 18.)

**RESPONSE**: Denied. The letter denied Bramanti's request for the check register for payroll information because the records were exempt from disclosure as an unwarranted invasion of personal privacy under the Freedom of Information Act. (Pltfs.' Ex. 18) When Bramanti appealed this denial, Mayor Owen reversed the decision and provided records responsive to the request within the limitations of the Freedom of Information Act. (Peterson dep., Ex. 24, Defs.' Ex. E)

73.     On February 3, 2003, Mayor Owen threatened to fire Plaintiff Valentino, telling another employee: "[Valentino's] going to get her but canned." (Valentino Dep. at 220-221, 240-241, Defs.' Ex. C; Bramanti Dep. at 142, Defs.' Ex. B)

**RESPONSE**: Denied. Valentino was not present, and so could not know what, if anything, Owen said. Valentino heard this story from Rose Bautista. (Valentino dep. at 220, Defs.' Ex. C) Bautista recalls Owen saying that some people were not going to be around too much longer. Bautista thought he was referring to Valentino because Valentino had said she was going to a doctor's appointment but had gone somewhere else. (Bautista dep. at 53-55, Defs.' Ex. H)

74.      Defendant Owen made this comment after Plaintiff Bramanti filed his FOIA request and Defendants knew that Plaintiff Valentino had spoken to Plaintiff Bramanti. (Valentino Dep. at 220-221, 240-241, Defs.' Ex. C; Bramanti Dep. at Defs.' Ex. B.)

**RESPONSE**: Denied. Owen did not make this comment. See Response, ¶74. Owen and Peterson had known since 1995 that Valentino "spoke to" Bramanti, because both knew that she occasionally worked for Bramanti. (Peterson dep. at 81, Defs.' Ex. E; Owen dep. at 51, Defs.' Ex. F)

75. Defendant Peterson admitted that he told Sally Maruffo not to talk to Sandra Valentino because Sandra Valentino would tell William Bramanti. (Peterson Dep. at 84, Defs.' Ex. E.)

**RESPONSE**: Denied. Peterson cautioned Maruffo not to talk about confidential payroll matters in the front office among the employees there. (Peterson Dep. at 86, Defs.' Ex. E.) Peterson recalls that this occurred in the spring or summer but does not remember what year. (Peterson Dep. at 85, Defs.' Ex. E.) Peterson did not know specifically that Valentino would be telling Bramanti. (Peterson Dep. at 88, Defs.' Ex. E.)

76. On February 27, 2003, Plaintiff Bramanti sent another set of FOIA requests seeking:

> (1) The actual bills and not statement for a list of items, which was attached to the FOIA (the "bill list" was attached); and

> (2) The names of the person or if more than one person their names and the breakdown of the salary on the appropriate ordinance #02-ORD-08.

(Bramanti 2/27/03 FOIA Requests, Ex. 16.)

**RESPONSE**: Admitted.

77. Plaintiff William Bramanti submitted the FOIA requests to the Village of South Chicago Heights seeking the production of documents requested (see ¶¶ 69, 70, 76, *supra*) because he wanted to inform the taxpayers where their money was going and to expose this information. (Valentino Dep. at 172, Defs.' Ex. C.)

**RESPONSE:** Denied. Bramanti submitted these FOIA requests because he was vengeful. (Peterson dep. at 190, Defs.' Ex. E)

78. On Friday, February 28, 2003, Plaintiff Bramanti sent a letter to the citizens of the Village of South Chicago Heights addressing the possible misappropriations of funds. (2/28/03 Citizens against Corruption Letter, ex. 22)

**RESPONSE:** Denied. Bramanti's letter was a scurrilous attack on all the elected officials of the Village shortly before the election in March, 2003. (Pltfs.' Ex. 22; Owen dep. at 141-142, Defs.' Ex. F)

<u>VI. Defendants Owen and Peterson Knew about Plaintiff Valentino's Speech</u>
<u>Regarding Defendant's Unlawful Conduct</u>

79.     Defendants Owen and Peterson were aware of the FOIA requests that had been filed by Plaintiff Bramanti as they came in.  (Owen Dep. at 58-60, Defs.' Ex. F; 2/3/03 Peterson FOIA denial letter, Ex. 18; 1/30/03 Peterson FOIA denial letter, Ex. 17.)

**RESPONSE:**   Admitted.  According to standard procedure, Peterson then submitted these FOIA to the Village attorney for evaluation.  (Peterson dep. at 191, 267-268, Defs.' Ex. E)

80.     On February 3, 2003, Mayor Owen threatened to fire Plaintiff Valentino to other employees stating "she's going to get her butt canned."  This occurred immediately following Plaintiff Bramanti submitting several FOIA requests in an attempt to investigate and expose the fraud and misuse of public funds.  (Valentino Dep. at 220-221, 240-241, Defs.' Ex. C; Bramanti Dep. at 142, Defs.' Ex. B; see also Bramatni FOIA Requests, Ex. 13-16.)

**RESPONSE:**  Denied.  See Response, ¶ 74.

81.     Defendant Owen also made the statement – that "Valentino's going to get her butt canned" – on the same day that Defendant Peterson sent Plaintiff Bramanti the letter denying his FOIA request for the payroll information, among other things.  (Valentino Dep. at 220-221, 240-241, Defs.' Ex. C; Bramanti Dep. at 142, Defs.' Ex. B; 2/3/03 Peterson FOIA denial letter, Ex. 18.)

