IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SANDRA VALENTINO AND WILLIAM P. )
BRAMANTI, )
 )
    Plaintiffs ) No. 04 C 2373
 )
    v. ) The Honorable William J. Hibbler
 )
VILLAGE OF SOUTH CHICAGO HEIGHTS, )
PAUL PETERSON, and MAYOR DAVID )
OWEN, in their official and individual )
capacities, )
 )
    Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Sandra Valentino and William Bramanti sued the Village of South Chicago Heights and two of its officials, alleging that the Village and officials retaliated against them for exercising their First Amendment rights. Defendants move for summary judgment.

### I. Factual Background

Sandra Valentino and William Bramanti both worked for the Village of South Chicago Heights. (Pl. 56.1(b)(3)(C) Statement ¶¶ 2-3). In 2001, Bramanti resigned his position because of disagreements with Mayor David Owen. (Bramanti Dep. at 77-78; Peterson July 15 Dep. at 14).[1] Bramanti believed, but had no evidence to support his belief, that Owen was using his position as Mayor to obtain jobs for family members who were not performing the work for which they were hired. (Bramanti Dep. at 77-78). In early 2002, Paul Peterson, the Village Administrator, met with

---

[1] Although the parties dispute the nature of the disagreements, both pointing fingers at the other, the reason for Bramanti's resignation is not a material fact.

1

Bramanti in an apparent effort to repair the rift between Bramanti and Owen and to seek Bramanti's reemployment with the Village. (Pl. St., Ex. 32; Peterson July 15 Dep. at 25). The parties dispute what occurred at the meeting (which is not a material fact), but it is undisputed that Bramanti did not return to work for the Village.

Several months later, Valentino, who worked in the Village's Water Department, complained that Joe Minotti failed to enforce compliance with shut off procedures and bill payment. (Pl. St. at ¶¶ 25, 28). Valentino believed that Minotti selectively enforced water shut off procedures to sway residents of the Village to vote for Owen or his slated trustee candidates. (Pl. St. at ¶ 30). In September 2002, Valentino confronted Minotti at the Village offices regarding his home closing, which she believed to have been conducted illegally. (Valentino Dep. at 201-203). Paul Peterson, who supervised both Valentino and Minotti, investigated the incident and required both Valentino and Minotti to provide a written description of their confrontation. (Peterson July 15 Dep. at 228; Pl. St., Ex. 5). In her description, Valentino repeated her criticism Minotti for failing to perform water shutoffs and blamed Minotti for the confrontation. (Pl. St., Ex. 5). As a result of the confrontation, Valentino received a verbal warning and Minotti received a written warning. (Pl. St., Exs. 7-8).[2]

Also in 2002, Valentino began to believe that the Village employed and paid members of Owen's family for work they did not perform. The parties spend numerous pages in their summary judgment materials disputing whether Owen's family members were, in fact, being ghost payrolled. But the status of these employees is not a material fact. Valentino began keeping notes detailing the

---

[2] The text of each warning, however, was identical, and confuses the parties in the description of events.

times she believed certain Village employees were not at work. (Pl. St. at ¶ 49; Defs. Owen & Peterson St. at ¶ 27). At the same time, Valentino believed the Village was unfairly docking her pay when she was tardy, while other Village employees were not docked when they were tardy. (Defs. Owen & Peterson St. at 29; Valentino Dep. at 125-126). She then began to monitor the Village's daily sign-in sheets to verify her suspicions (both that the Village was unfairly docking her pay and that Owen's family members were not performing the duties for which they were hired). (Defs. Peterson & Owen St. at ¶ 32; Pl. 56.1(b)(3)(B) St. ¶ 32; Valentino Dep. at 128). Although Valentino shared with Bramanti her suspicions regarding the ghost payrollees, she never shared her suspicions with Peterson or Owen. (Valentino Dep. at 122-23; Defs. Peterson & Owen St. at ¶¶ 43, 44, 56, 71, 72, 73).