**RESPONSE:**  Denied.  See Response, ¶¶ 73, 74.

82.     Defendants knew that Plaintiff Valentino had spoken to Plaintiff Bramanti.  (Valentino Dep. at 220-221, 240-241, Defs.' Ex. C; Bramanti Dep. at 142, Defs.' Ex. B.)

**RESPONSE:**  Admitted.  Owen and Peterson obviously had known since 1995 that Valentino "spoke to" Bramanti, because both knew that she occasionally worked for Bramanti, but they did not know about her communication with Bramanti about allegations of ghost-payrolling.  (Peterson dep. at 81, Defs.' Ex. E; Owen dep. at 51, Defs.' Ex. F)

83.     Defendant Peterson admitted that he told Sally Maruffo not to talk to Sandra Valentino because Valentino would tell William Bramanti.  (Peterson Dep. at 84, Defs.' Ex. E.)

**RESPONSE:**  Denied.  See Response, ¶ 75.

84.     Defendant Peterson knew of Plaintiff Valentino's complaints about the water billing issues and Minotti failing to comply with closing requirements and not having to pay the required fees. (Valentino Dep. at 204, 206, Defs.' Ex. C; Valentino 9/13/02 memo, Ex. 5)

**RESPONSE:** Denied. Peterson knew of tension between Valentino and Minotti and her complaints about him, and investigated these complaints. (Peterson dep. at 214-215, 294-295, Defs.' Ex. E)

85.     Defendant Peterson admits that Plaintiff Valentino had complained to him in regards to the issues she had with Joe Minotti. (Peterson Dep. at 136, 173, 186, 220-221, 294-295, Defs.' Ex. E.)

**RESPONSE:** Admitted.

86.     After Bramanti submitted the January 23, 2003 FOIA request, he was allowed to review a "bill list." While Plaintiff Bramanti was reviewing these documents at the Village Hall in the treasurer's office, Defendant Peterson walked in and saw Plaintiffs Bramanti and Valentino asking the treasurer questions about the "bill list." (Peterson Dep. at 255-260, Defs.' Ex. E.)

**RESPONSE:** Admitted.

87.     Plaintiff Valentino had complained to Plaintiff Bramanti on several occasions about the issues with the water billing and what she believed was ghost pay rolling. (Valentino Dep. at 38, 44, 112-114, 122-123, 168-170, 172-173, 179-180, 184-185, 198-199, 276, Defs.' Ex. C.)

**RESPONSE:** Admitted. Valentino never informed Peterson or Owen about what she believed was ghost pay rolling. (Valentino dep. at 121-122, Defs.' Ex. C)

88.     Following receipt of the FOIA requests from Bramanti and immediately following notification to Defendants of Bramanti's letter to the residents of February 28, 2003, Defendant Peterson went to Plaintiff Valentino's desk (that evening), rifled through her desk drawer, and found copies of some of her sign-in sheets, and Valentino's notes about those employees she believed were not being docked when they did not show up to work and were getting paid for time that they were not working. (Valentino Dep. at 122-123, 127-145, 238-241, Defs.' Ex. C.) Valentino was also keeping notes in her desk about Joe Minotti, Lou Bednarek, and the fraudulent water billing practices (Valentino Dep. at 238-241, Defs.' Ex. C.)

**RESPONSE:** Denied. Bramanti's letter is dated February 28, 2003, and it was sent to Village residents by U.S. Mail. (Owen dep., Ex. 5, Defs.' Ex. F; Bramanti dep. at 190, Defs.' Ex. B) Peterson could not have received a copy of the letter the same day it was mailed, so he could not have known about this letter on February 28, 2003. Peterson was most concerned about copies of the sign-in sheets found in Valentino's desk. (Owen

dep. at 33, Defs.' Ex. F)  Peterson did not know, until Valentino was deposed in this case, that she was keeping notes on other employees' time.  (Peterson dep. at 236-237, Defs.' Ex. E)

## VII. Retaliatory Termination of Sandra Valentino

89.    On February 28, 2002, immediately following Defendants' receipt of Plaintiff Bramanti's February 28, 2003 letter to citizens of the Village of South Chicago, and immediately following the submission of the FOIA requests by Plaintiff Bramanti, Defendant Peterson rummaged through Sandra Valentino's desk drawer and found her notes on the fraudulent water billing practice, the ghost pay rolling, and copies of some of her sign-in sheets.  (Valentino Dep. at 122-123, 127-145, 238-241, Defs.' Ex. C; Peterson Dep. at 316-317, Defs.' Ex. E; Defendant's 3rd Request to Admit Facts, No. 1, Ex. 23; Kurtz 37.2 Letters, Ex. 27.)

**RESPONSE:**  Denied.  Peterson could not have received Bramanti's February 28, 2003, letter the same day it was mailed.  See Response, ¶88.  Bramanti's first FOIA requests were submitted in January, 2003, more than a month prior to Valentino's termination.  See Response, ¶ 70.  Peterson found copies of the daily sign-in sheets in Valentino's desk.  There were other papers in the desk, but Peterson had no idea what they were.  (Peterson dep. at 317, Defs.' Ex. E)

90.    The very next business day (the next day that Valentino worked), on March 3, 2003, Defendant Peterson called Plaintiff Valentino into the office and told her: she was being terminated for these (holding the sign-in sheets and other documents – Valentino's notes – in his hand) and that he believed that she was making copies from Plaintiff Bramanti and taking them out of the office, which Plaintiff Valentino denies.  (Valentino Dep. at 234-235, Defs.' Ex. C.)