After Valentino shared her suspicions with him, Bramanti began submitting requests to the Village pursuant to the Freedom of Information Act. (Pl. St. at ¶ 69; Def. Peterson & Owen St. at ¶ 114). Many of Bramanti's requests were initially denied by Peterson, but later granted with limitations. (Def. Peterson & Owen St. at ¶¶ 115-127; Pl. St. at ¶¶ 70-72, 76-77). On February 28, 2003 (a Friday), Bramanti sent a letter to the citizens of the Village that, among other things, detailed his concerns over the alleged ghost payrolling of employees. (Pl. St., Ex. 22).

On March 3, 2003 (a Monday), Peterson found copies of the sign-in sheets that Valentino had made and left in her desk. (Peterson April 11 Dep. at 317-323).[3] Peterson contacted Owen, who directed him to contact the Village attorney. (Owen Dep. at 33-35). Peterson did so, and the Village

---

[3] Valentino also argues that the Village kept (and later destroyed) notes in her desk regarding her suspicions of ghost payrolling, and asks for an adverse inference against the Village for allegedly destroying the notes. In her deposition, however, Valentino states that she did not think she had any notes regarding ghost payrolling in her desk. (Valentino Dep. at 239). The Court declines her request for a negative inference against the Defendants.

3

attorney advised him that the copied sign-in sheets provided a basis to terminate Valentino. (Owen Dep. at 33-35, 55). Owen then consented to and approved of Peterson's recommendation to terminate Valentino. (Owen Dep. at 33-35, 55). The Village terminated Valentino that same day. (Pl. St. at ¶ 90).

Later in March, Owen mailed two letters to the citizens of the Village that defended his record, disputed the claims made in Bramanti's February letter, and attacked Bramanti's credibility and record. (Pl. St., Ex. 9). The letters made their way to the mayor of the Village of Glenwood, where Bramanti was employed. (Bramanti Dep. at 217-218). At some point (the record is not clear), the Mayor of Glenwood spoke with Bramanti about Owen and told Owen that she believed Owen was a "jerk." (Bramanti Dep. at 214-218). The letters did not affect Bramanti's job at Glenwood or cause him to lose any business. (Bramanti Dep. at 226-227). Two months later, Bramanti received a bill from the Village sent by Bob Carl for water services he allegedly owed. (Pl. St. at ¶ 106). Although Bramanti immediately disputed the accuracy of the bill, it remains pending. (Pl. St. at ¶¶ 112-114).

## II. Standard of Review

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The opposing party must then "go beyond the pleadings" and "designate specific facts showing that there is a genuine [material] issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). During its summary judgment analysis, the court must construe the

facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560 (7th Cir.1996).

III. Analysis

Valentino claims that the Village terminated her in retaliation for her exercise of her First Amendment Rights, asserting both a § 1983 claim (Count III) and a state claim for retaliatory discharge (Count I). Valentino bases both claims upon her attempt to expose what she believed to be the Village's ghost payrolling.

Public employees do not lose their First Amendment rights simply by virtue of their employment in the public sector. *Brooks v. Univ. of Wisc. Bd. Of Regents*, 406 F.3d 476, 479 (7th Cir. 2005); *Vargas-Harrison v. Racine Unified Sch. Dist.*, 272 F.3d 964, 970 (7th Cir. 2001). Public employers may not respond to their employees protected activity with actions aimed to deter that activity. *Garcetti v. Caballos*, — U.S. —, —, 126 S.Ct. 1951, 1957, 164 L.Ed. 2d 689 (2006). Public employees do not, however, have an unfettered right to express themselves on matters related to their jobs. *Brooks*, 406 F.3d at 479.

To establish a *prima facie* case of First Amendment retaliation, a public employee must present evidence that: 1) she engaged in constitutionally protected speech; 2) she suffered a deprivation likely to deter the exercise of her First Amendment rights; and 3) her speech was a motivating factor in the employer's action. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006); *Brooks*, 406 F.3d at 479. If a plaintiff establishes a *prima facie* case, the burden shifts to the public employer to demonstrate that it would have taken the same action in the absence of the protected speech. *Massey*, 457 F.3d at 717; *Brooks*, 406 F.3d at 479. If defendants carry that burden, the plaintiff must produce evidence from which a reasonable fact finder could conclude that the

defendants' proffered reasons were pretextual, or put another way, that the explanations were lies. *Massey*, 457 F.3d at 717.