**RESPONSE:**  Denied.  Peterson was holding in his hand the copies of the daily sign-in sheets Valentino had copied for a week starting on February 24, 2003, not any additional notes or papers.  (Valentino Dep. at 176-177, 234-235, Defs.' Ex. C.)  Peterson had no knowledge that Valentino was taking the sign-in sheets out of the office.  (Peterson dep. at 323, Defs.' Ex. D)

91.    Defendants claim that Plaintiff was terminated for "theft of Village property," i.e., sign-in sheets.  (Peterson 30(b)(6) Dep. at 322-323, Defs.' Ex. D.)

**RESPONSE:**  Admitted.  The Village attorney advised that Valentino could be terminated for theft of Village property, and Peterson acted upon that advice.  (Owen dep. at 37, 55, Defs.' Ex. F)

92.    Peterson admitted that the documents he was accusing her of "taking," he found in her desk and that they had no knowledge and did not see her actually taking anything out of the office.  (Peterson 30(b)(6) Dep. at 322-323, Defs.' Ex. D)

**RESPONSE:** Admitted.

93. Defendant Peterson also admitted that the sign-in sheets were not private and that anyone could see them and that there is no policy that restricts an employee from keeping copies of the daily sign-in sheets. (Peterson 30(b)(6) Dep. at 122, Defs.' Ex. D.)

**RESPONSE**: Admitted.

94. Defendant Peterson informed Defendant Owen that he found documents in Ms. Valentino's desk (her notes about the fraudulent water billing practices and some of the sign-in sheets) and that he was not happy about it. Owen testified that he told Peterson that it was okay with him (Owen) to terminate Valentino. (Peterson Dep. at 84, Defs.' Ex. E; Owen Dep. 18-20, Defs.' Ex. F.)

**RESPONSE**: Denied. Peterson informed Owen that Valentino had copies of sign-in sheets in her desk. Owen told Peterson to call the Village attorney. When Peterson told Owen the attorney's advice, Owen agreed with Peterson's recommendation to terminate Valentino. (Owen dep. at 18-19, 33-35, 55, Defs.' Ex. F)

95. Defendant Peterson made the decision to terminate Plaintiff Valentino at the direction of and with the consent of Defendant Owen. (Owen Dep. at 18-20, Defs.' Ex. F; Peterson Dep. at 84, Defs.' Ex. E; Fiorenzo Dep. at 148, Ex. 1.)

**RESPONSE**: Denied. See Response, ¶94.

96. Defendants terminated Plaintiff Valentino's employment because they believed that Plaintiff Valentino had and did expose Defendants' ghost pay rolling, fraudulent payments and overpayments to employees and purported employees of the Village of South Chicago Heights, fraudulent billing practices with respect to Village's water bills and collection of payments, and other fraudulent and other unlawful conduct. (Valentino Dep. at 240-241, Defs.' Ex. C.)

**RESPONSE**: Denied. Defendants terminated Valentino for theft of Village property. See Response, ¶ 91.

97. Plaintiff Valentino provided this information to Bill Bramanti who then engaged in an investigation and submitted FOIAs to the Village in an effort to further investigate this information, and then disclosed the information and apparent cover-up by Defendants, in that Defendants refused to provide the information requested, to the residents of the Village of South Chicago Heights. (Valentino's Dep. at 92-94, 156, 240-241, Defs.' Ex. C; 1/30/03 Peterson FOIA denial letter, Ex. 17.)

**RESPONSE**: Denied. Defendants did not refuse to provide information in response to Bramanti's FOIA requests, but rather forwarded each request to the Village attorney, who advised them on what records were or were not exempt from disclosure under the Freedom of Information Act. See Response, ¶¶ 71, 72.

98.     The evidence in the record suggests that in fact Defendants were engaging in ghost pay rolling and other fraudulent and illegal acts, and thereby unlawfully depleting public funds.  (Valentino hand written notes, Ex. 10; Faoro timesheets, Ex. 11; Valentino Dep. at 112, 36, 126, Ex. Defs.' Ex. C; Marrufo timesheet, Ex. 11; *see also* ¶¶ 42-64, *supra*.)

**RESPONSE:**  Denied.  See Response, ¶¶ 42-68.

### VII. Defendants' Retaliation Against Plaintiff William Bramanti

#### A. Defamatory Letters from Defendant Owen

99.     On or about March 11, 2003, Defendant Owen sent a letter to citizens of the Village of South Chicago Heights defaming and slandering Plaintiff Bramanti, stating in part: "It strikes me as odd that these charges are likely coming from someone I had to fire because he wanted me to ghost payroll him."  Defendant Owen made these false statements to the public in retaliation for Plaintiff Bramanti's attempts to discover and disclose the fraudulent and unlawful conduct by Defendants.  (Bramanti Dep. at 192-195, Defs.' Ex. B; Owen Dep. at 250-251, Defs.' Ex. F; 3/11/03 Owen letter, Ex. 9.)