Valentino argues that she engaged in protective speech when she attempted to expose ghost payrolling. Valentino admits that she did not report her suspicions to Peterson or Owen, but that failure does not necessarily doom her claim. Her speech need not be directed to her supervisors in order to be protected. Instead, when determining whether a public employee engaged in protected speech, courts employ the balancing test set forth in *Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968), and *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Under that test, the Court must determine first if the speech involved a matter of public concern and, if it did, whether the government's interest in providing effective and efficient services outweighs the employee's interest as a citizen in commenting on the matter. *Sullivan v. Ramirez*, 360 F.3d 692, 698 (7th Cir. 2004).

Peterson and Owen argue, unconvincingly, that Valentino's complaints touch only upon personnel matters and therefore do not address a matter of public concern. The Seventh Circuit has held unequivocally that speech involving documentation of time abuse addresses a matter of public concern. *Marshall v. Porter County Plan Comm'n*, 32 F.3d 1215, 1219-20 (7th Cir. 1994). Comment on government corruption is a quintessential matter of public concern, and Defendants' claims to the contrary are frivolous. *See, e.g., Brooks*, 406 F.3d at 484; *Sullivan*, 360 F.3d at 699; *Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000); *Lickiss v. Drexler*, 141 F.3d 1220, 1222 (7th Cir.1998); *Propst v. Bitzer*, 39 F.3d 148, 152 (7th Cir. 1994); *Marshall*, 32 F.3d at 1219-20; *Breuer v. Hart*, 909 F.2d 1035, 1038 (7th Cir. 1990). Peterson and Owen also make an argument relying on the *Pickering* balancing test, but they also base that argument on the faulty premise that

Valentino's speech touched upon only personal matters and was not speech regarding government corruption.

The Village, on the other hand, argues that Valentino did not speak at all, because she did not address her concerns to Peterson and Owen. But the First Amendment is not so narrow. Here, Valentino communicated her concerns regarding the suspected ghost payrolling to co-Plaintiff Bramanti. The Village offers no authority to support its notion that Valentino must have complained to her supervisors and not to another member of the public.[4] Instead, they argue that they were unaware of her speech, which is not relevant to the issue of whether she engaged in protected activity but instead only relevant to whether her protected activity was a motivating factor in her termination. The Village fails to make an argument based on the *Pickering* balancing test, which is confusing. The Village certainly would have an interest in protecting the privacy of its employees. Valentino did more than merely call Bramanti's attention to potential corruption — she shared with him information that potentially would have created discontent in the workplace. Consequently, the Court holds that Valentino has established that she engaged in protected activity.

Valentino is not, however, out of the woods. She must also demonstrate that her speech was a motivating factor in her employer's decision to terminate her. Both the individual Defendants and the Village (as noted above) argue that Valentino's speech could not have been a motivating factor in her termination because neither Peterson nor Owen knew about her speech. The Seventh Circuit has made clear that a motivating factor "does not amount to a but-for factor or to the only factor."

---

[4] The Village also makes an unconvincing argument that Valentino's "speech" was based upon rumor and that "her subjective belief as to what constitutes fraud or unlawful conduct does not raise a material issue of fact." But Valentino need not prove that Village employees actually acted unlawfully to have engaged in protected activity.

*Spiegla v. Hull*, 371 F.3d 928, 942 (7th Cir. 2004). It is true that both Peterson and Owen testified during their depositions that they had no knowledge of Valentino's speech (or of Bramanti's letter) — but such a smoking gun would indeed be a rare find. A plaintiff, however, need not come forward with a smoking gun, but may rely on circumstantial proof, such as the timing of events to demonstrate a retaliatory motive. *Massey*, 457 F.3d at 717; *Culver v. Gorman & Co.*, 416 F.3d 540, 545-46 (7th Cir. 2005).