**RESPONSE:** Defendants admit that the letter contains the statement quoted, but deny that the statement is false and deny that the statement constituted retaliation.  In 2001, Bramanti worked full-time for the Village of Glenwood.  He did not perform his duties satisfactorily as a part-time inspector at South Chicago Heights, yet he refused to accept a position as a consultant that reflected his actual job performance.  (Peterson 30(b)(6) dep. at 14-15, Defs.' Ex. D; Owen dep. at 20-21, 24-25, 93, Defs.' Ex. F)

100.     A second time in March 2003, Defendant Owen again slandered and defamed Plaintiff Bramanti by sending out another letter to the citizens of the Village of South Chicago Heights that stated in part: "It is Mr. Bill Bramanti, the person who wanted me to ghost payroll him."  (3/03 Owen Letter, Ex. 9.)

**RESPONSE**:  Defendants admit that the letter contains the statement quoted but deny that the statement is false or defamatory.  See Response, ¶ 99.

101.     The defamatory letters were also given to the Mayor of Glenwood and at least one trustee.  These letters were also distributed to the public of Glenwood. (Bramanti Dep. at 217-218, Defs.' Ex. B.)

**RESPONSE:** Denied.  Bramanti does not know how the letters became public in Glenwood, does not know how the mayor and a trustee got the letters, and received maybe six telephone calls about the letters, from residents he cannot recall.  (Bramanti Dep. at 214-218, 230, Defs.' Ex. B.)

24

102.    These retaliatory actions have caused some of the Citizens to question Plaintiff Bramanti's abilities in the Village of Glenwood and caused Bramanti to suffer damages including but not limited to humiliation, damage to his integrity, reputation, emotional distress, embarrassment and humiliation. (Bramanti Dep. at 218-223, 227-228, 230, Defs.' Ex. B.)

**RESPONSE:** Denied. See Response, ¶ 101. Bramanti is unable to identify any lost business attributable to the controversy with Owen, and cannot describe any humiliation or distress he has suffered. He has not south counseling or psychological help for any distress. (Bramanti dep. at 227-229, 236, Defs.' Ex. B)

103.    After Bramanti resigned from the Village, Defendant Peterson had went to talk to Plaintiff Bramanti several times to offer him a job and about returning to the Village after his resignation. (Bramanti Dep. at 221-222, Defs.' Ex. B.)

**RESPONSE**: Admitted.

104.    After Plaintiff Bramanti resigned, Defendant Owen had instructed Lou Bednarek to ask Plaintiff if he would also take a consulting job with the Village to help Bob Carl out and that he would make $6000 to $8000 per year. Lou Bednarek did go and ask Plaintiff Bramanti about the consulting job. Defendant Owen at that time did not believe Plaintiff was engaging in "ghost pay rolling." (Owen Dep. at 92-95, Defs.' Ex. F.)

**RESPONSE**: Defendants admit that Bednarek and numerous other people talked to Bramanti about a consulting job, but deny that Owen testified as alleged in paragraph 104. Owen testified that, at that time, he did not know how few inspections Bramanti was doing as building inspector for the Village. (Owen dep. at 96, 111-112, Defs.' Ex. F)

105.    Plaintiff Bramanti, as citizen and business owner in the Village of South Chicago Heights, was concerned about the diversion of public funds for private and political use. (Bramanti Dep. at 84, Defs.' Ex. B.)

**RESPONSE:** Denied. Bramanti believed he was treated unfairly by being offered a job at less pay, when he was not performing his duties as building inspector. (Bramanti dep. at 92, 116, Defs.' Ex. B)

## B. Fraudulent Water Bill

106.    In or about May 2003, Plaintiff Bramanti received a fraudulent bill for water services in the form of a letter from Bob Carl in excess of the actual amount owed. (Bramatni Dep. at 126-130, Defs.' Ex. B; *see* Carl Letter, Ex. 24.)

**RESPONSE:** Denied. Bramanti had no account for water service set up with the Village, and Carl sent a letter stating the amount Bramanti was in arrears for water service to his property since 1998. (Valentino dep. at 231-233, Defs.' Ex. C; Peterson dep. at 155-163, Defs.' Ex. E)

107.    Defendants sent Plaintiff Bramanti this bill in retaliation for his attempts to disclose Defendant's unlawful practices and in response to the letters Bramanti send to the residents of the Village of South Chicago Heights.  (Bramanti Dep. at 126-130, Defs.' Ex. B; *see* Carl Letter, Ex. 24.)

**RESPONSE:** Denied.  See Response, ¶106.

108.    Peterson testified that he had a conversation with Bob Carl in April 2003 **prior** to the letter being sent to Plaintiff.  Bob Carl sent the letter after talking to Paul Peterson.  Defendant Peterson authorized the letter from Bob Carl to Plaintiff Bramanti. (Peterson Dep. at 276, 278, Defs.' Ex. E; Carl Letter, Ex. 24; Bramanti Dep. at 126-130, Defs.' Ex. B.)

**RESPONSE:** Denied.  Peterson testified that he received a telephone call from Bramanti about a letter that Bramanti had received from Bob Carl about water service fees and charges.  That was the first time Peterson heard about this letter.  Peterson then talked to Carl, who said he sent the letter based on the information he had.  Peterson told him to research the matter further.  (Peterson dep. at 155-164, Defs.' Ex. E)

109.    David Owen and Paul Peterson had a hand in the fraudulent water bill for water service at 175 East 34th Street.  Plaintiff Bramanti testified that "Dave Owen's been with the village for over 30 years.  Nothing happens there without him knowing about it" and that Peterson had a hand in it.  (Bramanti Dep. at 125-127, Defs.' Ex. B.)