Valentino argues that she has submitted sufficient circumstantial evidence to demonstrate that her speech was a motivating factor in the Village's decision to terminate her. The undisputed facts demonstrate that Bramanti sent a letter to the citizens of the Village regarding alleged ghost payrolling, among other things, on February 28, 2003 (a Friday). On Monday, March 3, 2003, the Village terminated Valentino. The undisputed facts also demonstrate that the Village and its officials were aware of her association with Bramanti. Although Peterson and Owen both deny having knowledge of Bramanti's letter, Peterson's decision to fire Valentino just three days after Bramanti mailed the letter is sufficiently suspicious that a jury could reasonably infer that Valentino's speech (informing Bramanti of her suspicions regarding ghost payrolling) was a motivating factor in the Village's decision. *See, e.g., Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1314-15 (7th Cir. 1989); *Collins v. State of Ill.*, 830 F.2d 692, 705 (7th Cir. 1987). Consequently, the Court holds that Valentino has established a *prima facie* case of First Amendment retaliation.

The Village also argues, however, that Valentino has not satisfied the requirements of *Monell v. Dep't of Social Serv.*, 436 U.S. 58, 98 S.Ct. 2018 (1978). The Court agrees. The fact that Peterson fired Valentino is insufficient, by itself, to demonstrate that he (and Owen) had policymaking authority. *See Kujawksi v. Bd. of Com'rs of Bartholomew Co.*, 183 F.3d 734, 739 (7th

Cir. 1999). Instead, Valentino must demonstrate either that Peterson and Owen had the authority to set policy for hiring and firing or that the Village Board never reviewed Peterson's and Owen's personnel decisions. *Id.*

Valentino argues that the Village Board of Trustees merely rubber-stamped Peterson's and Owen's decisions regarding hiring and firing, and therefore, delegated final policy-making authority to them. In support, Valentino points to *Hanania v. Loren-Maltese*, 319 F. Supp. 2d. 814, 833 (N.D. Ill. 2004). But in *Hanania*, an express provision in the Town Code granted the president the discretion to contract for certain employees whenever she believed it to be in the Town's best interests. *Id.* at 833. That is not the case here. Here, it is undisputed that Peterson consulted with the Village's attorney prior to his decision to terminate Valentino. That consultation suggests that Peterson did not have the authority to set up policy for hiring and firing. Although Owen testified that he made decisions regarding terminations, that authority, as noted above, is not, by itself, sufficeint to demonstrate that Owen (or Peterson) had final policy-making authority. *See Kujawksi*, 183 F.3d at 739. Valentino also makes an unconvincing argument that the Village has a custom of retaliating against those who exercise their First Amendment rights. Plaintiffs produce a long list of people who believe they have grievances against the Village. But none of these people support their assertions on anything other than a subjective belief that the Village retaliated against them. Further, none of them connect Owen or Peterson to their alleged deprivations.

Consequently, the Court GRANTS the Village's motion for summary judgment on Count III of the Complaint because Valentino has not demonstrated that her deprivation was caused by a custom, policy or practice, or a person with final policy-making authority.

Defendants Peterson and Owen raise a different argument in their motion for summary judgment. Peterson and Owen provide a reason for Valentino's termination — Valentino had photocopied sign-in sheets (including employee signatures) and surreptiously stored them in her desk. Valentino argues that the timing of Peterson's and Owen's decision was suspicious (though she never explicitly suggests that this suggests the proffered reason was pretextual). As noted earlier it is reasonable to infer that once Peterson and Owen learned of Bramanti's letter, they may have been motivated to fire Valentino. But neither Peterson nor Owen chose to fire Valentino simply because Bramanti had written a letter to the citizens of the Village. It is undisputed that Peterson searched Valentino's desk on March 3. It is undisputed that Valentino copied employee sign-in sheets and stored them in her desk. It is undisputed that Peterson found these documents in Valentino's desk and contacted the Village's attorney, who told Peterson that he could terminate Valentino because she had taken the documents. It is undisputed that Peterson believed Valentino's copying of personnel records to have been an instance of egregious misconduct because of the invasion of employee privacy and potential for identity theft. The Village has an interest in protecting the privacy of its employees. Valentino has produced no evidence to suggest that the Village's concern about employee privacy was pretextual. Consequently, the Court also GRANTS Peterson's and Owen's motion to dismiss Count III as to them.