**RESPONSE:**  Denied.  See Response, ¶ 106-108.  Bramanti has no personal knowledge or evidence that either Peterson or Owen had anything to do with the letter sent by Carl.  (Bramanti dep. at 125-126, Defs.' Ex. B)

110.    Peterson testified that if there were any problems with water billing he would be informed about them, in fact, he testified that he talked to Bob Carl about the issue regarding the water service and water bill at Bill Bramanti's property at 175 East 34th Street in April 2003.  The letter from Carl was not sent until May 2003.  (Peterson Dep. at 94, 106-109, 159, 164-165.)

**RESPONSE:** Denied.  See Response, ¶ 108.

111.    David Owen testified that any problems or adjustments would have to get approved through him or through Peterson.  (Owen Dep. at 44, Defs.' Ex. F.)

**RESPONSE**:  Denied.  Owen testified that, when the Village went over to Lake Michigan water in about 2000, in order for any employee working in the billing department to make adjustments, the adjustment would have to be approved by Peterson or Owen.  (Owen's dep. 44, Defs.' Ex. F)  The letter sent to Bramanti by Bob Carl had nothing to do with an adjustment.  (Carl Letter, Pltfs.' Ex. 24)

112.    Plaintiff Bramanti responded to this letter and never received any bills, shut-off notices or correspondence after that.  (Bramanti Dep. at 131-132, Defs.' Ex. B; Bramanti 6/2/03 Letter, Ex. 25)

**RESPONSE:**  Admitted.  After Peterson talked to Carl about Carl's letter to Bramanti, he asked Carl to look further into the matter.  The issue slipped through the cracks after Carl's death in 2003 and when new people were brought on to do the water billing.  Peterson saw only the letter Carl had written, not any written response from Bramanti.  (Peterson dep. at 161-165, Defs.' Ex. E)

113.    Plaintiff Bramanti made a second attempt at resolving this issue by sending another letter requesting a response.  (Bramanti 8/18/03 Letter, Ex. 26.)

**RESPONSE:**  Admitted.  See Response, ¶112.

114.    To date, Defendants have taken no action to correct the fraudulent water bill or send Plaintiff Bramanti a corrected bill.  (Bramanti Aff., Ex. 32.)

**RESPONSE:**  Defendants admit that they have not attempted to resolve this issue, because of the pendency of this lawsuit, but deny that the bill was fraudulent.  See Response, ¶ 112.

## C. Defendants' Attempted to Interfere With Plaintiff Bramanti's Job at Village of Glenwood

115.    Right after Plaintiff Bramanti filed the first FOIA requests, both Defendant Peterson and Defendant Owen went to the Village of Glenwood Mayor and Village administrator in an effort to humiliate and intimidate Plaintiff Bramanti, who worked for the Village of Glenwood.  (Bramanti Dep. at 213-214, 244, Defs.' Ex. B.)

**RESPONSE:**  Denied.  Bramanti testified that Owen telephoned the mayor of Glenwood, but Bramanti cannot remember anything about the conversation that the mayor of Glenwood told him.  Bramanti admits that the mayor of Glenwood called Owen a jerk, and that anything Owen might have said would not affect his position at Glenwood.  (Bramanti dep. at 213-217, Defs.' Ex. B)

116.    On January 22, 2003, Defendant Peterson served a FOIA request on the Village of Glenwood, requesting records related to Plaintiff Bramanti's hire dates, hours expected to work, hours actually worked, salary, time sheets, time cards, sign-in sheets among other things.  (Peterson 1/22/03 FOIA Request to Glenwood, Ex. 19.)

**RESPONSE:**  Admitted.

117.    Defendant Peterson filed his FOIA request to Glenwood the day after Plaintiff Bramanti submitted his to the Village of South Chicago Heights.  (Bramanti 1/21/03 FOIA requests, Ex. 13; (Peterson 1/22/03 FOIA Request to Glenwood, Ex. 19.)

**RESPONSE:**  Admitted.

118.  Plaintiff Bramanti submitted additional FOIA requests and each time Defendant Peterson countered with requests of his own that mirrored what Plaintiff Bramanti had asked for.  (Bramanti 1/23/03 and 1/31/03, Ex. 14-15; Peterson 1/23/03 and 1/31/03 FOIA Request to Glenwood, Ex. 20-21.)

**RESPONSE:**  Denied.  Peterson's requests do not "mirror" Bramanti's.  The bulk of Bramanti's requests were for records related to contracts, ordinances, accounts, and a bond issue concerning the Village's acquisition of Lake Michigan water.  Peterson's FOIA requests had nothing to do with general projects of the Village of Glenwood, but rather with Bramanti's position in the Village as building inspector.  (Pltfs.' Exs. 14-15 and 20-21)

119.  Peterson testified that he submitted these FOIA requests because he wanted to find out information about Plaintiff Bramanti and was curious and he could not recall why all of sudden, after Plaintiff Bramanti filed a FOIA request, he wanted to find out information about Plaintiff Bramanti.  (Peterson Dep. at 193-195, Defs.' Ex. E.)