In Count I, Valentino presses a state-law retaliatory discharge claim against the Village. The Village argues that the Illinois Tort Immunity Act shields it from liability. *See* 745 ILCS 10/2-201 & 209. Section 2-201 provides that a public employee "serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion, even though

10

abused." 745 ILCS 10/2-201. Section 2-209 confers immunity on the Village if liability has been premised on the act of an employee who is immune. 745 ILCS 10/2-209. Here, Peterson and Owen exercised their discretion to terminate Valentino, and their act falls squarely within the plain language of the statute. See *Hanania*, 319 F. Supp. 2d at 835. Consequently, the Court GRANTS the Village's motion for summary judgment on Count I of the Complaint.

Bramanti's claims requires less discussion. In Count II, Bramanti claims that Owen defamed him in two letters written to the citizens of the Village. In the first letter, Owen writes that he had to fire "someone" who asked to be ghost payrolled. In the second letter, Owen names Bramanti as the person seeking to be ghost payrolled. Certain Illinois public officials, including mayors and administrators of municipalities, cannot be held liable for statements made in the scope of their official duties. *Geick v. Kay*, 236 Ill. App.3d 868, 876, 603 N.E.2d 121, 127 (Ill. App. Ct. 1992). This privilege provides absolute immunity against defamation suits, even if the plaintiff can demonstrate malice. *Geick*, 603 N.E.2d at 127. In this instance, Owen wrote the letters that allegedly defamed Bramanti in response to letters written by Bramanti attacking his administration. When viewed in that context, Owen's letters constitute an act performed in his duties as the Mayor — defending the Village (and its administration) from allegation of wrongdoing. *See Geick*, 603 N.E.2d at 127-29. Furthermore, Bramanti pleads in the Complaint that Owen acted at all times in the scope of his duties as Mayor. Bramanti fails to respond to the argument, and the Court grants Defendants' motions for summary judgment on Count II.[5]

---

[5] Bramanti withdrew his claim that Peterson defamed him, and only the claim against Owen remained.

Bramanti's § 1983 claim, raised in Count III, also is without merit. Bramanti bases his § 1983 retaliation claim on three allegedly retaliatory acts: Owen's distribution of the two letters mentioned before and the submission of a water bill that Bramanti claims to be false. With regard to Owen's letters, Bramanti has offered no evidence that his reputation actually suffered any harm: he did not lose his job, he cannot point to any lost contracts, and, his employer, the mayor of Glenwood, dismissed Owen's viewpoint because she held Owen in low regard. Bramanti argues that Owen's letters would have a chilling effect on any citizen who might choose to exercise his or her First Amendment rights. But Bramanti injected his voice in a public debate: whether the Village of South Chicago Heights was being run properly. Owen responded by defending his acts and implying that it was Bramanti, and not himself, who was untrustworthy. To hold that Owen's response constitutes "retaliation" for exercising his First Amendment rights would transform every political comment into a First Amendment retaliation claim and reduce political campaigns to a quagmire of lawsuits. To hold that Owen's response constitutes retaliation would therefore have a chilling effect on political discussions, and the Court declines Bramanti's invitation to transform a political squabble into a First Amendment retaliation claim. With regard to the allegedly false water bill, Bramanti has submitted no evidence that Owen or Peterson were responsible for the bill. It is undisputed that Carl sent Bramanti the bill (and that Bramanti contacted Carl to dispute it). Bramanti offers nothing but his own speculation that "Owen's been with the Village for over 30 years . . . [and] [n]othing happens there without him knowing about it" and that "Peterson had a hand in it" to support his claim that the water bill was retaliation for his exercise of his First Amendment rights. (Bramanti Dep. at 125-26). Bramanti's speculation is not sufficient to demonstrate that the Village (and more specifically Owen and Peterson) retaliated against him by sending him an

allegedly false water bill. Accordingly, the Court grants Defendants' motions for summary judgment on Bramanti's § 1983 retaliation claim.

IT IS SO ORDERED.

___9/27/06___
Dated

[signature: Wm. J. Hibbler]
William J. Hibbler
United States District Judge