**RESPONSE:**  Denied.  Peterson testified that he did not file FOIA requests with the Village of Glenwood in response to Bramanti's requests to South Chicago Heights. Peterson testified that he wanted to find out information about Bramanti and that he was curious about Bramanti's salary, because Bramanti complained that Bob Carl was paid more than Bramanti was.  Peterson did not submit the request in retaliation for Bramanti's filing of FOIA requests with the Village.  (Peterson dep. at 194-195, Defs.' Ex. E)

## IX. Defendants Destroy and Alter Documents

### A. Plaintiff's Notes about Ghost Pay Rolling and Unlawful Water Billing Practices That Were in Her Desk

120.  Plaintiff Valentino left various notes in her desk reflecting ghost pay rolling and fraudulent water billing practices.  (Valentino Dep. at 181, 238-239, 263, Defs.' Ex. C)

**RESPONSE**:  Denied.  When asked whether she was keeping notes about ghost pay rolling in her desk, Valentino testified, "I can't remember every single note that I did keeping there," and "Regarding ghost payrolling? I don't think I had any notes left there."  (Valentino dep. at 238-239, Defs.' Ex. C)

121.  Defendants have failed and refused to produce those notes, despite the fact that Defendants admit that they took them out of Plaintiff's desk and terminated Plaintiff based on those notes. (Peterson Dep. at 316-317, Defs.' Ex. E; Defendant's 3rd Request to Admit Facts, No. 1, Ex. 23; Kurtz 37.2 Letters, Ex. 27.)

**RESPONSE:** Denied. Plaintiffs' citation to defendants third Request to Admit Facts does not support the alleged fact of paragraph 121; there is no item concerning these notes in defendant's Request. Plaintiffs' citation to Peterson's deposition does not support the alleged fact; Peterson's testimony concerns the sign-in sheets he found in Valentino's desk, not any notes. Plaintiff's citation to counsel's 37.2 Letters does not support the fact alleged in paragraph 121; the letters contain no reference to any notes from Valentino's desk.

B. Defendants' Alteration of Time-Sheets and Sign-In Sheets to Cover-Up the Fraud

122.    Defendants produced a sign-in sheet for Sally Marrufo for September 17, 2002, despite the fact that she was out of the office sick that day. (Valentino hand written note, Ex. 10; Marrufo Sign-In Sheet, Ex. 12.)

**RESPONSE:** Denied. The daily sign-in sheet for September 17, 2002, shows Marrufo signing in at 8:00 a.m., out at 11:30 a.m., in again at 12:01 p.m., out at 2:00 p.m., in at 5:45 p.m., and leaving at 6:15 p.m. (S000299, Pltfs.' Ex. 11) See Response, ¶ 60.

123.    Some of the time sheets appear to have been "whited" out and the time changed. (Time Sheets, ex. 11.)

**RESPONSE:** Denied. Plaintiffs have not identified which of the six time sheets in Exhibit 11 contain any such alleged whited-out time, nor have plaintiffs cited any evidence whatever to document when such corrections, if any, were made or that they were intended to cover up fraud.

124.    Defendants created sign-in sheets and timesheets after the fact to cover up the fraud. In several instances where Eric Faoro was not working, he later filled out a sign-in sheet and often times a corresponding time-sheet that only he signed. (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12; Faoro timesheets, ex. 11.)

 **RESPONSE:** Denied. See Response, ¶ 49. Plaintiffs have not cited any evidence whatsoever that Faoro's timesheets were created after the fact.

125.    Other examples of the extensive discrepancies with Defendant's sign-in sheets and time sheets and the times in which Defendant Owen's children were actually working, are the sign-in sheets for Eric Faoro where in fact it appears that he was not even working that day, either the sign-in sheet was fabricated or the time sheet was, and even the sign-in sheet is inconsistent with the time sheet that he actually worked. (Valentino hand written note, Ex. 10; Faoro sign-in sheets, Ex. 12; Faoro timesheets, Ex. 11.)

**RESPONSE:** Denied. See Responses, ¶¶ 49-54. Plaintiffs have not cited any evidence whatsoever that Owen's children's or Faoro's timesheets were created after the fact.

126. Defendants failed and refused to produce several of the payroll records and time-sheets that were requested in discovery and refused and failed to produce the originals for inspection, despite Plaintiffs' repeated requests. On many of the records, there appears to have white-out and other changes to the original, but the original was never produced. (*See* Sign-In Sheets, Ex. 12; Time Sheets, Ex. 11; Kurtz 37.2 Letters, Ex. 27.)

**RESPONSE:** Denied. Defendants repeatedly made the originals of all documents available to plaintiffs' counsel, who was unable to schedule a time to review them. Defendants further deny any changes to the original documents before copies were forwarded to plaintiffs.

## X. Pattern and Practice of Retaliation Against Other

127. Defendants retaliated against other individuals and unlawfully threatened to shut off many of those individuals water services or retaliated against them in other ways, including Rosario Delroso, Goerge Ellis, Rose Bautista, Terry Fiorenzo, and Darryl Boren, just to name a few. (*See* ¶¶ 128-148, *infra*.)

**RESPONSE:** Denied. See ¶¶ 128-148 below.

### Rosario DelGroso

128. During the 2001 election Rosario DelGroso was approached by Defendant Owen and asked why they had a sign supporting Joe Kudra. After that they were denied pickup of debris that otherwise normally would take place. (Joe Kudra Dep. at 13-15, 105-106, Ex. 2.)

**RESPONSE:** Denied. Kudra testified that the DelGrosos told him when he was running for mayor in 2001 that Owen visited them and asked why they had a sign up supporting Kudra. Kudra did not know how long after this conversation it was that the Village refused to pick up debris or how much debris they asked the Village to cart away. Kudra has no knowledge that Owen directed anyone not to pick up debris at the DelGrossos. (Kudra dep. at 16-17, 106-107, Pltfs.' Ex. 2)

129. Joe Kudra believes that he was denied insurance benefits that he believed he was entitled to for running against Defendant Owen in the 2001 election. (Joe Kudra Dep. at 56, 111-112, Ex. 2.)

**RESPONSE:** Denied. Kudra did not receive health insurance benefits that are extended to Village retirees because he did not qualify for that benefit; he was not 55

years old, disabled, or receiving social security benefits. (Owen dep. at 174-175, Defs.' Ex. F)

<u>George Bova</u>

130. After the April 2003 election, Defendant Peterson fired Plaintiff's stepfather, Mr. Bova. (Bova Dep. at 64-66, Ex. 30.)

**RESPONSE:** Denied. Bova received a termination letter from his part-time position as an electrical inspector on May 30, 2003, almost two months after the election. (Bova dep at 64-65, Pltfs.' Ex. 30)

131. Mr. Bova supported the political opponent to Mayor Owen, Joe Kudra. (Bova Dep. at 48-49, Ex. 30.)

**RESPONSE:** Admitted. Bova supported Kudra for trustee in the 2003 election. Bova does not believe that Peterson even knew that he supported Kudra. (Bova Dep. at 48-49, Ex. 30.)

132. On June 26, 2003, Defendant Peterson sent Plaintiff's stepfather, Mr. Bova, a South Chicago Heights resident, a certified letter in which he unlawfully threatened to "cut off" Mr. Bova's water. (Bova Dep. at 45-46, Ex. 30; Valentino Dep. at 91, Defs.' Ex. C; Bramanti Dep. at 150, Defs.' Ex. B.)

**RESPONSE:** Denied. Bova had requested to review his personnel file. When he came to Peterson's office, before he said anything, he slammed down a tape recorder on the desk and said he was going to tape the conversation. Peterson did not object. When Bova looked through his file, he said repeatedly, "My attorney is going to love this." Bova grabbed Peterson's arm, shoved him against the wall, and yelled at him. Finally, when Bova picked up copies of his file, he refused to pay the copying charge of 25 cents per page. After that, Peterson sent a letter requesting Bova to pay $3.25, or Peterson would shut off his water. Peterson knows that was a mistake and that he could not have done this. Bova and Peterson have known each other for a long time; Bova has threatened Peterson in the past and never done anything. Peterson knows that Bova would not do anything to hurt him. (Peterson dep. at 110-123, Defs.' Ex. E; Bova dep. at 46-48, Pltfs.' Ex. 30)

133. Mr. Bova was not late on his water bill. (Bova Dep. at 46-47, Ex. 30.)

**RESPONSE:** Admitted. See Response, ¶ 132.

134. Peterson admitted that he sent the letter because he "was angry," and that it was wrong. (Peterson Dep. at 111-112, Defs.' Ex. E.)

**RESPONSE:** Admitted. See Response, ¶ 132.

<u>George Ellis</u>

135.     George Ellis was renting a house from Terry Fiorenzo.  (Ellis Dep. at 30, Ex. 3.)

**RESPONSE:** Admitted.

136.     During the 1997 election George Ellis was asked three or four times by Lou Bednarek, at the direction of Defendant Owen, to move from his home because it did not look good to be working for the Village and living in the oppositions home.  (Ellis Dep. at 30-32, 37-40, 66-67, Ex. 3.)

**RESPONSE:**  Defendants admit that Ellis testified that he and Bednarek were drinking at Paulie's Pub in the Village on three or four occasions.  Ellis also testified that the Village has not retaliated against him for speaking out on local issues, that the Village has never retaliated against him for criticizing the way the Village is run, that Paul Peterson has never retaliated against him, that David Owen has never retaliated against him for complaining about how the village is run or for speaking out about local political issues. (Ellis Dep. at 30-32, 37-40, 50-51, 66-67, Pltfs.' Ex. 3.)  Ellis' position was eliminated by the Board of Trustees. (Kudra dep. at 62-64, Pltfs.' Ex. 2)

137.     In these conversations Lou Bednarek expressed to George Ellis that he should move "if he wants to keep his job: and then offered to find him a new place to live.  (Ellis Dep. at 36, 38-40, Ex. 3.)

**RESPONSE:** Defendants admit only that Ellis so testified.  See Response, ¶136.

138.     Mr. Ellis refused to move.  (Ellis Dep. at 37-39, Ex. 3.)

**RESPONSE:**  Admitted.

139.     In response to Mr. Ellis refusing to move, Lou Bednarek told George Ellis that "they" (referring to Dave Owen) would be getting rid of him, in regards to George Ellis' job with the Village.  (Ellis Dep. at 33-35, Ex. 3.)

**RESPONSE:** Defendants admit only that Ellis so testified.  See Response, ¶ 136. Defendants further state that Mr. Ellis' position was eliminated by the Board of Trustees. (Kudra dep. at 62-64, Pltfs.' Ex. 2)

140.     After the election, Defendant Owen sent Mr. Ellis a letter stating he was terminating Mr. Ellis.  (Ellis Dep. at 49-50, Ex. 3; 7/7/97 Termination Letter from Owen, Ex. 29.)

**RESPONSE:** Denied.  Defendants admit that the letter informed Ellis that his position of Public Works Foreman was being eliminated by the Board of Trustees. (Pltfs.' Ex. 29; see also Kudra dep. at 62-64, Pltfs.' Ex. 2)

141.  George Ellis believed he was terminated in retaliation for not moving from his home.  (Ellis Dep. at 49-50, Ex. 3; 7/7/97 Termination Letter from Owen, Ex. 29.)

**RESPONSE:** Defendants admit that Ellis held such a belief and so testified.  See Response, ¶ 136.  Defendants deny that he was terminated in retaliation for not moving from his home. (see Kudra dep. at 62-64, Pltfs.' Ex. 2)

142.  Bill Brink who was the head of Public works told George Ellis that he believed that George Ellis was "…politically gotten rid of."  (Ellis Dep. at 68, Ex. 3.)

**RESPONSE:** Defendants admit only that Ellis so testified.  Defendants further state that the position was eliminated by the Board of Trustees, not by David Owen. (Kudra dep. at 62-64, Pltfs.' Ex. 2)

143.  George Ellis and Ron Diedrich had been long time friends and after the 1997 election Ron Diedrich told George Ellis he was told to stay away from him and not to talk to him.  (Ellis Dep. at 72-73, Ex. 3.)

**RESPONSE:** Defendants admit only that Ellis so testified.

<u>Rose Bautista</u>

144.  After Defendants terminated Sandra Valentino, they retaliated against Rose Bautista in violation of the First Amendment by removing her from the senior center and transferring her to the village hall because she supported Joe Kudra in the election.  (Bova Dep. at 39-40, Ex. 30; Bautista Dep. 12-14, Ex. 4.)

**RESPONSE:** Bautista moved from her work at the Senior Center to the Village Hall in 2001, two months after the election.  Through the election, people were telling her that they (Peterson and Owen) were trying to get rid of her.  She talked to Peterson and Owen to clear the air of rumors.  She told both Peterson and Owen that she worked at Kudra's election headquarters on election night.  She is still a friend of Kudra and that is not a problem for Peterson or Owen.  Bautista has much more responsibility in the Building Department and has received pay increases.  (Bautista dep. at 6, 16-22, Defs.' Ex. G)

<u>Terry Fiorenzo</u>

145.  Terry Fiorenzo ran for Mayor of South Chicago Heights in the 1997 election against Defendant Owen.  (Fiorenzo Dep. at 45-48, 65-68, 117, Ex. 1.)

**RESPONSE:** Admitted.

146.    During this election Terry Fiorenzo's windows were shot out, eggs thrown at house, his phone lines were cut, things were stolen off his truck, and damage to several supporter's tires including his own.  (Fiorenzo Dep. at 45-48, 65-68, 117,  Ex. 1.)

RESPONSE:  Defendants admit only that Fiorenzo so testified.  Fiorenzo has no evidence that Peterson or Owen had anything to do with these alleged acts of vandalism. (Fiorenzo dep. at 45-47, Pltfs.' Ex. 1)

147.    While at a party Terry Fiorenzo was led to believe that police officer Todd Krol may have been the one who did the damage since he lived right next door to their campaign headquarters.  (Fiorenzo Dep. at 45-48, 65-68, 117, Ex. 1.)

RESPONSE: Defendants admit only that Fiorenzo so testified.  Fiorenzo has no evidence that Peterson or Owen had anything to do with these acts of vandalism. Fiorenzo believes that "Todd's the kind of guy that would think he'd be doing somebody a favor by doing it [vandalism]," and Fiorenzo also questioned his qualifications for appointment as a police officer.  Fiorenzo complained to the police department about all the police, because they were going down behind his election headquarters probably every 15 minutes.  (Fiorenzo dep. at 65-68, Pltfs.' Ex. 1)

<u>Darryl Boren</u>

148.    Darryl Boren had given a donation of $100 to the Kudra's campaign in 2001.  The mayor found out about it and fired Mr. Boren.  (Bramanti Dep. at 145-146, Defs.' Ex. B.)

RESPONSE: Defendants admit only that Bramanti so testified.


Respectfully submitted,

Paul Peterson and Mayor David Owen          Village of South Chicago Heights

s/ Parker H. Johnson                                        s/ Patrick J. Ruberry
Attorney for Defendants                                   Attorney for Defendant

Ellen K. Emery                                                 Patrick J. Ruberry
Parker J. Johnson                                            Dowd & Dowd, Ltd.
Ancel, Glink, Diamond, Bush,                          617 West Fulton Street
      DiCianni & Rolek, P.C.                             Chicago, Illinois 60661
140 South Dearborn Street, Sixth Floor          (312) 704-4400
Chicago, Illinois 60603                                    (312) 704-4500 Fax
(312) 782-7606
(312) 782-0943 Fax